Case No. 17-1010

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

SPRING CREEK EXPLORATION & PRODUCTION COMPANY, LLC,
and GOLD COAST ENERGY LLC,

*Plaintiffs-Appellants,*

v.

HESS BAKKEN INVESTMENT II, LLC f/k/a TRZ ENERGY LLC,
and STATOIL OIL & GAS LP f/k/a BRIGHAM OIL & GAS LP,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Colorado
The Honorable Philip A. Brimmer
Case No. 14-cv-00134-PAB-KMT

## APPELLANTS' OPENING BRIEF

Respectfully submitted,

Tamir I. Goldstein
John W. Mill
Joseph C. Daniels
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 297-2900

*Attorneys for Plaintiffs-Appellants*

## ORAL ARGUMENT REQUESTED

June 28, 2017

# DISCLOSURE STATEMENT

When Plaintiff-Appellant Spring Creek Exploration & Production Company, LLC ("Spring Creek") filed its Complaint (Dec. 13, 2013), Spring Creek was a Colorado limited liability company. At that time its members (and the states of their citizenship) were:

> Coleman Oil, Inc. (Colorado)
> Great Plains Exploration, Inc. (Colorado)
> TC Exploration LLC (Colorado)
> Terra Vita Energy, LLC (Colorado)
> Otter Creek Exploration, LLC (Colorado)

Spring Creek later was merged into Zavanna, LLC ("Zavanna").[1] Neither Spring Creek nor Zavanna had or has any parent corporation, and no publicly-held corporation held or holds a 10% or greater interest in them.

Plaintiff-Appellant Gold Coast Energy LLC ("Gold Coast") was a Colorado limited liability company. Its members (and their states of citizenship were):

> J. Mark McPherson (Colorado)
> B/Green Trust (Colorado)

Gold Coast was merged into Orrion Energy LLC ("Orrion") effective December 13, 2013. Orrion is a Colorado limited liability company. Its members

---

[1] Diversity jurisdiction is based on "the jurisdictional facts as they are when the complaint is filed." <u>Symes v. Harris</u>, 472 F.3d 754, 758 (10th Cir. 2006). Once jurisdiction attaches, "it cannot be ousted by subsequent events." <u>Id.</u> (citation omitted). Thus, the Spring Creek merger is irrelevant to jurisdiction.

(and their states of citizenship) at April 21, 2015 (the effective date of Gold Coast's intervention) and today are:

> J. Mark McPherson (Colorado)
> B/Green Trust (Colorado)

Neither Gold Coast nor Orrion had or has any parent corporation, and no publicly-held corporation held or holds a 10% greater interest in them.

# TABLE OF CONTENTS

Page

I. JURISDICTIONAL STATEMENT ..............................................................1

II. ISSUES PRESENTED FOR REVIEW ........................................................2

III. STATEMENT OF THE CASE ....................................................................4

    A.     Tomahawk Agreement .......................................................................5

        1.     TRZ/Hess Will Pursue Leases in the AMI .................................7

        2.     Plaintiffs Will Receive ORRI on All Leases Acquired in the AMI by TRZ/Hess or Its Successors and Assigns ...............7

        3.     Plaintiffs Agreed Not to Compete for Leases ............................9

        4.     TRZ/Hess Promised to Keep the AMI Agreement Confidential .................................................................................9

        5.     Plaintiffs Provided Leases and Confidential Information ........11

    B.     What Plaintiffs Knew During the Three-Year AMI Period ...............11

    C.     After October 2012 Plaintiffs Learned What Had Happened .............14

        1.     October 30, 2012 Brigham/Statoil Letter .................................14

        2.     Complaint ..................................................................................15

        3.     The TRZ/Hess-Brigham/Statoil Agreement .............................16

        4.     TRZ/Hess Disclosed the AMI Agreement to Brigham/Statoil ..........................................................................17

        5.     After Seeing the AMI Agreement, Brigham/Statoil Revised the TRZ/Hess-Brigham/Statoil Agreement to Attempt to Avoid the AMI Agreement's Obligations ..............19

        6.     TRZ/Hess Believed Brigham/Statoil Was Bound by the AMI Agreement and Expected Plaintiffs Would Sue When They Found Out ...........................................................19

| | | | |
|---|---|---|---|
| | 7. | The Separate Subsequent Assignment of Spring Creek Leases to Brigham/Statoil | 20 |
| | 8. | Gold Coast | 21 |
| D. | | Plaintiffs' Damages | 21 |
| IV. | | SUMMARY OF ARGUMENT | 22 |
| V. | | THE COMPLAINT STATES PLAUSIBLE CLAIMS AGAINST DEFENDANTS | 24 |
| A. | | Plaintiffs State a Plausible Claim for Breach of Contract Against TRZ/Hess for Not Pursuing Leases in the AMI Throughout the Three-Year Term | 25 |
| | 1. | The District Court Did Not Accept as True Plaintiffs' Allegations | 26 |
| | 2. | The District Court Did Not Consider the Entire AMI Agreement or the Entire Tomahawk Agreement | 27 |
| | 3. | The District Court Deprived Plaintiffs of the Benefit of the Bargain | 27 |
| | 4. | The Intent of the Parties Must Be Decided by the Jury Because the AMI Agreement Is Ambiguous | 28 |
| B. | | Plaintiffs State a Plausible Claim Against TRZ/Hess for Breach of the Covenant of Good Faith and Fair Dealing | 31 |
| C. | | Plaintiffs State a Plausible Claim Against TRZ/Hess for Fraudulent Concealment | 32 |
| | 1. | TRZ/Hess Had a Duty to Not Conceal Facts From Plaintiffs | 33 |
| | 2. | The Economic Loss Rule Does Not Bar the Fraudulent Concealment Claim | 35 |
| D. | | Plaintiffs State a Plausible Claim Against Brigham/Statoil for Tortious Interference With Contract | 36 |

E.      Plaintiffs State a Plausible Claim Against Defendants for Civil Conspiracy ................................................................................37

VI.   THE DISTRICT COURT IMPROPERLY DENIED PLAINTIFFS' MOTION FOR RECONSIDERATION ......................................37

A.      All Ten Parts of the Tomahawk Agreement Must Be Construed Together ..................................................................................39

B.      The Jury Must Decide the Factual Issue of Whether the Tomahawk Agreement Required TRZ/Hess to Pursue Leases ..........40

C.      The District Court Misapprehended Plaintiffs' Position and the Facts ......................................................................................41

D.      The District Court Should Have Allowed Plaintiffs to Submit Expert Testimony Regarding Industry Custom .................................42

VII.  ON CROSS-MOTIONS FOR SUMMARY JUDGMENT THE DISTRICT COURT ACTED AS THE TRIER OF FACT, DECIDED DISPUTED FACTUAL ISSUES AND MISAPPLIED THE LAW ..................................................................................43

A.      The AMI Agreement Is Binding on Brigham/Statoil for Three Independent Reasons ................................................................45

1.     The AMI Covenants Run with the Land ..................................46

a.    The AMI Covenants meet all requirements under North Dakota law to be covenants running with the land .................................................................... 46

b.    The District Court erroneously ruled AMI Agreements cannot run with the land. ........................... 49

2.     Brigham/Statoil Expressly Assumed the AMI Agreement .......53

3.     Brigham/Statoil Accepted the Benefits of the Tomahawk Agreement and by Law Consented to Its Obligations ..............55

B.      The Facts are Undisputed and a Reasonable Jury Could Only Conclude That TRZ/Hess Breached the AMI Confidentiality Provision ................................................................................59

C.    A Genuine Issue of Material Fact Exists on Whether the Breach of Confidentiality Claim Was Timely Filed.........................................60

    1.    The Jury Could Conclude the Claim Accrued in May-October 2012 ....................................................................61

    2.    Alternatively, the Jury Could Conclude the Claim Accrued After December 2010 ...................................62

    3.    The District Court Erred in Making Factual Findings the Claim Accrued on September 13, 2010 ...................................63

    4.    The Jury Could Conclude that TRZ/Hess's Conduct Equitably Tolled the Statute of Limitations.............................68

VIII.  PLAINTIFFS' WORKING INTEREST DAMAGES ARE PROPER BREACH OF CONTRACT DAMAGES .......................................69

IX.    CONCLUSION.............................................................................73

# TABLE OF AUTHORITIES

Page

**Cases**

Ad Two, Inc. v. City and Cty. of Denver, 9 P.3d 373 (Colo. 2000) ................ 28, 30

ADT Security Servs., Inc. v. Premier Home Protection, Inc., 181 P.3d
    288 (Colo. App. 2007) ......................................................................... 32

Allen v. Pacheco, 71 P.3d 375 (Colo. 2003) ............................................... 27

Amoco Oil Co. v. Ervin, 908 P.2d 493 (Colo. 1995) ..................................... 31, 32

Anderson Energy Corp. v. Dominion Okla. Tex. Exploration & Prod.
    Tex., LLC, 469 S.W.3d 280 (Tex. App. 2015) ....................................... 50

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................. 44, 51

Barfield v. Hall Realty, Inc., 232 P.3d 286 (Colo. App. 2010) ............................ 33

Barnes v. Harris, 783 F.3d 1185 (10th Cir. 2015) .................................................. 25

Beeter v. Sawyer Disposal LLC, 771 N.W.2d 282 (N.D. 2009) ............................ 46

Brody v. Bock, 897 P.2d 769 (Colo. 1995) ............................................................ 35

Brown v. Perez, 835 F.3d 1223 (10th Cir. 2016) .................................................. 44

Buell Cabinet Co. v. Sudduth, 608 F.2d 431 (10th Cir. 1979) .............................. 44

Cheyenne Mountain Sch. Dist. v. Thompson, 861 P.2d 711 (Colo.
    1993) .................................................................................................. 42

Cillo v. City of Greenwood Village, 739 F.3d 451 (10th Cir. 2013) ..................... 44

Crosby v. American Family Mut. Ins. Co., 251 P.3d 1279 (Colo. App.
    2010) .................................................................................................. 61

Denver Classroom Teachers Ass'n v. School Dist. No. 1, 2017 WL
    117179 (Colo. App. Jan. 12, 2017) ...................................................... 30, 41

Designer Direct, Inc. v. DeForest Redevelopment Auth., 368 F.3d 751
    (7th Cir. 2004) ................................................................................... 71

Dias v. City and Cty. of Denver, 567 F.3d 1169 (10th Cir. 2009) .........................25

Dorman v. Petrol Aspen, Inc., 914 P.2d 909 (Colo. 1996).....................................28

First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp., 744
    P.2d 1197 (Colo. 1987).........................................................................................69

Flying Diamond Oil Corp. v. Newton Sheep Co., 776 P.2d 618 (Utah
    1989) .......................................................................................................................47

Fort Lyon Canal Co. v. High Plains A & M, LLC, 167 P.3d 726
    (Colo. 2007) ...........................................................................................................42

Foster v. Mtn. Coal Co., 830 F.3d 1178 (10th Cir. 2016) ....................................43

Gallagher v. Shelton, 587 F.3d 1063 (10th Cir. 2009) ...........................................25

Geostar Corp. v. Parkway Petroleum, Inc., 495 N.W.2d 61 (N.D.
    1993) .......................................................................................................................46

Gognat v. Ellsworth, 259 P.3d 497 (Colo. 2011) ...................................................60

Golden v. Parker, 138 P.3d 285 (Colo. 2006).........................................................31

Golden v. SM Energy Co., 826 N.W.2d 610 (N.D. 2013) ......... 3, 49, 50, 52, 56, 59

Gorsuch, Ltd. v. Wells Fargo Nat. Bank Ass'n, 771 F.3d 1230 (10th
    Cir. 2014) ..........................................................................................................6, 39

Grosvenor v. Qwest Corp., 854 F. Supp. 2d 1021 (D. Colo. 2012) ......................44

H&H Distributors, Inc. v. B&B Int'l, Inc., 812 P.2d 659 (Colo. 1990)........... 33, 35

Haynes Trane Serv. Agency, Inc. v. American Standard, Inc., 573
    F.3d 947 (10th Cir. 2009) ...............................................................................35, 36

Hennagir v. Utah Dep't of Corrections, 587 F.3d 1255 (10th Cir.
    2009) .......................................................................................................................43

Houston Fearless Corp. v. Teter, 313 F.2d 91 (10th Cir. 1962) ............................38

Huffman v. Saul Holdings Ltd. Partnership, 194 F.3d 1072 (10th Cir.
    1999) .......................................................................................................................58

Hunt v. Cromartie, 526 U.S. 541 (1999) .................................................63

In Re Application for Water Rights of Town of Estes Park, 677 P.2d
    320, 327 (Colo. 1984) ................................................................ 39, 40

Jacklovich v. Simmons, 392 F.3d 420 (10th Cir. 2004) ........................44

James Barlow Family Ltd. P'ship v. David M. Munson, Inc., 132 F.3d
    1316 (10th Cir. 1997).........................................................................54

Kincaid v. W. Operating Co., 890 P.2d 249 (Colo. App. 1994)............51

Krystkowiak v. W.O. Brisben Cos., Inc., 90 P.3d 859 (Colo. 2014) .....................36

Leone v. Owsley, 810 F.3d 1149 (10th Cir. 2015) ........................... 23, 63

Lyle Cashion Co. v. McKendrick, 204 F.2d 609 (5th Cir. 1953)...........74

Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164 (S.D. Ind.
    1992) ..................................................................................................59

Philadelphia Indemnity Ins. Co. v. Lexington Ins. Co., 845 F.3d 1330
    (10th Cir. 2017).......................................................................... 49, 70

Pinkerton v. Colorado Dept. of Transp., 563 F.3d 1052 (10th Cir.
    2009) ..................................................................................... 44, 64, 67

Pioneer Real Estate, Inc. v. Larese, 762 P.2d 720 (Colo. App. 1988)....................72

Radiology Prof. Corp. v. Trinidad Area Health Ass'n, Inc., 577 P.2d
    748 (Colo. 1978) ................................................................................27

Raytheon Constructors, Inc. v. Asarco, Inc., 368 F.3d 1214 (10th Cir.
    2003) ......................................................................................... 38, 39

Resolution Trust Corp. v. Fed. Sav. & Loan Corp., 25 F.3d 1493 (10th
    Cir. 1994) ...........................................................................................70

Servants of the Paraclete v. Does, 204 F.3d 1005 (10th Cir. 2000) .......42

Shore Exploration and Prod. Corp. v. Exxon Corp., 976 F. Supp. 514
    (N.D. Tex. 1997).................................................................................51

Symes v. Harris, 472 F.3d 754 (10th Cir. 2006)...................................... i

The Superlative Group, Inc. v. WIHO, L.L.C., 2014 WL 1385533 (D. Kan. Apr. 9, 2014) ...........................................................71

Town of Alma v. Azco Constr., Inc., 10 P.3d 1256 (Colo. 2000)..........................35

TransTexas Gas Corp. v. Forcenergy Onshore, Inc., 2012 WL 1255218, at *6, 2012 Tex. App. LEXIS 2907, at **17-18, No. 13-10-00445-CV (Tex. Ct. App. Corpus Christi Apr. 12, 2012) ......................51

United States v. Premises Known as 717 S. Woodward Street, Allentown, Pennsylvania, 2 F.3d 529 (3d Cir. 1993) ...................................64, 65

Walker v. Van Laningham, 148 P.3d 391 (Colo. App. 2006) .................................37

Watson v. Cal-Three, LLC, 254 P.3d 1189 (Colo. App. 2011).............................71

Wehner v. Schroeder, 354 N.W.2d 674 (N.D. 1984) ............................................54

Westland Oil Dev. Corp. v. Gulf Oil Corp., 637 S.W.2d 903 (Tex. 1982) ..................................................................... 4, 49, 50, 51, 52

**Statutes**

28 U.S.C. § 1291 ....................................................................................................2

28 U.S.C. § 1332(a) ...............................................................................................1

C.R.S. § 13-80-101(1)(a) .....................................................................................60

C.R.S. § 13-80-108(6).........................................................................................60

N.D. Cent. Code § 47-04-24 .................................................................... 46, 50, 52

N.D. Cent. Code § 47-04-26 .................................................................... 46, 50, 52

N.D. Cent. Code § 9-03-25 ...................................................................... 23, 45, 55, 58

**Rules**

Fed. R. Civ. P. 1 ...................................................................................................38

Fed. R. Civ. P. 8(c)(1) ..........................................................................................61

Fed. R. Civ. P. 54(b) .............................................................................................38

Fed. R. Civ. P. 56(a)...................................................................43

Fed. R. Civ. P. 60(b) ..............................................................38

**Other Authorities**

1-1 <u>Corbin on Contracts</u> § 1.21 (2017) ...................................72

5-24 <u>Corbin on Contracts</u> § 24.30 (2012) ...............................30

8 Patrick Martin and Bruce Kramer, <u>Williams & Meyers, Oil and Gas Law, Manual of Oil and Gas Terms</u> (Lexis/Nexis Matthew Bender 2016) .................................................................... 2, 33, 49

Cross, Terry I., "The Ties that Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties," 5 <u>Tex. Wesleyan L. Rev</u>. 193, 215 (1999).......................48

Graham, Andrew Scott, "Real or Personal? The Area of Mutual Interest Covenant in the Williston Basin after *Golden v. SM Energy Company*," 89 <u>N.D. L. Rev</u>. 240, 254 (2013)......................... 48, 51, 52

Lansdown, Scott, "Recent Challenges to Area of Mutual Interest Agreements" at 9, 28th Annual Ernest E. Smith Oil, Gas & Mineral Law Institute (University of Texas School of Law) (Mar. 22, 2002).................48

<u>Restatement (Second) of Contracts</u> § 232................................66

<u>Restatement (Second) of Contracts</u> § 237................................70

<u>Restatement (Second) of Contracts</u> § 344........................ 71, 72

<u>Restatement (Second) of Contracts</u> § 347................................72

<u>Restatement (Second) of Torts</u> § 550 ........................ 33, 34, 35

Thomas, David A., "How Far Does the Covenant Run?: Covenants that Run with the Land in Oil and Gas Transactions," 53 Rocky Mtn Min. L. Inst. 19-1, at 9 (2007)....................................................47

## **PRIOR OR RELATED APPEALS**

There are no prior or related appeals.

# I.     JURISDICTIONAL STATEMENT

Spring Creek filed this action against Hess Bakken Investment II, LLC f/k/a TRZ Energy LLC ("TRZ/Hess") and Statoil Oil & Gas LP f/k/a Brigham Oil & Gas LP ("Brigham/Statoil") on December 13, 2013 in state court.  App. 56-115.[2] Brigham/Statoil removed this case to federal court.  App. 5.  Gold Coast intervened as a plaintiff effective April 21, 2015.  App. 388-94.  The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

The District Court dismissed many of Plaintiffs' claims, App. 214-42, denied Plaintiffs' motion for reconsideration, App. 658-63, and after extensive discovery and numerous motions granted Defendants' motions for summary judgment (and denied Plaintiffs' cross-motions for partial summary judgment). App. 4901-1 through 4901-14; App. 5641-82.

The only claims remaining were Plaintiffs' claims for past royalties due on leases where Plaintiffs have prior undisputed overriding royalty interests ("ORRI") ("the Existing Lease Claims").  App. 5665-67, 5675-78.  The parties then agreed to resolve the Existing Lease Claims in arbitration through a signed Arbitration Agreement.  App. 5684, ¶3; Ex. 1 to Appellant's Response to Court's Order Dated February 1, 2017 (Doc. 01019765906).  The District Court then dismissed those

---

[2] All references in this Opening Brief to "App." are to Appellants' Appendix.

claims and closed the case.   App. 5683-86; App. 5689-98.   The Arbitration Agreement is binding and enforceable.  The arbitration is scheduled for November 13, 2017 before Steve Briggs, at Judicial Arbiter Group.  Thus, the Existing Lease Claims will be resolved in arbitration and are not subject to further proceedings in court.

The District Court entered its Amended Final Judgment disposing of all of Plaintiffs' claims on December 21, 2016.  App. 5697-98.  Plaintiffs' Notice of Appeal was timely filed pursuant to F.R.A.P. 4(b) on January 13, 2017.  App. 5699-702.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II.   ISSUES PRESENTED FOR REVIEW

In October 2009, Plaintiffs and TRZ/Hess entered into a complex, ten-part agreement ("the Tomahawk Agreement") to mutually benefit from the acquisition and development of oil and gas interests in a sixty-seven square mile (approximately 40,000 acres) area of Williams County, North Dakota called the Tomahawk Prospect or Area of Mutual Interest ("AMI").[3]   The Tomahawk Prospect covered an area of the Bakken that was expected, and later was proved to

_____

[3] An area of mutual interest agreement is "[a]n agreement . . . by which the parties attempt to describe a geographical area within which they agree to share certain additional leases or other interests acquired by any of them in the future." 8 Patrick Martin and Bruce Kramer, <u>Williams & Meyers, Oil and Gas Law, Manual of Oil and Gas Terms</u> (Lexis/Nexis Matthew Bender 2016) ("Williams & Meyers").

be productive and valuable. Plaintiffs honored their obligations under the Tomahawk Agreement. App. 2121, ¶41. Defendants did not. App. 461-67, ¶¶8-31.

This appeal presents the following issues:

1.     The District Court erred in not accepting as true Plaintiffs' well-pleaded factual allegations, deciding Defendants' motions to dismiss without having all parts of the Tomahawk Agreement before it, dismissing parts of Plaintiffs' breach of contract claims and dismissing all of Plaintiffs' tort claims.

2.     The District Court erred in denying Plaintiffs' motion for reconsideration on procedural grounds, not fully considering the motion on the merits and not holding that the Tomahawk Agreement read as a whole at a minimum was ambiguous because it could reasonably be interpreted as obligating TRZ/Hess to pursue new leases in the AMI.

3.     The District Court erred in denying Plaintiffs' motion for partial summary judgment on liability against Brigham/Statoil for not assigning and paying Plaintiffs ORRI on the new leases Brigham/Statoil acquired in the AMI ("the Nonassignment Claim").

4.     The District Court erred in not applying the proper summary judgment standard, misunderstanding <u>Golden v. SM Energy Co.</u>, 826 N.W.2d 610 (N.D. 2013), not giving sufficient weight to cases from other states holding AMI

agreements are covenants running with the land including <u>Westland Oil Dev.</u> <u>Corp. v. Gulf Oil Corp.</u>, 637 S.W.2d 903 (Tex. 1982), ignoring evidence the AMI Agreement was a covenant running with the land, predicting that the North Dakota Supreme Court would rule AMI agreements cannot be covenants running with the land and granting summary judgment for Brigham/Statoil on the Nonassignment Claim.

5.     The District Court erred in denying Plaintiffs' motion for partial summary judgment on liability against TRZ/Hess for breaching the confidentiality provision in the AMI Agreement ("the Breach of Confidentiality Claim").

6.     The District Court erred in not applying the proper summary judgment standard, acting as the trier of fact, weighing evidence, disregarding evidence, not recognizing that TRZ/Hess had the burden of proof on its affirmative defense and granting summary judgment for TRZ/Hess on statute of limitations.

7.     The District Court erred in granting TRZ/Hess's motion for summary judgment on Plaintiffs' damages for the value of the lost opportunity to compete for and acquire leases in the AMI ("Plaintiffs' Working Interest Damages").

### III.     <u>STATEMENT OF THE CASE</u>

Spring Creek had extensive experience acquiring oil and gas leases and drilling oil and gas wells in North Dakota.  App. 688, ¶¶7-8.  By October 2009,

4

Spring Creek and Gold Coast owned over 5,409.63 net acres of oil and gas leases in the Tomahawk Prospect ("the Spring Creek Leases"). App. 689, ¶13.

In September 2009, Plaintiffs gave Coachman Energy (through an affiliate) an option to purchase the Spring Creek Leases. App. 689-90, ¶¶15-16; App. 701-07. If the option was exercised, Spring Creek intended to continue to acquire leases in and around the Tomahawk Prospect, and drill wells there. App. 689-90, ¶15; App. 2046-47, ¶¶6-9; App. 3750-51 at 128:9-129:23. Thus, the option did not contain a noncompete or AMI. App. 689-90, ¶15.

Coachman sold the option to TRZ/Hess. App. 341-45. TRZ/Hess requested to change the deal from a simple sale of leases to a broader development agreement. App. 2046, ¶7. TRZ/Hess asked to add a noncompete, the AMI and ORRI for Plaintiffs. App. 692, ¶20.

## A.    Tomahawk Agreement

On October 8, 2009, Plaintiffs and TRZ/Hess entered into the Tomahawk Agreement. App. 690-91, ¶¶17-19; App. 61, ¶33; App. 638, ¶33. The Tomahawk Agreement reflects that the parties were "actively engaged in the exploration and development of [oil and gas] leasehold interests situated in Williams. . . Count[y], North Dakota." App. 312. The Tomahawk Agreement refers to "jointly participat[ing] in the exploration and development of the Tomahawk Prospect." App. 270. "The purpose of the AMI Agreement was to facilitate exploration and

development of oil and gas resources in the Tomahawk Prospect/AMI area." App. 2046, ¶8.  To do that, Plaintiffs and TRZ/Hess pooled their assets and resources as follows:

- Plaintiffs gave confidential lease and well data to TRZ/Hess.  App. 312-13, ¶¶1-2; App. 751-52, ¶¶ 1-2.

- Plaintiffs transferred over 5,000 acres of oil and gas leases in the AMI to TRZ/Hess.  App. 58, ¶11; App. 765-81; App. 1684, ¶13; App. 1687; ¶20; App. 326-40.

- Plaintiffs agreed not to acquire leases in the AMI for three years.  App. 304-05, ¶1.

- TRZ/Hess promised to pursue the acquisition of leases in the AMI area during the three-year term.  E.g., App. 304-05, ¶1.

- TRZ/Hess agreed its obligations were binding on its successors and assigns.  App. 307, ¶11.

- TRZ/Hess agreed to assign Plaintiffs an ORRI of approximately 3% on all leases TRZ/Hess or its successors and assigns acquired in the AMI.  App. 304-07, ¶¶1, 4, 11.

- TRZ/Hess agreed to keep confidential the terms of the AMI Agreement.  App. 306, ¶5.

TRZ/Hess drafted the Tomahawk Agreement.  App. 977 at 81:6-82:4. Colorado law governs it.  App. 306, ¶7; App. 274, ¶8.  The parts of the Tomahawk Agreement must be read together.  Gorsuch, Ltd. v. Wells Fargo Nat. Bank Ass'n, 771 F.3d 1230, 1238 (10th Cir. 2014).  The ten parts of the Tomahawk Agreement can be summarized as follows:

### 1. TRZ/Hess Will Pursue Leases in the AMI

TRZ/Hess and Plaintiff agreed that "the Parties desire to establish an area of mutual interest covering the Tomahawk Prospect and **provide for the acquisition of interests by [TRZ/Hess]**." App. 81 (second recital) (emphasis added); see also App. 82, ¶3 (TRZ/Hess to retain Diamond Resources, Spring Creek's lease broker, "to acquire interests within the AMI"). Consistent with the AMI Agreement, the Complaint expressly alleges:

> The parties' intent in entering into the [Tomahawk] Agreement . . . was that [TRZ/Hess] and/or its successors and assigns would acquire additional leasehold interests within the Tomahawk Prospect throughout the term of the [AMI] Agreement.

App. 58, ¶15. This allegation is also supported by other parts of the Tomahawk Agreement. App. 270 (third recital); App. 280, ¶(f); the Letter of Intent between TRZ/Hess and Coachman, App. 343-44, ¶(f); deposition testimony by Spring Creek's William Coleman, App. 580 at 210:18-20; App. 3771 at 298:1-3; and the opinion of Plaintiffs' expert, Robin Forté, App. 3064-83.

### 2. Plaintiffs Will Receive ORRI on All Leases Acquired in the AMI by TRZ/Hess or Its Successors and Assigns

The AMI Agreement provides:

> For any oil and gas lease acquired by [TRZ/Hess] in the AMI, . . . Spring Creek and Gold Coast shall be entitled to an overriding royalty interest in such lease.

App. 81, ¶1 ("the Override Covenant"); App. 5220, ¶15.   Consistently, the

Complaint alleged that Plaintiffs were to receive ORRI on all leases acquired in the

AMI area during the AMI period.  App. 58, ¶15.

The AMI Agreement has two provisions making clear that its obligations are

binding on successors and assigns:

- "<u>Covenant Running with the Land</u>.  This AMI and all rights, covenants and conditions hereof shall be considered covenants running with the land and shall inure to and be binding upon the Parties hereto, and their respective successors and assigns."  App. 83, ¶4 ("the AMI Running with the Land Provision").

- "<u>Binding Effect</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto, and their respective successors and assigns."  App. 84, ¶11.

TRZ/Hess and Plaintiffs intended and believed the AMI Agreement obligations ran

with the land and bound successors and assigns.  App. 5047, ¶22; App. 5027 at

106:14-24.   Consistently, the Complaint alleged that Brigham/Statoil became

subject to the ORRI covenant because that obligation (1) "ran with the land," and

(2) was expressly assigned to Brigham/Statoil. App. 59-60, ¶¶18, 23-24.   The

Complaint alleged that Brigham/Statoil breached the AMI Agreement by "failing

to assign to Spring Creek its [ORRI] in the New Leases acquired by

[Brigham/Statoil] [in the AMI]." App. 62, ¶41.

### 3. Plaintiffs Agreed Not to Compete for Leases

In exchange for TRZ/Hess's promises, Plaintiffs "agreed not to acquire any other leasehold interests within the Tomahawk Prospect." App. 57, ¶10; App. 81, ¶1 ("Except for the Spring Creek ORRI, Spring Creek and Gold Coast, or their affiliates shall not be entitled to acquire any interest or otherwise compete with [TRZ/Hess] in the AMI.") ("the Noncompete Covenant"). Throughout the three-year AMI period, Plaintiffs honored the Noncompete Covenant. App. 2120, ¶¶35-36; App. 3010 at 261:5-6 (Diamond "was under strict orders not to lease anything in [the AMI]"); App. 2942-44, ¶¶8(b-c), 9(a-b).[4]

### 4. TRZ/Hess Promised to Keep the AMI Agreement Confidential

"Given that Spring Creek was agreeing not to compete with [TRZ/Hess] within the Tomahawk Prospect, it was important to both parties that the terms of the AMI [Agreement] remain confidential." App. 58-59, ¶16. The AMI Agreement clearly and unambiguously says:

> The terms of this Agreement are confidential and no Party nor any of its respective affiliates or representatives shall furnish this Agreement, or disclose any of its contents, to any third party."

---

[4] During the AMI period, Plaintiffs inadvertently acquired a miniscule 5.58 net acres of leases in the AMI that were not offered to TRZ/Hess. App. 2940-46, ¶¶5-14; App. 2941-3003; App. 3006-10 at 243:2-244:10, 245:13-250:18, 258:10-260:21, 261:5-6; App. 2534-35 at 262:24-263:19. In the 40,000 acre AMI, Plaintiffs substantially complied with the noncompete. App. 2935-36.

App. 83, ¶5 ("the AMI Confidentiality Provision").

The oil and gas industry is highly competitive. App. 2112, ¶10. Confidentiality is important in oil and gas transactions. App. 2117-18, ¶25; App. 2208 at 128:10-23; App. 2216-17 at 99:5-100:5, 122:11-17. This is particularly true regarding the acquisition of leases "in the highly competitive area of the Bakken Field in North Dakota." App. 2849.

The AMI Confidentiality Provision was a material and essential term and without it Plaintiffs would not have signed the Tomahawk Agreement. App. 2118, 2120, ¶27, ¶37; App. 2116-19, ¶¶23-26, ¶29; App. 2208 at 128:10-23; App. 2216-17 at 99:5-100:5, 122:11-17. Spring Creek relied on TRZ/Hess to comply with the AMI Confidentiality Provision. App. 2121, ¶42.

Brigham/Statoil was a competitor of Spring Creek, that Spring Creek did not want to know the terms of the Tomahawk Agreement. App. 2119, ¶29; App. 3016 at 14:6-15:2; App. 2111-12, ¶¶5-10; App. 2117, ¶24. "One of the key benefits of the confidentiality provision in the AMI Agreement was to require [TRZ/Hess] to notify Spring Creek if [TRZ/Hess] was contemplating a transaction that required [TRZ/Hess] to disclose to a third party the terms of the Tomahawk [Agreement]." App. 5053-54, ¶44; see also App. 5052-53, ¶43; App. 3760 at 235:12-15.

### 5. Plaintiffs Provided Leases and Confidential Information

Plaintiffs transferred to TRZ/Hess 5,409.63 net acres of leases in the AMI. App. 58, ¶11; App. 765-81; App. 1684, ¶13; App. 1687, ¶20; App. 326-40. Plaintiffs also gave TRZ/Hess confidential well, lease and land information. App. 751-52, ¶¶1-2.

### B. What Plaintiffs Knew During the Three-Year AMI Period

After signing the Tomahawk Agreement, TRZ/Hess acquired leases in the AMI ("the TRZ/Hess Leases") and assigned to Plaintiffs ORRI in those leases. App. 3579-94 (recorded 4/14/2010); App. 3596-3601 (recorded 7/22/2010); App. 3603-08 (recorded 12/23/2010). When the third assignment of ORRI was signed and recorded on December 23, 2010, Spring Creek "had no red flags raised," and Spring Creek believed TRZ/Hess was assigning ORRI to Plaintiffs in accordance with the AMI Agreement. App. 5206-07 at 329:9-330:2; App. 5008, ¶15.

In September 2010, Gold Coast knew that Brigham/Statoil had bought at least some leases in Tomahawk from TRZ/Hess. App. 4764. Spring Creek, however, did not learn of the TRZ/Hess–Brigham/Statoil deal or agreement until later. App. 5200 at 182:5-12; App. 4369; App. 5008, ¶12: 5009, ¶17; App. 2507 at 239:5-7.

In January or February 2011, Spring Creek learned that TRZ/Hess had sold some of the Spring Creek Leases to Brigham/Statoil. App. 5199 at 179:23-180:4;

11

App. 4369.  This did <u>not</u> cause Spring Creek to believe that TRZ/Hess had breached the AMI Confidentiality Provision.  App. 5191 at 292:7-12.  In January and February 2011, Spring Creek believed that Brigham/Statoil would be honoring the AMI Agreement and assigning to Plaintiffs ORRI on leases it acquired in the AMI.  App. 5204 at 202:6-16.

In January/February 2011, Plaintiffs believed that TRZ/Hess had complied with the confidentiality provision in the AMI Agreement.  App. 5008, ¶16; App. 5316, ¶10.

On February 3, 2011, Spring Creek asked TRZ/Hess for a copy of its agreement with Brigham/Statoil.  App. 4347-48.  TRZ/Hess refused to provide it and represented that disclosing it was prohibited.  <u>Id.</u>  In fact, the existence and terms of Defendants' agreement were not confidential and TRZ/Hess could have disclosed it with minor redactions.  App. 4637, ¶9.  If TRZ/Hess had disclosed Defendants' agreement in February 2011, Plaintiffs would have discovered TRZ/Hess's breach of the AMI Confidentiality Provision and Defendants' conspiracy, and promptly sued.  App. 5010-11, ¶23.  TRZ/Hess failed to mention material facts that if disclosed would have caused Spring Creek to sue TRZ/Hess.  App. 5010-11, ¶¶22-23.

In May 2012,[5] Plaintiffs started thinking Brigham/Statoil was not assigning them ORRI on new leases Brigham/Statoil acquired in the AMI. App. 5204 at 203:10-15; App. 4893. Spring Creek "thought maybe it was just like an oversight, or maybe they didn't quite understand something." App. 5204 at 203:16-21. Plaintiffs' started investigating. Id.

In July 2012, Spring Creek asked Diamond to investigate who was acquiring leases in the Tomahawk Prospect. App. 5155-56; App. 5011, ¶24. Prior to July 2012, Spring Creek "didn't think there was an issue," and "assumed people would honor their contracts and they would give us our override assignments." App. 5206 at 328:10-23, 326:4-10.

On August 30, 2012, Diamond sent Spring Creek a report indicating that after March 2010 TRZ/Hess stopped acquiring leases in the AMI and Brigham/Statoil acquired approximately 2,500 acres of leases in the AMI. App. 5155-87; App. 5153, ¶19. Spring Creek sent this report to Gold Coast. App. 5155; App. 5316, ¶12.

As of September 18, 2012, and at all times prior, Plaintiffs did not know, did not suspect and did not have any information suggesting that TRZ/Hess had violated the AMI Confidentiality Provision. App. 5011, ¶26; App. 5317, ¶13.

---

[5] Both Plaintiffs asserted their claims less than three years after May 2012.

On September 18, 2012, Spring Creek's counsel sent a letter to TRZ/Hess and Brigham/Statoil raising the issue that Brigham/Statoil had not yet assigned Plaintiffs' the ORRI on the leases acquired by Brigham/Statoil within the AMI. App. 4371-74.

### C.    After October 2012 Plaintiffs Learned What Had Happened

After the AMI Agreement expired on October 8, 2012, Plaintiffs finally learned what Defendants had done and concealed from Plaintiffs for years.

### 1.    October 30, 2012 Brigham/Statoil Letter

On October 30, 2012, Brigham/Statoil's lawyer sent Spring Creek's counsel a letter stating Brigham/Statoil's position it was not bound by the AMI Agreement obligations. App. 5263-64. This letter disputed Plaintiffs' position that the AMI Agreement was a real covenant running with the land and was binding on Brigham/Statoil. Id. at 5263-64.[6] Before this letter, Plaintiffs did not know that Brigham/Statoil's position was that the AMI Agreement did not run with the land and it would not pay Plaintiffs ORRI on leases it took in the AMI. App. 5011, ¶27; App. App. 5008, ¶14. This letter caused Spring Creek to believe TRZ/Hess had breached the AMI Confidentiality Provision by disclosing the terms of the AMI Agreement to Brigham/Statoil before TRZ/Hess and Brigham/Statoil entered into

---

[6] Even as of October 2012, Defendants' secrecy and deception continued because Brigham/Statoil's counsel's letter did not mention, provide, or offer to provide a copy of Defendants' agreement. App. 5263-64.

their agreement.  App. 5203 at 198:13-201:17; App. 5190-92 at 289:15-297:8, 291:20-292:1, 292:13-293:6; App. 5310, ¶7.  Gold Coast did not know or suspect that TRZ/Hess had disclosed the AMI Agreement to Brigham/Statoil until even later--sometime after Spring Creek filed the Complaint in December 2013.  App. 5317, ¶15.

## 2.    Complaint

The Complaint attached the AMI Agreement and the First Assignment but not the other parts of the Tomahawk Agreement.  App. 56-115.  The Complaint alleged:

- "The general agreement in the AMI [Agreement] was that Spring Creek would refrain from securing any additional oil and gas leases within the Tomahawk Prospect and in exchange [TRZ/Hess] would pursue additional leases and provide Spring Creek with an overriding royalty interest."  App. 58, ¶13.

- "The parties' intent in entering into the [Tomahawk] Agreement was that [TRZ/Hess] and/or its successors and assigns would acquire additional leasehold interests [in the AMI]."  App. 58, ¶15.

- "Given that Spring Creek was agreeing not to compete with [TRZ/Hess] within the Tomahawk Prospect, it was important . . . the terms of the AMI [Agreement] remain confidential."  App. 58-59, ¶16.

- On information and belief, TRZ/Hess breached the confidentiality provision in the AMI Agreement by "disclos[ing] the terms of the AMI [Agreement] to [Brigham/Statoil] prior to entering into the [TRZ/Hess-Brigham/Statoil] Agreement."  App. 59, ¶19.

The Complaint alleged that Defendants did not disclose their agreement to Spring Creek, agreed to conceal facts from Spring Creek, and were liable for

fraudulent concealment and conspiracy.    App. 59-60, ¶¶18-22; App. 63-64, ¶¶55-68.

The Complaint alleged that Brigham/Statoil purchased the Spring Creek Leases from TRZ/Hess "subject to" Spring Creek's rights to ORRI and all other interests that "ran with the land," the AMI Agreement was expressly assigned to Brigham/Statoil, Brigham/Statoil obtained the benefits of the AMI Agreement (e.g., the Noncompete Covenant), and had to comply with its burdens (e.g., the Override Covenant).  App. 60, ¶¶23, 24-26.

The Complaint alleged that before the October 30, 2012 letter from Brigham/Statoil's lawyer, Spring Creek "was unaware that [Defendants] were taking the position that [leases acquired by Brigham/Statoil in the AMI area and period] were not subject to the terms of the AMI [Agreement]."  App. 61, ¶31.

The following facts in subsections 3-6 were unknown to Plaintiffs until disclosed after the filing of the Complaint.

### 3.    The TRZ/Hess-Brigham/Statoil Agreement

This lawsuit finally forced Defendants to disclose to Plaintiffs their secret agreement dated February 24, 2010 ("the TRZ/Hess-Brigham/Statoil Agreement").[7]    The TRZ/Hess-Brigham/Statoil Agreement consisted of a

---

[7] The TRZ/Hess-Brigham/Statoil Agreement was disclosed to Plaintiffs with Defendants' initial disclosures served on April 3, 2014.    App. 5266-73.

Settlement Agreement (App. 4633-66), and an Indemnity Agreement (App. 5252-55). These and other documents obtained by Plaintiffs in this litigation show that Defendants breached their obligations under the AMI Agreement, concealed their wrongful actions from Plaintiffs, causing Plaintiffs substantial damages.

### 4. TRZ/Hess Disclosed the AMI Agreement to Brigham/Statoil

Three months after the Tomahawk Agreement, in January 2010, Brigham/Statoil accused TRZ/Hess of violating a confidentiality provision in an unrelated agreement. App. 4628; App. 5229 at 151:13-152:16. TRZ/Hess admitted the violation, and proposed to settle the issue by selling to Brigham/Statoil leases in area that included the Spring Creek Leases in the AMI. See App. 5327-28; App. 5031 at 147:16-148:2; App. 5330. The proposed settlement initially provided that Brigham/Statoil would assume TRZ/Hess's obligations under the Tomahawk Agreement. App. 5330; App. 5805-07; App. 5034 at 159:14-23; App. 995 at 217:2-20.

---

Defendants concealed the TRZ/Hess-Brigham/Statoil Agreement from Plaintiffs for over four years. This concealment prejudiced Plaintiffs by preventing them from learning during the AMI period what Defendants had done and forcing Plaintiffs to file their Complaint and respond to Defendants' motions to dismiss without having copies of Defendants' secret agreement.

Before finalizing the settlement, Brigham/Statoil asked TRZ/Hess for copies of the Tomahawk Agreement. App. 5032-33 at 153:1-157:21; App. 5231-32 at 204:13-205:7.

TRZ/Hess never notified Plaintiffs that it disclosed the AMI Agreement to Brigham/Statoil. App. 2119, ¶31. Plaintiffs never were asked, and never agreed to waive the AMI Confidentiality Provision. App. 2119, ¶¶32-33. In contrast, TRZ/Hess requested and received a waiver from Coachman of the virtually-identical confidentiality provision in the Participation Agreement. App. 5067, ¶6; App. 5239. A reasonable inference is that TRZ/Hess knew it needed a waiver but chose not to request one from Plaintiffs.

On February 18, 2010, TRZ/Hess disclosed to Brigham/Statoil a summary of the terms of the AMI Agreement. App. 5239; App. 2209-10 at 153:1-154:14; App. 5231-32 at 204:15-205:2; App. 5049, ¶28. That breached the AMI Confidentiality Provision.

On February 20, 2010, TRZ/Hess gave Brigham/Statoil a copy of the AMI Agreement. App. 5232 at 207:19-208:5; App. 2033; App. 2210-11 at 157:23-158:15; App. 5049, ¶28; App. 2032-34. That, again, breached the AMI Confidentiality Provision.

The fact that TRZ/Hess disclosed the AMI Agreement to Brigham/Statoil is admitted. App. 636, ¶19 (TRZ/Hess "admits it disclosed terms of the [AMI]

Interest Agreement to [Brigham/Statoil] before entering into the [TRZ/Hess–Brigham/Statoil] Agreement.").

### 5. After Seeing the AMI Agreement, Brigham/Statoil Revised the TRZ/Hess-Brigham/Statoil Agreement to Attempt to Avoid the AMI Agreement's Obligations

After TRZ/Hess improperly disclosed the AMI Agreement, Brigham/Statoil attempted to exclude the AMI Agreement (and its obligation to assign Plaintiffs ORRI).  App. 5035 at 162:14-163:9; App. 5247 at 127:12-128:6; App. 5338, ¶3(i); App. 5034-35 at 160:20-163:9; App. 5233 at 217:2-219:9.  Defendants' final Settlement Agreement included a provision attempting to avoid Brigham/Statoil's obligation to assign to Plaintiffs ORRI:

> "The [leases sold by TRZ/Hess to Brigham/Statoil] do not include the following properties which are excluded from this transaction:  the assignments of overriding royalties and working interests owed under the terms of . . . the Area of Mutual Interest Agreement dated October 8, 2009 among [TRZ/Hess], [Coachman], [Spring Creek] and [Gold Coast]."

App. 4634, ¶2.  Despite Brigham/Statoil's desire, this provision could not nullify obligations that were legally binding on Brigham/Statoil.  See infra § VII(A).

### 6. TRZ/Hess Believed Brigham/Statoil Was Bound by the AMI Agreement and Expected Plaintiffs Would Sue When They Found Out

TRZ/Hess believed that the AMI Agreement covenants "ran with the land" and therefore were binding on Brigham/Statoil.  App. 5027 at 106:14-24; App. 5030 at 143:18-144:14; App. 5032 at 153:16-22; App. 5033 at 156:12-18; App.

5035 at 162:20-163:9; App. 5037-38 at 184:8-188:10; App. 5245 at 119:4-10; App. 5245-46 at 120:20-121:5. TRZ/Hess expected to be sued and insisted it be indemnified. Id. Brigham/Statoil agreed to indemnify TRZ/Hess. App. 5252-55; App. 5247 at 127:12-128:6; App. 5248 at 130:6-131:18; App. 5234 at 241:9-242:23; App. 5036 at 172:10-173:11. The Indemnity Agreement states:

- "[Brigham/Statoil] shall fully protect, indemnify, and defend [TRZ/Hess] . . . from . . . Claims asserted by the parties to the Tomahawk [] Agreement for Brigham's lack of performance or breach of the Tomahawk [] Agreement." App. 5253, ¶1.

- "[Brigham/Statoil] is not acquiring an assignment of any interest in the Tomahawk [] Agreement and is not agreeing to be subject to any future AMI rights, duties or obligations or override burdens created under the Tomahawk Agreement that are not already **in themselves covenants running with the land burdening the leases that [Brigham/Statoil] is acquiring in the transaction with TRZ/Hess**.[8] [Brigham/Statoil] is only receiving an assignment of the leases owned by [TRZ/Hess], as burdened by the encumbrances that run with those leases that resulted from the Tomahawk [AMI] Agreement." Id. ¶2 (emphasis added).

### 7. The Separate Subsequent Assignment of Spring Creek Leases to Brigham/Statoil

In a recorded separate assignment agreement, TRZ/Hess assigned to Brigham/Statoil over 10,000 acres of leases, including the Spring Creek Leases. App. 5714, ¶2; App. 5032 at 152:4-24; App. 5230 at 193:25-194:18; App. 1835-62

---

[8] Brigham/Statoil acknowledged, in the highlighted language, that some obligations under the Tomahawk Agreement are covenants running with the land and binding on Brigham/Statoil.

(the "Second Assignment of Spring Creek Leases" or "Second "Assignment"). The Second Assignment included "all of [TRZ/Hess's] right, title and interest" and "overriding royalty interests." App. 1835. The Second Assignment is a separate agreement from the TRZ/Hess-Brigham/Statoil Agreement, and does not disclaim the AMI Agreement or its obligations. Id.; App. 1785 at 277:6-13; App. 1783 at 214:15-216:18.

### 8. Gold Coast

Gold Coast is a party to the Tomahawk Agreement, but was not a plaintiff when Spring Creek filed the Complaint. App. 304. Gold Coast intervened as a plaintiff effective April 21, 2015. App. 388-94; App. 5668 at n.18.

### D. Plaintiffs' Damages

Defendants caused Plaintiffs to suffer significant damages. Plaintiffs presented evidence of two alternative types of damages:

- The value of ORRI they expected to receive on leases TRZ/Hess and Brigham/Statoil acquired in the AMI totaling $24.2 million to $59.3 million ("Plaintiffs' ORRI Damages"). App. 4766-4824; App. 4826-86.

- The value of the lost opportunity for Plaintiffs to acquire leases in the AMI from February 2010 (when TRZ/Hess breached the AMI Confidentiality Provision) until the AMI Agreement's term expired with a value of $182 million to $403 million ("Plaintiffs' Working Interest Damages"). Id.

# IV. SUMMARY OF ARGUMENT

At every turn, the District Court erroneously deprived Plaintiffs of the right to have their valid claims decided by the jury. This Court should reverse and allow Plaintiffs' claims to move forward, direct the District Court to enter judgment for Plaintiffs on certain claims and/or at a minimum let the jury decide the disputed issues of fact.

Plaintiffs' argument is summarized as follows:

**1.** **Dismissal**. Plaintiffs alleged plausible claims against Defendants that the District Court erroneously dismissed. See infra § V. The District Court failed to accept as true Plaintiffs' factual allegations, dismissed claims for breach of contract without having the entire agreement, and deprived Plaintiffs of the benefit of the bargain. Plaintiffs alleged plausible breach of contract, breach of good faith and fair dealing, fraudulent concealment, tortious interference and conspiracy claims.

**2.** **Reconsideration**. After it had the entire agreement, the District Court should have reconsidered its dismissal of certain claims and allowed them to move forward. See infra § VI. The District Court incorrectly applied Rule 60(b). Whether the Tomahawk Agreement required TRZ/Hess to pursue leases in the AMI is at a minimum ambiguous and for the jury.

**3.** **Claims Against Brigham/Statoil**. The AMI Agreement is binding on Brigham/Statoil, and Brigham/Statoil owes Plaintiffs ORRI on all leases it acquired in the AMI for three independent reasons: (i) the AMI Agreement is a covenant running with the land (the Spring Creek Leases); (ii) the AMI Agreement was expressly assigned to Brigham/Statoil in a subsequent, separately-recorded assignment; and/or (iii) N.D. Cent. Code § 9-03-25 applies and provides that Brigham/Statoil accepted the AMI Agreement's obligations as a matter of law. See infra § VII(A). Thus, Plaintiffs are entitled to judgment against Brigham/Statoil on liability. At a minimum, genuine issues of material fact require reversal of the District Court's summary judgment for Brigham/Statoil.

**4.** **Breach of Confidentiality**. TRZ/Hess's disclosure of the AMI Agreement to Brigham/Statoil is undisputed and admitted. The evidence of breach is "so powerful that no reasonable jury would be free" to find in favor of TRZ/Hess. Leone v. Owsley, 810 F.3d 1149, 1154 (10th Cir. 2015). Thus, Plaintiffs are entitled to summary judgment on liability. See infra § VII(B).

**5.** **Statute of Limitations**. There are genuine issues of material fact on when Plaintiffs' breach of confidentiality claim against TRZ/Hess accrued. This requires reversal of the District Court's grant of summary judgment for TRZ/Hess on statute of limitations. See infra § VII(C).

**6.** **Working Interest Damages**.  Plaintiffs' Working Interest Damages are properly recoverable on Plaintiffs' Breach of Confidentiality Claim against TRZ/Hess.  See infra § VIII.

## V.    THE COMPLAINT STATES PLAUSIBLE CLAIMS AGAINST DEFENDANTS

The Complaint asserted claims for breach of contract and torts against Defendants. App. 61-64, ¶¶32-68.  The District Court erroneously dismissed many of Plaintiffs' claims.  App. 214-242.  The claims that were dismissed, and that survived, are summarized in Table 1 below:

### Table 1:  Dismissed and Surviving Claims

| Dismissed Claims Being Appealed |
| --- |
| Breach of contract against TRZ/Hess for not pursuing leases in the AMI |
| Breach of implied covenant of good faith and fair dealing against TRZ/Hess |
| Fraudulent concealment against TRZ/Hess |
| Tortious interference with contract against Brigham/Statoil |
| Civil conspiracy against both Defendants |
| **Surviving Claims** |
| Breach of contract against TRZ/Hess for violating the AMI Confidentiality Provision (summary judgment being appealed) |
| Breach of contract against Brigham/ Statoil for not assigning Plaintiffs ORRI on New Leases (summary judgment being appealed) |
| Breach of contract against both Defendants for underpayment of ORRI on Existing Leases (in arbitration) |

"Dismissal for failure to state a claim is reviewed de novo, accepting all well-pled facts as true and viewing them in the light most favorable to the plaintiff." Barnes v. Harris, 783 F.3d 1185, 1192-93 (10th Cir. 2015); see also Dias v. City and Cty. of Denver, 567 F.3d 1169, 1178 (10th Cir. 2009) (all reasonable inferences drawn in favor of plaintiff). The question is "whether it is plausible that the plaintiff is entitled to relief." Gallagher v. Shelton, 587 F.3d 1063, 1068 (10th Cir. 2009). Applying this standard, the Court should reverse the dismissal of Plaintiffs' claims.

### A. Plaintiffs State a Plausible Claim for Breach of Contract Against TRZ/Hess for Not Pursuing Leases in the AMI Throughout the Three-Year Term

The Complaint expressly alleged that Plaintiffs and TRZ/Hess intended "that [TRZ/Hess] and/or its successors and assigns **would acquire** additional leasehold interests within the Tomahawk Prospect throughout the term of the Agreement." App. 398, ¶15 (emphasis added); see also App. 397, ¶10 ("TRZ/Hess would secure additional leases within the Tomahawk Prospect"); App. 397-98, ¶13 ("[TRZ/Hess] would pursue additional leases . . . over the next 3 years"). The term of the AMI Agreement was three years. App. 81-82, ¶1. The Complaint alleged that in 2010 TRZ/Hess entered into the TRZ/Hess-Brigham/Statoil Agreement and "breach[ed] its agreement with Spring Creek by no longer entering into leases in the Tomahawk prospect." App. 59-60, ¶18-22. These allegations, plus the others

in the Complaint, are more than sufficient to state a claim for breach of contract against TRZ/Hess for not pursuing leases in the AMI throughout the three-year term.[9]  App. 61, ¶¶33-37.

The District Court erroneously held that "[r]ather than evidencing an intent of the parties to require [TRZ/Hess] to acquire additional leases, the AMI reflects an agreement to define [TRZ/Hess's] obligations in the event that it *did* acquire a new lease."  App. 222-23.  In other words, the District Court agreed with TRZ/Hess's argument that it only owed Plaintiffs ORRI "in any leases that it happened to acquire in the Tomahawk Project during the relevant time period." App. 221 (emphasis added).  The District Court dismissed Plaintiffs' breach of contract claim alleging that TRZ/Hess breached the obligation to acquire leases in the AMI.  App. 218-23.  This conclusion is reversible error for multiple reasons.

### 1.    The District Court Did Not Accept as True Plaintiffs' Allegations

The District Court failed to accept as true Plaintiffs' factual allegations.  The District Court gave lip service to this standard (App. 215), but it only accepted as true some allegations (App.  215-17), and on the issue of whether TRZ/Hess was

---

[9] Plaintiffs' allegations are supported by the testimony of Spring Creek's William Coleman.  "[T]he whole intent of that agreement was [TRZ/Hess] [was] supposed to buy [leases]."  App. 3771 at 298:1-3; see also App. 580 at 210:18-20 ("Then that was the intent that . . . we would get an override and that [TRZ/Hess] would be leasing.").

required to acquire leases in the AMI it completely ignored Plaintiffs' allegations. Id. at 221-23.

### 2. The District Court Did Not Consider the Entire AMI Agreement or the Entire Tomahawk Agreement

The District Court did not have or consider the entire Tomahawk Agreement. See infra § VI. The District Court purported to discern the intent of the parties from the language of the AMI Agreement alone. App. 215-223. In interpreting a contract, a court must consider "all the provisions of the agreement." Radiology Prof. Corp. v. Trinidad Area Health Ass'n, Inc., 577 P.2d 748, 750 (Colo. 1978). The District Court ignored the recital in the AMI Agreement expressing the parties' intent: "the Parties desire to establish an area of mutual interest covering the Tomahawk Prospect and **provide for the acquisition of interests by [TRZ/Hess]**." App. 81 (emphasis added); see also App. 221-23 (not mentioning recitals). This recital, together with the AMI's three-year term, App. 81, ¶1, alone support Plaintiffs' allegation that TRZ/Hess was obligated to pursue oil and gas leases in the AMI throughout its three-year term.

### 3. The District Court Deprived Plaintiffs of the Benefit of the Bargain

A contract must be construed "in a manner that allows each party to receive the benefit of the bargain." Allen v. Pacheco, 71 P.3d 375, 378 (Colo. 2003). Plaintiffs alleged the "bargain" was that "[TRZ/Hess] would pursue additional

leases . . . in the Tomahawk Prospect over the next three years," Plaintiffs would receive ORRI in those leases, and in turn Plaintiffs would not pursue leases in the AMI.   App. 58, ¶13.   However, the District Court concluded that the AMI Agreement did not "evidenc[e] an intent of the parties to require [TRZ/Hess] to acquire additional leases."  App. 222-23.  This deprived Plaintiffs of the benefit of the bargain.

### 4.   The Intent of the Parties Must Be Decided by the Jury Because the AMI Agreement Is Ambiguous

The District Court said "the only reasonable interpretation" of the AMI Agreement is that it did not require TRZ/Hess to acquire leases.  App. 223.  This shows that the District Court assumed that the AMI Agreement is unambiguous. "[T]he determination of whether a provision in [a] contract is ambiguous [is a] question[] of law."  Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 912 (Colo. 1996). Thus, the Court reviews the District Court's decision de novo and gives its interpretation no deference.  Ad Two, Inc. v. City and Cty. of Denver, 9 P.3d 373, 376 (Colo. 2000).

To discern the intent of the parties to a complex, ten-part, multi-party, multi-million dollar agreement, the District Court simplistically focused on one isolated sentence in the AMI Agreement:   "If, during the term of the AMI, [TRZ/Hess] should acquire any oil and gas lease . . ., [TRZ/Hess] shall offer such interest to Coachman."  App. 221-23. First, this sentence deals with TRZ/Hess's

obligations to Coachman, a 10% working interest holder, not TRZ/Hess's obligations to assign ORRI to Plaintiffs. Second, the District Court indicated the word "if" "is inconsistent with any obligation for [TRZ/Hess] to acquire new leases." App. 222. This provision, if applicable, reasonably can be read as simply acknowledging that neither party can guarantee that a mineral owner will sign a lease, i.e., while TRZ/Hess had an overarching obligation to pursue leases in the AMI area and term, it did not have to acquire any <u>particular</u> lease if the owner would not sell or agree to reasonable terms.

The District Court cited only one other provision: "[TRZ/Hess] shall endeavor to retain Diamond Resources as a lease broker to acquire interests in the AMI."[10] <u>Id.</u> But, the District Court did not view it in the light most favorable to Plaintiffs. This provision reasonably means the parties intended TRZ/Hess would retain Spring Creek's lease broker for the purpose of TRZ/Hess acquiring lease interests in the AMI.

The District Court did not consider a key provision of the AMI Agreement: "the Parties desire to establish an area of mutual interest covering the Tomahawk Prospect and <u>provide for the acquisition of interests by [TRZ/Hess]</u>." App. 81

---

[10] Diamond Resources was the longtime lease broker for Spring Creek and Mr. Coleman. App. 2120-21, ¶38.

(emphasis added). This recital must be considered and it makes Plaintiffs' interpretation plausible.

Considered as a whole, the AMI Agreement is at least ambiguous on whether TRZ/Hess was obligated to acquire leases.[11] The AMI Agreement would be unambiguous, as the District Court held, if it said "TRZ/Hess does <u>not</u> have to acquire leases." It does not. While the "if" provision may in isolation support the District Court's interpretation, the recital and broker provisions can reasonably be read as supporting Plaintiffs' interpretation.[12] "Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation." <u>Ad Two</u>, 9 P.3d at 376-77 (citations omitted). Thus, whether the Tomahawk Agreement required TRZ/Hess to acquire leases throughout the three-year AMI term is a factual issue for the jury. <u>See</u>, <u>e.g.</u>, <u>Denver Classroom Teachers Ass'n v. School Dist. No. 1</u>, 2017 WL 117179, at *4 (Colo. App. Jan. 12, 2017); 5-24 <u>Corbin on Contracts</u> § 24.30 (2012).

---

[11] Plaintiffs argued the AMI Agreement unambiguously required TRZ/Hess to acquire leases (App. 167-69), but alternatively argued it is ambiguous (App.169 & n.1).

[12] Other evidence, including other provisions of the Tomahawk Agreement, also support Plaintiffs' interpretation. <u>See</u> <u>supra</u> § III(A)(1); <u>infra.</u> § VI(A).

**B. Plaintiffs State a Plausible Claim Against TRZ/Hess for Breach of the Covenant of Good Faith and Fair Dealing**

The Complaint alleged that TRZ/Hess breached the implied covenant of good faith and fair dealing by failing "to make good faith efforts to acquire additional leases within the Tomahawk Prospect." App. 62-63, ¶¶46-47. The District Court dismissed this claim based on its erroneous determination that TRZ/Hess had no obligation to pursue leases during the AMI term. App. 226-27.

The duty of good faith and fair dealing applies to every contract. Golden v. Parker, 138 P.3d 285, 292 (Colo. 2006). When a party has discretion in the manner of performance of a contract, it must exercise that discretion in good faith and consistent with fair dealing. Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995). Here, the Tomahawk Agreement can reasonably be read as requiring TRZ/Hess to acquire leases during the AMI term while leaving the details of leasing to TRZ/Hess's discretion (e.g., how aggressively to lease, who to lease from, how much to pay, what terms to offer, etc.). Thus, TRZ/Hess had a duty of good faith and fair dealing regarding the manner of acquiring leases. TRZ/Hess breached that duty when--four months into the three-year AMI term--TRZ/Hess agreed to the TRZ/Hess-Brigham/Statoil Agreement and stopped all efforts to acquire leases in the AMI.

The covenant of good faith and fair dealing is intended "to effectuate the intentions of the parties or to honor their reasonable expectations." Ervin, 908

P.2d at 498. "A party's justified expectations are violated if evidence indicates it would not have signed the contract had it known of the manner in which the party given discretion would exercise its discretion to determine open terms under a contract." ADT Security Servs., Inc. v. Premier Home Protection, Inc., 181 P.3d 288, 293 (Colo. App. 2007). Plaintiffs would not have entered into the Tomahawk Agreement if they had known TRZ/Hess would completely stop acquiring leases in the AMI just four months into the three year term. App. 1128, ¶37. Accordingly, the Complaint alleges a plausible claim for breach of TRZ/Hess's duty of good faith and fair dealing.

## C. Plaintiffs State a Plausible Claim Against TRZ/Hess for Fraudulent Concealment

The Complaint alleged that TRZ/Hess fraudulently concealed from Plaintiffs (i) the terms of the TRZ/Hess-Brigham/Statoil Agreement, (ii) TRZ/Hess was no longer acquiring leases in the AMI, and (iii) Spring Creek would not be assigned ORRI on the New Leases acquired by Brigham/Statoil in the AMI area and term. App. 59-60, ¶¶20-22, 28; App. 63-64, ¶¶56-61. TRZ/Hess concealed this information so Plaintiffs "would presume that [TRZ/Hess] would continue acquiring new leases during the term of the AMI," because if Plaintiffs were "aware of all material facts" they "would have taken a different course of action." App. 63-64, ¶¶57-59. The Complaint alleges all necessary elements to state a claim for fraudulent concealment. App. 63-64, ¶¶55-61; Barfield v. Hall Realty,

<u>Inc.</u>, 232 P.3d 286, 292 (Colo. App. 2010). The District Court, however, held this claim is barred by the economic loss rule. App. 227-31.

### 1. TRZ/Hess Had a Duty to Not Conceal Facts From Plaintiffs

Plaintiffs and TRZ/Hess had a special relationship of trust and confidence as, in essence, joint venturers combining their resources to explore and develop the oil and gas resources in the AMI. <u>See</u> <u>supra</u> § III(A); App. 57-59, ¶¶8-17; Williams & Meyers. Therefore, under tort law, in equity and good conscience TRZ/Hess had a duty to disclose to Plaintiffs the existence and terms of its agreement with Brigham/Statoil, that TRZ/Hess would not pursue any additional leases in the AMI after February 2010, and that Brigham/Statoil was taking the position that it was not bound by the AMI Agreement and would not be assigning Plaintiffs ORRI on leases it took in the AMI. <u>H&H Distributors, Inc. v. B&B Int'l,</u> <u>Inc.</u>, 812 P.2d 659, 662 (Colo. 1990) (defendant had duty to disclose to other contracting party post-contract detrimental information about business plans and prospects). App. 246, ¶19; App. 4347-48; App. 4369; App. 4708; App. 4890-91; App. 5008-09, ¶14, ¶17; App. 5011-12, ¶¶27-28; App. 5035 at 163:14-164:6; App. 5050, ¶31; App. 5146, ¶¶11-13; App. 5234 at 243:7-14, 244:8-17; App. 5259-62; App. 5263-64; App. 5266-73; App. 5315-17, ¶8, ¶11, ¶¶14-15.

As Plaintiffs investigated, TRZ/Hess also had a duty to not prevent or frustrate Plaintiffs' investigation. <u>Restatement (Second) of Torts</u> § 550 ("a party to

33

a transaction who by concealment or other action intentionally prevents the other from acquiring material information" is liable for fraudulent concealment). Fraudulent concealment occurs "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation." Id. cmt. b. Plaintiffs alleged that Defendants concealed from Plaintiffs the terms of the TRZ/Hess-Brigham/Statoil Agreement and that TRZ/Hess would not be obtaining any new leases in the AMI, "so that [Brigham/Statoil] could acquire new leases within the [AMI] without any competition from [Plaintiffs]" and because if Plaintiffs found out they could "either void the AMI and/or seek damages." App. 59-60, ¶¶20-22; App. 63-64, ¶¶55-61. When Spring Creek asked TRZ/Hess for a copy of the TRZ/Hess-Brigham/Statoil Agreement, TRZ/Hess <u>refused to provide it and affirmatively misrepresented that it could not be disclosed</u>. App. 4347-48; App. 4637, ¶9; App. 5010-11, ¶23.

This prevented Plaintiffs from discovering what had happened. Indeed, TRZ/Hess concealed from Plaintiffs the TRZ/Hess-Brigham/Statoil Agreement for over four years (during the last 2½ years of the AMI term, and even after this lawsuit was filed and the parties were briefing the motions to dismiss). See supra n.7; App. 1903, ¶12. Plaintiffs not only allege a plausible fraudulent concealment claim against TRZ/Hess, the evidence strongly supports it.

## 2.    The Economic Loss Rule Does Not Bar the Fraudulent Concealment Claim

The District Court erroneously held that the economic loss rule bars Plaintiffs' fraudulent concealment claim against TRZ/Hess.   App. 227-31.   The Court reviews this issue de novo.   Haynes Trane Serv. Agency, Inc. v. American Standard, Inc., 573 F.3d 947, 962 (10th Cir. 2009).

The economic loss rule does not apply when a defendant's duty is independent of a contract.   Id.   To be independent, the duty must (i) "arise from a source other than the relevant contract," and (ii) "not be a duty also imposed by the contract."   Id.   "[C]ertain common law claims that sound in tort and are expressly designed to remedy economic loss may exist independent of a breach of contract claim."   Town of Alma v. Azco Constr., Inc., 10 P.3d 1256, 1263 (Colo. 2000). This can include claims for fraud and/or fraudulent concealment.   Brody v. Bock, 897 P.2d 769, 776 (Colo. 1995) (fraud claim was based on duty independent of contract); H&H Distributors, 812 P.2d at 662-63 (defendant's duty to disclose was "separate and apart from its obligations under the contract").   Here, tort law imposed a duty on TRZ/Hess to disclose information that in equity and good conscience should be disclosed to Plaintiffs, and to not fraudulently conceal information to prevent or frustrate Plaintiffs' investigation.   Id.; Restatement (Second) of Torts) § 550.   This duty does not arise from the Tomahawk Agreement.   Thus, the economic loss rule does not apply.   As this Court held in

Haynes, "[the defending party's] economic-loss-rule argument fails … because the tort duty alleged by [the claiming party] is not duplicated in [the] contract." Haynes, 573 F.3d at 963.

> **D.**   **Plaintiffs State a Plausible Claim Against Brigham/Statoil for Tortious Interference With Contract**

The Complaint alleged that Brigham/Statoil knew of the Tomahawk Agreement and tortiously interfered with Plaintiffs' rights under that agreement by intentionally and improperly inducing TRZ/Hess to breach it, insisting that TRZ/Hess not disclose to Plaintiffs the TRZ/Hess-Brigham/Statoil Agreement, and intentionally structuring that agreement so Brigham/Statoil could claim it was not bound by the AMI Agreement.  App. 59, ¶¶18-19; App. 63 ¶¶ 49-54.  This alleges all elements of the claim.  Krystkowiak v. W.O. Brisben Cos., Inc., 90 P.3d 859, 871 (Colo. 2014).  The District Court correctly said that "interfering with the AMI [Agreement] could be improper under the balancing test applied by Colorado courts."  App. 238-39, n.8.  However, the District Court dismissed the tortious interference claim based on its conclusion that TRZ/Hess had no obligation to pursue additional leases in the AMI, and Brigham/Statoil "cannot have interfered with a contractual obligation that did not exist."  App. 238.  That conclusion is erroneous.  See supra § V(A).  Since the jury could conclude that TRZ/Hess was obligated to pursue leases in the AMI, the Complaint alleges a valid claim (and the

jury could conclude) that Brigham/Statoil tortiously interfered with Plaintiffs' existing contractual relations with TRZ/Hess.

**E.** **Plaintiffs State a Plausible Claim Against Defendants for Civil Conspiracy**

Plaintiffs alleged all elements of a civil conspiracy claim. App. 64, ¶¶62-68; Walker v. Van Laningham, 148 P.3d 391, 396 (Colo. App. 2006). The District Court dismissed the conspiracy claim only because it dismissed the underlying fraudulent concealment and tortious interference claims. App. 240-41. Since the dismissal of those claims was erroneous, the dismissal of the conspiracy claim was also erroneous.

**VI.** **THE DISTRICT COURT IMPROPERLY DENIED PLAINTIFFS' MOTION FOR RECONSIDERATION**

Plaintiffs moved for reconsideration of part of the dismissal order. App. 258-69. Plaintiffs (i) submitted, and asked the District Court to consider, all ten parts of the Tomahawk Agreement (App. 270-340); (ii) argued provisions in the Participation Agreement and Well Data Exchange Agreement, which the District Court previously did not have before it, showed the Tomahawk Agreement was at least ambiguous on whether TRZ/Hess was required to pursue leases throughout the three-year AMI term (App. 263-67); (iii) submitted TRZ/Hess's letter of intent stating "[TRZ/Hess] will acquire oil and gas leases in the Tomahawk Project" (App. 341) (emphasis added); and (iv) argued the District Court should consider

extrinsic evidence, including expert testimony on industry standards, on the issue of ambiguity (App. 264-67). Plaintiffs asked the District Court to reconsider the dismissal of the claims that (i) TRZ/Hess breached the AMI Agreement by not pursuing leases throughout the AMI term, (ii) TRZ/Hess breached the covenant of good faith and fair dealing, and (iii) Brigham/Statoil tortiously interfered with Plaintiffs' agreement with TRZ/Hess. App. 264-66.

The District Court summarily denied the motion for reconsideration because Plaintiffs erroneously cited Fed. R. Civ. P. 60(b) instead of the court's inherent authority to reconsider interlocutory orders. App. 660 ("the motion is procedurally improper and is denied on this ground"). Plaintiffs acknowledge their citation error. Plaintiffs should have cited the court's inherent authority to revise interlocutory orders. Fed. R. Civ. P. 54(b); Houston Fearless Corp. v. Teter, 313 F.2d 91, 92 (10th Cir. 1962). However, denying the motion for a mere citation error was contrary to the interests of justice and Fed. R. Civ. P. 1.

The District Court then also denied the motion for reconsideration under Rule 60(b) because the additional parts of the Tomahawk Agreement submitted with the motion did not constitute "newly discovered evidence" under Rule 60(b)(2). App. 661-62. "The district court was incorrect to treat [the] motion for reconsideration under Rule 60(b), which only applies to final orders or judgments." Raytheon Constructors, Inc. v. Asarco, Inc., 368 F.3d 1214, 1217 (10th Cir. 2003).

Thus, the District Court applied the wrong legal standard. This was reversible error, which is reviewed de novo. Id.

Applying the correct legal standard--the interest of justice--compels the conclusion that the District Court should have granted the motion for reconsideration, considered all parts of the Tomahawk Agreement, concluded it is at least ambiguous on TRZ/Hess's obligation to pursue leases throughout the AMI term, reconsidered the dismissal of that part of Plaintiffs' breach of contract claim, Plaintiffs' breach of good faith and fair dealing claim and Plaintiffs' tortious interference claim, and allowed these claims to proceed.

### A.  All Ten Parts of the Tomahawk Agreement Must Be Construed Together

When, as here, an agreement is set forth in multiple, interrelated contracts, "courts construe those documents together." Gorsuch, 771 F.3d at 1238; In Re Application for Water Rights of Town of Estes Park, 677 P.2d 320, 327 (Colo. 1984) ("separate instruments that pertain to the same transaction should be read together"). Thus, as a matter of law, the District Court was required to consider the entire Tomahawk Agreement, including the eight parts of the agreement and the related letter of intent that were submitted with the motion for reconsideration. The District Court refused to do so. App. 661-62. This was reversible error.

**B.** **The Jury Must Decide the Factual Issue of Whether the Tomahawk Agreement Required TRZ/Hess to Pursue Leases**

Plaintiffs argued that the additional documents submitted with the motion for reconsideration supported Plaintiffs' alternative argument that the Tomahawk Agreement is at least ambiguous on whether TRZ/Hess was obligated to pursue leases throughout the AMI term.  App. 261-67.  These documents state:  (i) "the Parties desire to establish an area of mutual interest covering the Tomahawk Prospect <u>and provide for the acquisition of interests therein</u> by [TRZ/Hess]," Participation Agreement (App. 270) (emphasis added); (ii) "the Parties own oil and gas leasehold interests and are actively engaged in the exploration of such leasehold interests situated in Williams . . . Count[y], North Dakota," Well Data Exchange Agreement (App. 312); and (iii) "[TRZ/Hess] <u>will</u> acquire oil and gas leases in the Tomahawk Prospect," Letter of Intent ¶7(f)(i)[13] (App. 343) (emphasis added); Agreement for Assignment of Option to Purchase ¶4(f)(i) (App. 280).  The District Court refused to consider these parts of the Agreement.  App. 661-62.  These documents, together with the AMI Agreement, show that the Tomahawk

---

[13] The letter of intent was signed by TRZ/Hess and Coachman just six days before the Tomahawk Agreement.  The letter of intent required execution of the AMI Agreement, Joint Operating Agreement, Participation Agreement and Well Data Exchange Agreement.  App. 342-44, ¶¶7(c-f).  Thus, the rule that interrelated documents must be considered together "has particular force" with respect to the letter of intent.  <u>Application for Water Rights</u>, 677 P.2d at 327.

Agreement is at least ambiguous on TRZ/Hess's obligation to pursue leases throughout the three-year AMI term. The meaning of an ambiguous contract is a factual issue for the jury. <u>Denver Classroom Teachers</u>, 2017 WL 117179, at *4.

## C. <u>The District Court Misapprehended Plaintiffs' Position and the Facts</u>

In denying the motion for reconsideration, the District Court misapprehended both Plaintiffs' position and the facts. First, the District Court stated "Spring Creek's argument in response to [TRZ/Hess's] motion to dismiss was that the AMI 'unambiguously' obligated [TRZ/Hess] to pursue additional leases." App. 662. This ignored Plaintiffs' alternative position that the Tomahawk Agreement was ambiguous on this issue. App. 169 n.1. Second, the District Court said Spring Creek was attempting to resurrect its breach of contract claim against TRZ/Hess "by raising an argument based on different agreements." App. 662. That misperceives the fundamental fact that the Tomahawk Agreement "contained various contracts, all of which were part of the one [Tomahawk] Agreement." App. 57, ¶10; <u>see also</u> App. 260 ("the multi-part [Tomahawk] Agreement . . . actually consisted of 10 agreements"); App. 5642 n.3. By misapprehending

Plaintiffs' position and the facts, the District Court failed to do justice in this case.[14]

### D. The District Court Should Have Allowed Plaintiffs to Submit Expert Testimony Regarding Industry Custom

"In deciding whether a contract is ambiguous, a court 'may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage.'" <u>Cheyenne Mountain Sch. Dist. v. Thompson</u>, 861 P.2d 711, 715 (Colo. 1993) (citation omitted). In addition, "extrinsic evidence of the intent of the parties may be helpful in resolving the ambiguity." <u>Fort Lyon Canal Co. v. High Plains A & M, LLC</u>, 167 P.3d 726, 728-29 (Colo. 2007). In the motion for reconsideration, Plaintiffs said they "may disclose an industry expert to provide testimony regarding industry norms and customs in the oil and gas industry in order to assist the Court in understanding the parties' intent, understanding, and expectations under the [Tomahawk] Agreement." App. 266. At the motion to dismiss stage, Plaintiffs had not obtained an expert. Given the specialized nature of oil and gas transactions, expert testimony on industry custom with respect to AMI agreements was particularly appropriate. The District Court should have

---

[14] Even under the stricter Rule 60(b) standard, "a motion for reconsideration is appropriate where the court has misapprehended the facts, [or] a party's position." <u>Servants of the Paraclete v. Does</u>, 204 F.3d 1005, 1012 (10th Cir. 2000).

either denied the motions to dismiss or deferred a decision to allow Plaintiffs to get an expert and present their testimony.[15]

## VII. ON CROSS-MOTIONS FOR SUMMARY JUDGMENT THE DISTRICT COURT ACTED AS THE TRIER OF FACT, DECIDED DISPUTED FACTUAL ISSUES AND MISAPPLIED THE LAW

The parties filed cross-motions for summary judgment on (i) Plaintiffs' claim that TRZ/Hess breached the AMI Confidentiality Provision by disclosing the AMI Agreement to Brigham/Statoil, and (ii) Plaintiffs' claim that Brigham/Statoil was bound by the AMI Agreement and breached it by not assigning Plaintiffs ORRI on leases Brigham/Statoil acquired in the AMI. App. 1647-2042; App. 2103-2265; App. 1235-1329; App. 3178-4894. The District Court granted summary judgment for Defendants and denied Plaintiffs' motions. App. 5641-82.

The Court reviews de novo a district court's grant or denial of summary judgment. Foster v. Mtn. Coal Co., 830 F.3d 1178, 1186 (10th Cir. 2016). "Summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Hennagir v. Utah Dep't of Corrections, 587 F.3d 1255, 1261 (10th Cir. 2009); Fed. R. Civ. P. 56(a). A court must view the evidence in the light most favorable to the nonmoving party and resolve all factual disputes and make all reasonable

---

[15] Plaintiffs presented such expert testimony later in the case. See Report of Robin Forté (Dec. 14, 2014) (App. 3064-83).

inferences in its favor. Cillo v. City of Greenwood Village, 739 F.3d 451, 461 (10th Cir. 2013). At the summary judgment stage, "[t]he evidence of the nonmovant is to be believed." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 269 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Pinkerton v. Colorado Dept. of Transp., 563 F.3d 1052, 1058 (10th Cir. 2009) (quoting Anderson, 477 U.S. at 255).

When parties file cross-motions for summary judgment the same summary judgment standard applies. Jacklovich v. Simmons, 392 F.3d 420, 425-26 (10th Cir. 2004). However, each motion must be evaluated independently. Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979); Grosvenor v. Qwest Corp., 854 F. Supp. 2d 1021, 1024 (D. Colo. 2012). This is so "[b]ecause the determination of whether there is a genuine issue as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a prima facie case or to establish a genuine dispute as to material fact." Grosvenor, 854 F. Supp. 2d at 1024. A court must not assume that the filing of cross-motions means that there is no genuine issue of material fact. Brown v. Perez, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (by filing a motion for summary judgment, "a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede

that no issues remain in the event that his adversary's theory is adopted" (emphasis added) (citation omitted)).

### A. The AMI Agreement Is Binding on Brigham/Statoil for Three Independent Reasons

Plaintiffs and Brigham/Statoil cross-moved for summary judgment on Plaintiffs' Nonassignment Claim that Brigham/Statoil is bound by the AMI Agreement and obligated to assign Plaintiffs ORRI on the over 2,500 acres of new leases Brigham/Statoil acquired in the AMI. App. 1235-1349; App. 1647-2042. The AMI Agreement is binding on Brigham/Statoil for three independent reasons:

(1) The AMI Agreement's noncompete and ORRI covenants ("the AMI Covenants") are covenants running with the land.

(2) Brigham/Statoil was expressly assigned the AMI Agreement's obligations in a separate document signed and recorded <u>after</u> the TRZ/Hess-Brigham/Statoil Agreement.

(3) Brigham/Statoil accepted the benefits of the Tomahawk Agreement (including the noncompete and the Joint Operating Agreement ("JOA")), therefore, pursuant to N.D. Cent. Code § 9-03-25 Brigham/Statoil is deemed to have accepted its obligations.

On each of the issues, the facts are undisputed and Plaintiffs are entitled to judgment as a matter of law on liability and the Court should reverse the District Court's denial of Plaintiffs' motion, and remand with directions to enter judgment for Plaintiffs. App. 1647-2042; App. 5641-82. Alternatively, at an absolute minimum, viewing the evidence in the light most favorable to Plaintiffs as the nonmoving parties on Brigham/Statoil's motion, there are genuine issues of

material fact on each of these issues and the Court should reverse the District

Court's grant of summary judgment for Brigham/Statoil.

### 1. The AMI Covenants Run with the Land

#### a. The AMI Covenants meet all requirements under North Dakota law to be covenants running with the land.

TRZ/Hess and Plaintiffs clearly intended the AMI Covenants to run with the

land:

> This AMI [Agreement] and all rights, covenants and conditions hereof shall be considered covenants running with the land and shall inure to and be binding upon the Parties hereto, and their respective successors and assigns.

App. 305, ¶4; App. 1506 at 106:14-24, 108:20-109:3; App. 1377, ¶22. While

intent alone is not enough, see Beeter v. Sawyer Disposal LLC, 771 N.W.2d 282,

286 (N.D. 2009), it should be considered.

Under North Dakota law, a covenant running with the land is (i) "in a grant

of an estate in real property," and (ii) "made for the direct benefit of the property,"

or "appurtenant to" such property. N.D. Cent. Code §§ 47-04-24 and -26. Real

covenants "bind the assigns of the covenantor and . . . vest in the assigns of the

covenantee in the same manner as if they personally had entered into them." Id.

§ 47-04-24. Oil and gas leases are real property. Geostar Corp. v. Parkway

Petroleum, Inc., 495 N.W.2d 61, 67 (N.D. 1993). Thus, the assignment of the

Spring Creek Leases from Plaintiffs to TRZ/Hess is a conveyance of real property.

App. 765-81 ("the First Assignment of Spring Creek Leases"). The AMI Covenants are effectively incorporated into the First Assignment of Spring Creek Leases. App. 766, ¶B ("This Assignment is made subject to that certain Agreement for Exercise of Option to Purchase"); App. 1728, ¶7(c) (referring to and making a condition of closing the "AMI Agreement . . . that includes . . . [the covenant to assign Plaintiffs ORRI on all leases obtained in the AMI]"); App. 1664-65. Thus, the AMI Covenants run with the land (i.e., the Spring Creek Leases) and bind successors such as Brigham/Statoil if those covenants "directly benefitted" those leases.

The record contains substantial and undisputed evidence that the AMI Covenants, which must be viewed together,[16] directly benefitted the Spring Creek Leases. App. 1691, ¶¶35-36; App. 1665-71; App. 1364-67. The AMI Covenants:

- Helped TRZ/Hess and Brigham/Statoil acquire leases and develop the AMI area. App. 2046, ¶8; App. 1780 at 155:7-156:25; Andrew Scott Graham, "Real or Personal? The Area of Mutual Interest Covenant in the Williston Basin after *Golden v. SM Energy Company*," 89 N.D. L.

---

[16] App. 2047-49, ¶¶15-18, 21; App. 1668-69; <u>Flying Diamond Oil Corp. v. Newton Sheep Co.</u>, 776 P.2d 618, 625 (Utah 1989); Note, "Covenants Running with the Land: Viable Doctrine or Common-Law Relic?," 7 <u>Hofstra U. L. Rev</u>. 139, 164 (1978) ("the promise to pay is meaningless if separated from the context of the payment"); David A. Thomas, "How Far Does the Covenant Run?: Covenants that Run with the Land in Oil and Gas Transactions," 53 Rocky Mtn Min. L. Inst. 19-1, at 9 (2007) ("If a covenant to pay money enables performance of an act that itself touches and concerns the land, then the covenant qualifies as touching and concerning.").

Rev. 240, 254 (2013) ("Graham") ("the AMI . . . directly affected the prospects of leasehold development on the Original Leasehold estate in which both parties had vested interests");[17] Graham at 260 ("The AMI initially served to increase the possible return on any risk assumed by the parties developing the original leasehold, increasing the potential profit of the initial venture.").

- Reduced the prices that TRZ/Hess and Brigham/Statoil had to pay for leases in the AMI. App. 2048, ¶19; Terry I. Cross, "The Ties that Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties," 5 Tex. Wesleyan L. Rev. 193, 215 (1999) (AMI's reduction in competition "can contribute to keep the cost of leases lower than it would be otherwise").

- Allowed TRZ/Hess and Brigham/Statoil to acquire large blocks of leases in the AMI and increased the value of the Spring Creek Leases. App. 2047, ¶12; App. 2048, ¶20; App. 1814 at 54:2-20; App. 1815 at 108:11-16; App. 1791 at 79:20-80:24; App. 1797 at 131:6-132:13; App. 1808-09 at 217:21-218:6; Scott Lansdown, "Recent Challenges to Area of Mutual Interest Agreements" at 9, 28th Annual Ernest E. Smith Oil, Gas & Mineral Law Institute (University of Texas School of Law) (Mar. 22, 2002) ("The right to share in adjacent interests therefore affects the value of a lease.").

On Plaintiffs' motion for summary judgment on liability, the District Court should have concluded these facts are undisputed and granted summary judgment on liability for Plaintiffs. Alternatively, at an absolute minimum, the District Court should have concluded that there is a genuine issue of material fact on whether the AMI covenants directly benefitted the Spring Creek Leases, and let the jury decide.

---

[17] Both Plaintiffs and TRZ/Hess had vested interests in the Spring Creek Leases: TRZ/Hess owned them and Plaintiffs held an ORRI in them.

**b.    The    District    Court    erroneously    ruled    AMI
Agreements cannot run with the land.**

In granting summary judgment for Brigham/Statoil, the District Court erroneously ruled that under North Dakota law AMI agreements can <u>never</u> run with the land. App. 5660. The Court reviews this legal ruling de novo. <u>Philadelphia Indemnity Ins. Co. v. Lexington Ins. Co.</u>, 845 F.3d 1330, 1336-37 (10th Cir. 2017). The District Court misread the North Dakota Supreme Court's decision in <u>Golden v. SM Energy Co.</u>, 826 N.W.2d 610 (N.D. 2013) and dismissed or disregarded substantial authority holding covenants in AMI Agreements <u>do</u> run with the land. <u>See</u>, <u>e.g.</u>, <u>Westland Oil Dev. Corp. v. Gulf Oil Corp.</u>, 637 S.W.2d 903 (Tex. 1982); Williams & Meyers (citing <u>Westland</u>).

The District Court put great weight on <u>Golden</u>. App. 5657-90. However, <u>Golden</u> simply does not address, much less decide, the issue of whether an AMI agreement can be a covenant running with the land under North Dakota law. <u>Golden</u>, 826 N.W.2d at 615-19. In <u>Golden</u>, the parties <u>stipulated</u> that the joint area of interest clause in their 1970 letter agreement was not a covenant running with the land. 826 N.W.2d at 615. Thus, that issue was not before the court. The only issue before the court was whether "SM and its predecessors in interest [had] agreed to be bound by the AMI clause under the law of assignments." <u>Id.</u> The court then addressed and decided the assignment issue. <u>Id.</u> at 616-17. Therefore, <u>Golden</u> has no precedential value on whether an AMI agreement can satisfy North

Dakota's statutory requirements to be a covenant running with the land. The District Court acknowledged that the <u>Golden</u> court "did not expressly decide" the issue, yet the District Court then erroneously held that <u>Golden</u> decided the issue. App. 5658-59 & nn.13-14.

Moreover, the District Court took the <u>Golden</u> court's comments regarding the law of assignments, App. 5659 ("an assignee of contractual rights 'is responsible only for the obligations of the assignor which the assignee contracts to undertake'" (quoting <u>Golden</u>, 826 N.W.2d at 616)), and erroneously concluded this meant an assignee must consent for a covenant to run with the land, <u>id.</u> This misstates the law and conflates two completely separate legal concepts. Nothing in N.D. Cent. Code §§ 47-04-24 and -26 requires an assignee's consent for a covenant to run with the land, which would undermine the entire concept.

Substantial authority supports the conclusion that the North Dakota Supreme Court would hold that AMI agreement covenants can run with the land. <u>See</u>, <u>e.g.</u>, <u>Westland</u>, 637 S.W.2d at 911; <u>Anderson Energy Corp. v. Dominion Okla. Tex. Exploration & Prod. Tex., LLC</u>, 469 S.W.3d 280, 292 (Tex. App. 2015) (holding parties intended oil and gas interests acquired by successors in area of mutual

interest be subject to joint operating agreement);[18] <u>Shore Exploration and Prod.</u> <u>Corp. v. Exxon Corp.</u>, 976 F. Supp. 514, 523 (N.D. Tex. 1997) (holding notice and delay rental provisions in oil and gas lease are covenants running with the land); <u>cf.</u> <u>TransTexas Gas Corp. v. Forcenergy Onshore, Inc.</u>, 2012 WL 1255218, at *6, 2012 Tex. App. LEXIS 2907, at **17-18, No. 13-10-00445-CV (Tex. Ct. App. Corpus Christi Apr. 12, 2012) (holding joint operating agreement that stated it was binding on successors and assigns ran with the land); <u>Kincaid v. W. Operating Co.</u>, 890 P.2d 249, 253 (Colo. App. 1994) (affirming trial court finding that oil and gas operating agreement applied to later-acquired interests); Graham at 263-64. In <u>Westland</u>, the Texas Supreme Court held that an AMI agreement covenant to assign ORRI "clearly affected the nature and value of the estate conveyed" and "runs with the land." 637 S.W.2d at 905, 911. With no analysis, the District Court rejected <u>Westland</u> and did not address the other cases. App. 5657-60.

Mr. Graham's 2013 <u>North Dakota Law Review</u> article concludes that even after <u>Golden</u> "an AMI can exist as a real covenant in North Dakota." Graham at 243. The author said AMI agreements are analogous to many real covenants that at common law run with the land, and not allowing AMIs to run with the land

---

[18] In <u>Anderson</u>, the trial court ruled that the AMI provisions are real covenants that run with the land and the parties did not appeal that ruling. <u>Anderson</u>, 469 S.W.3d at 293 n.6.

would "disadvantage development" of oil and gas resources. Id. at 263. Plaintiffs cited this article. App. 1667-74; App. 1367. The District Court, however, did not address it. App. 5656-60. The North Dakota Supreme Court would likely consider it.

The North Dakota Supreme Court certainly would recognize that it did not decide the issue in Golden and likely would view Westland, the other cases, and Mr. Graham's article as persuasive and hold that AMI agreements can be covenants running with the land if they satisfy N.D. Cent. Code §§ 47-04-24 and -26. Therefore, the Court should reverse the District Court and hold that AMI agreements can be covenants running with the land under North Dakota law. The Court should then hold the AMI Agreement in the instant case is a covenant running with the land and binding on Brigham/Statoil, and direct the District Court to enter judgment that Brigham/Statoil breached the AMI Agreement by not assigning Plaintiffs ORRI on all leases Brigham/Statoil acquired in the AMI. Alternatively, at an absolute minimum, the Court should reverse the District Court's grant of summary judgment for Brigham/Statoil and allow the jury to decide.

## 2. Brigham/Statoil Expressly Assumed the AMI Agreement

Although Brigham/Statoil tried not to assume the AMI Agreement in the TRZ/Hess-Brigham/Statoil Agreement, it did expressly assume it in the separate, subsequently executed and recorded Second Assignment. App. 1835-62.

In the Second Assignment, TRZ/Hess assigned all of its "right, title and interest" in the Spring Creek Leases to Brigham/Statoil, including "all overriding royalty interests." App. 1835, ¶A. It states:

> [TRZ/Hess] grants, bargains, sells, conveys, assigns, transfers, and delivers unto [Brigham/Statoil] all of [TRZ/Hess's] right, title and interest . . . in and to . . . :
>
> A. The oil and gas leases specifically described in <u>Exhibit A</u>, including all leasehold estates, royalty interests, <u>overriding royalty interests</u>, net profits interests, and similar interests.

<u>Id.</u> (emphasis added). Before the Second Assignment, TRZ/Hess had assigned Plaintiffs ORRI in the Spring Creek Leases. App. 1864-95 ("the ORRI Assignment"). The ORRI Assignment said it "is made subject to" the AMI Agreement. App. 1865, ¶B. After the Second Assignment, Brigham/Statoil understood, and does not dispute, that it was obligated to honor the terms of the ORRI Assignment. App. 647, ¶27 ("[Brigham/Statoil] admits that it has made overriding royalty payments to Plaintiffs for certain leasehold interests in the Tomahawk Prospect that [Brigham/Statoil] acquired from [TRZ/Hess] in 2010, <u>which were subject to Plaintiffs' overriding royalty interests then in existence</u>." (emphasis added)).

Nothing in the Second Assignment of Spring Creek Leases disclaims the AMI Agreement. App. 1835-36; App. 1785 at 277:6-13.

The TRZ/Hess-Brigham/Statoil Agreement and the Second Assignment of Spring Creek Leases are two separate agreements. Both were signed by David Brigham for Brigham/Statoil. Mr. Brigham, Statoil's Rule 30(b)(6) witness on the subject, testified that the original agreement and a subsequent assignment are "separate agreements." App. 1783 at 214:15-216:18; App. 1651, ¶12. Because they are separate agreements, Brigham/Statoil's self-serving statements in the TRZ/Hess-Brigham/Statoil Agreement that "we don't want the AMI Agreement" are overridden by the subsequent Second Assignment. James Barlow Family Ltd. P'ship v. David M. Munson, Inc., 132 F.3d 1316, 1321 (10th Cir. 1997) (intent of parties to preserve federal oil and gas leases expressed in terms of settlement agreements overridden by terms of subsequently-recorded mining claim patents); Wehner v. Schroeder, 354 N.W.2d 674, 678 (N.D. 1984) (when agreement is followed by recorded deed "*the deed alone must be looked to for determination of the rights of the parties*" (emphasis in original) (citation omitted)). Thus, the subsequently-recorded Second Assignment expressly assigns the AMI Agreement to Brigham/Statoil.

Furthermore, Brigham/Statoil "expressly assume[d]" the JOA:

> 3. This Assignment is <u>made subject to</u> and [Brigham/Statoil] hereunder <u>expressly assumes</u> its proportionate share

54

of the obligations owed to the other parties under the terms of the
Joint Operating Agreement.

App. 1835, ¶3 (emphasis added). The JOA, App. 1564-1646, was attached to and

made part of the Participation Agreement. [19] App. 1393-99. The Participation

Agreement refers to and specifically includes the AMI Agreement (and the AMI

Covenants). App. 1393, ¶1. Thus, by expressly assuming the JOA,

Brigham/Statoil expressly assumed the AMI Agreement.

### 3. Brigham/Statoil Accepted the Benefits of the Tomahawk Agreement and by Law Consented to Its Obligations

Finally, the AMI Agreement is binding on Brigham/Statoil because of N.D.

Cent. Code § 9-03-25. By statute, and for obvious reasons, North Dakota prevents

a party from taking the benefits of a contract without the obligations.

> A voluntary acceptance of the benefit of a transaction is equivalent to
> a consent to all the obligations arising from it so far as the facts are
> known or ought to be known to the person accepting.

Id. Thus, the AMI Agreement's obligations are binding on Brigham/Statoil if it (i)

knew of the obligations of the Tomahawk Agreement, and (ii) voluntarily accepted

the benefits of the Tomahawk Agreement. These elements are satisfied and

undisputed.

---

[19] The JOA was attached to and made a part of the Tomahawk Agreement
Participation Agreement. App. 1395, ¶2. The JOA "govern[ed] all of the
operations on the leases within the Tomahawk Prospect and the AMI." Id. The
JOA addresses the rights and duties of the operator of wells, well drilling and
operations, expenses, and other issues. App. 1571-84, §§ V, VI and VII.

First, Brigham/Statoil undisputedly knew the facts concerning the obligations of the Tomahawk Agreement because Brigham/Statoil got a copy of the AMI Agreement from TRZ/Hess before signing the TRZ/Hess-Brigham/Statoil Agreement. See supra §III.C.4.

Second, Brigham/Statoil voluntarily accepted benefits of the Tomahawk Agreement. App. 1835, ¶3; App. 5155-87; App. 2048, ¶¶19-20; App. 1746-52; App. 1902, ¶¶5-9; App. 1835, ¶4.

The benefits of the Tomahawk Agreement clearly provided to Brigham/Statoil as the holder of the Spring Creek Leases include:

- The JOA, App. 1910-90; App. 1818-19 at 168:20-169:6, 171:4-12;

- Making it easier to develop the AMI area. App. 2046, ¶8; App. 1780 at 155:7-156:25;

- Plaintiffs not competing for leases in the AMI which reduced the prices Brigham/Statoil had to pay for leases. App. 2048, ¶19;

- Helping Brigham/Statoil acquire large blocks of leases in the AMI, App. 2047-48, ¶¶12, 20; App. 1814 at 54:2-20; App. 1815 at 108:11-16; App. 1791 at 79:20-80:24; App. 1797 at 131:6-132:13; App. 1808 at 217:21-218:6; and

- Getting (from TRZ/Hess) Plaintiffs' confidential well, lease and land information. App. 1746-52; App. 1902, ¶¶5-9.

Voluntary acceptance requires "extrinsic evidence of conduct after completion of the transaction that suggests a voluntary acceptance of the benefit of the transaction." Golden, 826 N.W.2d at 618. In other words, "the mere act of entering into a transaction itself" is not sufficient. Id. The District Court found

that there is "no evidence [Brigham/Statoil] itself assumed the benefits of the AMI agreement by, for example, attempting to enforce the AMI Agreement's non-compete provision." App. 5664. That conclusion ignores the undisputed evidence and overly-restricts how a party can accept the benefits of a transaction. Brigham/Statoil's conduct in and after signing the TRZ/Hess-Brigham/Statoil Agreement shows that it did voluntarily accept the benefits of the Tomahawk Agreement.

First, Brigham/Statoil indisputably accepted the benefits of the JOA. The Second Assignment states:

> 3. This Assignment is <u>made subject to</u> and [Brigham/Statoil] hereunder <u>expressly assumes</u> its proportionate share of the obligations owed to the other parties under the terms of the <u>Joint Operating Agreement</u>.

App. 1835, ¶3 (emphasis added). The evidence is undisputed that the JOA was a benefit. Brigham/Statoil's own expert, Bruce Kramer, testified that a joint operating agreement benefits the parties by defining operating issues and relationships. App. 1818-19 at 168:20-169:6. He also testified that the JOA was part of the benefits of the Tomahawk Agreement. App. 1819 at 171:4-12. Thus, it is undisputed that Brigham/Statoil accepted the benefits of the JOA and the Tomahawk Agreement.

Second, Brigham/Statoil purchased many leases (totaling over 2,500 acres) in the AMI. App. 5155-87. With each of these lease purchases, Brigham/Statoil

accepted the benefits of Plaintiffs not competing for leases in the AMI. This included facing no competition for leases from Plaintiffs and paying lower prices for leases. App. 2048, ¶¶19-20.

Third, Brigham/Statoil accepted Plaintiffs' confidential well, lease and land information from TRZ/Hess. App. 1746-52; App. 1902, ¶¶5-9.

Brigham/Statoil's voluntary acceptance of the benefits of the Tomahawk Agreement was expressly confirmed in April 2010 when Brigham/Statoil signed the Second Assignment stating that TRZ/Hess "transfer[red] to [Brigham/Statoil] . . . the benefit of . . . the covenants . . . with respect to the [Spring Creek Leases]." App. 1835, ¶4.

All requirements of N.D. Cent. Code § 9-03-25 are satisfied. On Plaintiffs' motion, with respect to § 9-03-25, "the evidence is such that no reasonable jury could return a verdict for the nonmoving party." Huffman v. Saul Holdings Ltd. Partnership, 194 F.3d 1072, 1080 (10th Cir. 1999); see also App. 1677-79. Therefore, the Court should reverse the District Court and direct the entry of judgment on liability in favor of Plaintiffs.

Alternatively, the jury should decide whether Brigham/Statoil voluntarily accepted the benefits of the Tomahawk Agreement. Generally, "whether one has voluntarily accepted a benefit of a transaction under N.D.C.C. § 9-03-25 is a question better suited for trial before a trier of fact than for summary judgment

disposition." Golden, 826 N.W.2d at 618.  On Brigham/Statoil's motion, viewing the evidence in the light most favorable to Plaintiffs as the nonmoving parties, at an absolute minimum there is a genuine issue of material fact on whether Brigham/Statoil voluntarily accepted the benefits of the Tomahawk Agreement, and the Court should reverse the grant of summary judgment for Brigham/Statoil and remand for trial.

### B. The Facts are Undisputed and a Reasonable Jury Could Only Conclude That TRZ/Hess Breached the AMI Confidentiality Provision

That TRZ/Hess disclosed the AMI Agreement to Brigham/Statoil before entering into the TRZ/Hess-Brigham/Statoil Agreement is undisputed and admitted.  App. 636, ¶19.  Plaintiffs moved for partial summary judgment on liability on the breach of confidentiality claim.  App. 2103-2265.  TRZ/Hess's response did not raise the statute of limitations.  App. 2304-25.[20]  Later, TRZ/Hess moved for summary judgment based on statute of limitations.  App. 3178-3222. The District Court's only basis for denying Plaintiffs' motion was statute of limitations.  App. 5667-75, 5681-82.  However, that decision must be reversed. See infra § VII(C).  On the question of liability on the merits, no reasonable jury could conclude that TRZ/Hess did not breach the AMI Confidentiality Provision.

---

[20] As to Plaintiffs' motion, TRZ/Hess waived the statute of limitations.  Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1167 (S.D. Ind. 1992).

Thus, the Court should reverse the District Court's denial of Plaintiffs' motion for partial summary judgment and direct the District Court to enter judgment on liability in Plaintiffs' favor.

**C.    A Genuine Issue of Material Fact Exists on Whether the Breach of Confidentiality Claim Was Timely Filed**

Whether a claim is barred by the statute of limitations "is generally held to be a question of fact for the jury." Gognat v. Ellsworth, 259 P.3d 497, 502 (Colo. 2011). Such is the case here. A reasonable jury could conclude that Plaintiffs timely filed their breach of confidentiality claim against TRZ/Hess. While some evidence may support a contrary conclusion that simply creates a genuine issue of material fact that must be decided by the jury, if not waived by TRZ/Hess.

Plaintiffs could timely file their breach of contract claim up to three years after "the date the breach [was] discovered or reasonably should have been discovered by the exercise of reasonable diligence." C.R.S. §§ 13-80-108(6), 13-80-101(1)(a). Spring Creek filed suit on December 13, 2013. App. 56-115. Gold Coast intervened as of April 21, 2015. App. 388-94. Thus, the question is whether a reasonable jury could conclude that the breach of confidentiality claim accrued on or after December 13, 2010 (Spring Creek) or April 21, 2012 (Gold Coast). As to both Plaintiffs, the answer is yes. This is particularly true because the statute of limitations is an affirmative defense, and TRZ/Hess had the burden of proof. Crosby v. American Family Mut. Ins. Co., 251 P.3d 1279, 1283 (Colo.

App. 2010); Fed. R. Civ. P. 8(c)(1). Here, to reach its conclusion, the District Court improperly made inference upon inference against Plaintiffs, contrary to the evidence and the law.

### 1. The Jury Could Conclude the Claim Accrued in May-October 2012

Plaintiffs presented evidence that from May-October 2012 Plaintiffs investigated and discovered that TRZ/Hess had stopped acquiring leases after March 2010 and Brigham/Statoil then acquired 2,500 acres of leases without assigning Plaintiffs any ORRI. App. 5204 at 203:10-21; App. 4893; App. 5155-56; App. 5011, ¶24; App. 5206 at 326:4-10, 328:10-23; App. 5153-54, ¶19; App. 5316, ¶12. Witnesses for Spring Creek and Gold Coast declared under oath that as of September 18, 2012, and at all times prior, Plaintiffs did not know, did not suspect and did not have any information suggesting that TRZ/Hess had violated the AMI Confidentiality Provision. App. 5011, ¶26; App. 5317, ¶13.

Two witnesses testified that the October 30, 2012 letter from Brigham/Statoil's counsel is what caused Spring Creek to suspect or believe that TRZ/Hess had disclosed the AMI Agreement to Brigham/Statoil before entering into the TRZ/Hess-Brigham/Statoil Agreement. App. 5011-12, ¶28; App. 5203 at 198:13-201:17; App. 5191 at 291:20-292:1 ("I didn't know it until the lawyer said that they had sold the agreement and – 'But we didn't take this, that, or the other,' so I knew they had breached it."); App. 5310, ¶7; App. 5263-64.

61

Gold Coast's president stated under oath that "Gold Coast did not know or suspect . . . that TRZ/Hess had disclosed the . . . AMI Agreement to Brigham/Statoil" until after Spring Creek filed the Complaint on December 23, 2013. App. 5317, ¶15.

The jury could believe the foregoing evidence and reasonably conclude that Plaintiffs did not discover, and reasonably should not have discovered, the breach of the AMI Confidentiality Provision until May-October 2012. Since that is less than three years before Spring Creek sued and Gold Coast intervened, Plaintiffs' breach of confidentiality claim is timely.

### 2. Alternatively, the Jury Could Conclude the Claim Accrued After December 2010

In April, July and December 2010, TRZ/Hess sent Plaintiffs documents that assigned Plaintiffs ORRI in leases that TRZ/Hess had acquired in the AMI. App. 3579-94, 3596-3601, 3603-08. When the third of these was recorded on December 23, 2010, Plaintiffs believed TRZ/Hess was assigning Plaintiffs ORRI according to the AMI Agreement and Plaintiffs "did not know, did not suspect, and did not have any information suggesting that TRZ/Hess had disclosed the AMI Agreement to Brigham/Statoil in violation of the AMI Agreement's confidentiality provision." App. 5008, ¶15; App. 5315, ¶9. A month or two later, Plaintiffs "believed that TRZ/Hess would comply and had complied with its obligations under the AMI Agreement's confidentiality provision." App. 5008-09, ¶16; App. 5316, ¶10.

From these facts, the jury could at least reasonably conclude that as of December 23, 2010 Plaintiffs had not, and reasonably should not have, discovered TRZ/Hess's breach of the AMI Confidentiality Provision. Since Spring Creek sued less than three years later, Spring Creek's claim is also timely as of then.

### 3. The District Court Erred in Making Factual Findings the Claim Accrued on September 13, 2010

Contrary to the foregoing evidence, the District Court said it "agrees with [TRZ/Hess]," "finds" that the confidentiality claim accrued as of September 13, 2010, and held it was barred by the statute of limitations. App. 5670, 5673, 5675. Reversible error permeates the District Court's analysis and conclusion. The District Court made "find[ings]" that only the jury can make. App. 5673-75. The District Court failed to view the evidence from the perspective of a reasonable jury or recognize that TRZ/Hess has the burden of proof. App. 5667-75. The District Court made factual findings, added them together and drew inference upon inference that was contrary to the evidence.[21]

---

[21] The Court recently reversed the District Court (Brimmer, J.) in a similar situation. See Leone, 810 F.3d at 1161. "'Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.'" Id. at 1153 (quoting Hunt v. Cromartie, 526 U.S. 541, 553 (1999)). The Court said "[t]he district court's conclusions are troubling in a number of respects, including the fact that the court drew inferences in favor of the [defendant] rather than plaintiff." Id. at 1160. The same is true in the instant case.

The District Court's first finding of fact was that Plaintiffs had "actual notice" of the TRZ/Hess-Brigham/Statoil Agreement by September 13, 2010. App. 5670. This was based solely on one email from Gold Coast's president. Id. (citing App. 4764) ("We sold Tomahawk to Randy, who flipped to Tracker until Brigham came to Tracker and claimed TRZ violated an agreement and Brigham got to buy Tom from TRZ.")). Gold Coast does not dispute that no later than September 13, 2010, Gold Coast knew TRZ/Hess had sold some leases in the Tomahawk Prospect to Brigham/Statoil. However, this one fact could in no way be the basis for summary judgment.

Moreover, Spring Creek did not learn of the TRZ/Hess-Brigham/Statoil deal until later, in January/February 2011. App. 5200 at 182:5-12; App. 5008, ¶12. As to Spring Creek, the jury could believe this evidence which itself would put Spring Creek within the three-year statute of limitations. However, the District Court ignored it, App. 5670-75, or disbelieved it, App. 5672-733 n.20 ("Ms. Weissner's statements asserting Spring Creek's ignorance of the agreement are not entitled to any weight.").[22] This violated the rule that on summary judgment "the evidence of the non-movant is to be believed." Pinkerton, 563 F.3d at 1058 (citation omitted).

_____

[22] The District Court cited United States v. Premises Known as 717 S. Woodward Street, Allentown, Pennsylvania, 2 F.3d 529, 533 (3d Cir. 1993) for the proposition that a denial of knowledge in a declaration is not sufficient to defeat summary judgment. App. 5672-73 n.20. However, the District Court failed to mention that

The second finding of fact was that Gold Coast's president learned of the TRZ/Hess-Brigham/Statoil Agreement from William Coleman of Spring Creek by September 2010. App. 5670-71 (citing App. 5214 at 125:13-18). The evidence does not support this inference. First, the District Court relied on testimony by Mr. McPherson concerning a separate later email dated October 14, 2011. App. 5213 at 121:24-122:7; App. 4051. Mr. McPherson testified that "[a]t that point," i.e., as of October 14, 2011, he had an understanding that some of the Tomahawk Prospect properties had been sold by TRZ/Hess to Brigham/Statoil. App. 5214 at 125:2-18. This testimony says nothing about the source of Mr. McPherson's knowledge in September 2010. Moreover, when asked directly when Mr. Coleman told him, Mr. McPherson testified he did not recall. Id. at 125:23-126:2. This record does not preclude that in September 2010 Mr. McPherson had heard about a deal between TRZ/Hess and Brigham/Statoil from a source other than Mr. Coleman, and Mr. Coleman mentioned it to him, if he did at all, only later at a time Mr. McPherson does not recall. As noted above, there is evidence that Spring Creek did not learn of even the sale of leases from TRZ/Hess to Brigham/Statoil until January/February 2011--within the statute of limitations for Spring Creek. App.

---

the Third Circuit held there was no reason a rational jury could not believe the sworn affidavit and actually reversed the lower court's grant of summary judgment. Id. at 534-536.

5200 at 182:5-12; App. 4369; App. 5008-09, ¶¶12, 17; App. 4735-36; App. 2507 at 239:5-7.

The District Court's third finding of fact was that "Plaintiffs knew that any entity, such as [Brigham/Statoil], would need to review all agreements that burdened oil and gas leases before agreeing to acquire those leases." App. 5673. While there is evidence from which the jury might reach that conclusion, there also is evidence from which the jury reasonably could conclude that is not always true. App. 3727 at 33:13-18 ("I've seen it nowadays where they [sophisticated buyers of oil and gas assets] don't [want to review contracts that burdened the properties that are being transacted]"); id. at 33:19-24 (industry custom and practice has changed in the last five to seven years). The District Court--improperly acting as the trier of fact--discredited this testimony. App. 5673-74. Viewed in the light most favorable to Plaintiffs as the nonmoving parties, this testimony supports the conclusion that sophisticated buyers of leases do not always review agreements burdening the leases before buying them. This creates a genuine issue of material fact that only the jury can decide.[23]

---

[23] Moreover, Plaintiffs reasonably (and quite properly) believed TRZ/Hess would comply with the AMI Confidentiality Provision. App. 5008-09, ¶16; App. 5316, ¶10; cf. Restatement (Second) of Contracts § 232 cmt. a (contract law assumes parties will honor their contract obligations).

Further, based on the above findings of fact, the District Court (again improperly acting as the trier of fact) drew the inference (adverse to Plaintiffs even though they were the nonmoving parties) that "as soon as plaintiffs were aware of [the sale of leases], plaintiffs either knew or should have known that [TRZ/Hess] disclosed the AMI agreement to [Brigham/Statoil]." App. 5674. The District Court erred in acting as the trier of fact and drawing this inference against the nonmoving parties. Pinkerton, 563 F.3d at 1058. Furthermore, this inference is directly contradicted by sworn testimony from not one, not two, but three witnesses:

- "Q. . . . You understood that [TRZ/Hess] breached the confidentiality clause because it had sold the assets to [Brigham/Statoil]? . . . A. No." App. 5191 at 292:7-12.

- "When I learned in January or February 2011 that TRZ/Hess had sold or assigned to Brigham/Statoil some of the leases that Spring Creek had sold to TRZ/Hess, I believed and assumed that Brigham/Statoil had not seen the AMI Agreement until after the leases had been assigned to them." App. 5009, ¶18.

- The recorded assignment of leases from TRZ/Hess to Brigham/Statoil (App. 4735-62) "did not and would not have caused me to think or suspect, that TRZ/Hess had disclosed the AMI Agreement to Brigham/Statoil before TRZ/Hess assigned to [Brigham/Statoil] the leases that are assigned in [the Second Assignment]." App. 5315, ¶7.

The District Court ignored this evidence and held the breach of confidentiality claim was barred by the statute of limitations. App. 5675. The Court should reverse and let the jury decide.

### 4. The Jury Could Conclude that TRZ/Hess's Conduct Equitably Tolled the Statute of Limitations[24]

In addition, the jury reasonably could conclude that TRZ/Hess fraudulently concealed material information that in equity and good conscience should have been disclosed to Plaintiffs and this concealment tolled the statute of limitations. The District Court disagreed and in one paragraph concluded that because it found that the statute of limitations started to run on September 13, 2010, any concealment by TRZ/Hess did not matter. App. 5674-75.

Plaintiffs submitted evidence that TRZ/Hess (i) concealed from Plaintiffs the TRZ/Hess-Brigham/Statoil Agreement for over four years (App. 5146, ¶12; App. 5009, ¶17; App. 5266-5305; App. 5035 at 163:14-164:6; supra n.7); (ii) concealed other material information (App. 5050, ¶31; App. 5008, ¶14; App. 5009, ¶17;App. 5011-12, ¶¶27-28; App. 5315-17, ¶¶8, 11, 14-15); (iii) misrepresented that the TRZ/Hess-Brigham/Statoil Agreement was "confidential" and could not be shared (App. 4347-48; App. 4637, ¶9; App. 5010-11, ¶¶21-23); and (iv) made other misrepresentations (App. 4708; App. 5009-11, ¶¶17, 22-23; App. 5317-19, ¶¶16-19). Given the nature of the Tomahawk Agreement between TRZ/Hess and

---

[24] The Court only needs to address equitable tolling if it is otherwise inclined to not reverse on the statute of limitations issue.

Plaintiffs,[25] the jury reasonably could conclude that TRZ/Hess "in equity and good

conscience should [have] disclosed," the information it concealed from Plaintiffs.

First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp., 744 P.2d 1197,

1200 (Colo. 1987). Thus, the jury reasonably could conclude that TRZ/Hess's

concealment of material facts from Plaintiffs (which if known would have caused

Plaintiffs to sue TRZ/Hess earlier) tolled the statute of limitations to October 2012.

With such tolling Plaintiffs' claims are unquestionably timely.

## VIII. PLAINTIFFS' WORKING INTEREST DAMAGES ARE PROPER BREACH OF CONTRACT DAMAGES

TRZ/Hess moved for summary judgment on Plaintiffs' Working Interest

Damages arguing they "are legally improper contract damages." App. 525-32.

TRZ/Hess's motion only addressed whether Plaintiffs' Working Interest Damages

are recoverable on a breach of contract claim and did not assert that Plaintiffs had

---

[25] The Tomahawk Agreement was "a broader development agreement," intended to "facilitate exploration and development of oil and gas resources in the" AMI to "share the risk of developing the prospect" with TRZ/Hess "tak[ing] the lead and be[ing] in control of development," with Plaintiffs contributing leases and confidential well, lease and land information, and with Plaintiffs supposed to receive ORRI on all leases acquired in the AMI by TRZ/Hess and its successors and assigns. App. 5219, ¶¶7-8; App. 270 (recitals); App. 5220, ¶¶9-10; App. 1196-1201; App. 5047-48, ¶23; App. 5222, ¶22; App. 312-13, ¶¶1-2; App. 5051, ¶¶35-36; App. 5221-23, ¶¶19-25; see also App. 304-06, ¶¶1, 4; App. 5220, ¶15.

not suffered or submitted evidence of such damages.[26]  The Court reviews this legal issue de novo.  <u>Philadelphia Indemnity</u>, 845 F.3d at 1336-37.

TRZ/Hess's breach of the AMI Confidentiality Provision was a material breach of the AMI Agreement that discharged Plaintiffs' duty to comply with the Noncompete Provision.  <u>Resolution Trust Corp. v. Fed. Sav. & Loan Corp.</u>, 25 F.3d 1493, 1501 (10th Cir. 1994); <u>Restatement (Second) of Contracts</u> § 237. Plaintiffs then "would have immediately begun competing with [TRZ/Hess] and/or [Brigham/Statoil] by aggressively acquiring leases in the AMI area."  App. 698, ¶43(b).  From TRZ/Hess's breach through the end of the AMI term, Plaintiffs would have obtained up to 6,174 net acres of leases in the AMI.  App. 784-85, ¶¶10-11; App. 786-88.  These leases would have given plaintiffs a right to working interests in wells drilled with a value of $182 million to $403 million.  App. 624. These are Plaintiffs' Working Interest Damages.

Plaintiffs' Working Interest Damages are properly recoverable on Plaintiffs' claim against TRZ/Hess for breaching the AMI Confidentiality Provision. TRZ/Hess's breach of confidentiality caused Plaintiffs to lose the opportunity to acquire leases in the AMI.  Such "lost opportunity" damages are proper breach of

---

[26] Since Plaintiffs' tort claims had been dismissed, whether Plaintiffs' Working Interest Damages are recoverable on Plaintiffs' tort claims was not before the District Court.

contract damages. See, e.g., The Superlative Group, Inc. v. WIHO, L.L.C., 2014 WL 1385533, at *4 (D. Kan. Apr. 9, 2014) (under Kansas law, plaintiff can recover reliance damages in the form of lost opportunities to make contracts); Designer Direct, Inc. v. DeForest Redevelopment Auth., 368 F.3d 751, 752 (7th Cir. 2004) (under Wisconsin law, "plaintiff may also seek reliance damages under a theory of lost opportunity"); Restatement (Second) of Contracts § 344(b) (contract remedies include "reimburse[ment] for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made"); id. cmt. a (contract damages include those incurred "in foregoing opportunities to make other contracts"). Thus, lost opportunity damages are widely available for breach of contract.

The District Court erroneously predicted that the Colorado Supreme Court likely would limit reliance or lost opportunity damages "to circumstances where expectation damages are uncertain or impossible to calculate." App. 4901-8. This misstates the law. Colorado courts allow recovery of a wide range of breach of contract damages. See, e.g., Watson v. Cal-Three, LLC, 254 P.3d 1189, 1194-95 (Colo. App. 2011) ("The expectancy interest is not the only interest that is protectable by an award of damages in a breach of contract case."); Restatement

(Second) of Contracts § 344.[27] While Plaintiffs often seek reliance or lost opportunity damages when their expectation damages are uncertain or impossible to calculate, nothing in Colorado law imposes that as a condition to recover reliance or lost opportunity damages.

The District Court also erroneously held that a party's reliance or lost opportunity damages are capped at the amount of expectation damages. App. 4901-1 through 4901-14. Again, this misstates the law. While certain damages may be limited to the contract price in some circumstances, see Restatement (Second) of Contracts § 347 cmt. b, the law does not prohibit recovery of lost opportunity damages that exceed expectation damages if supported by the evidence. TRZ/Hess indisputably breached the AMI Confidentiality Provision. That material breach deprived Plaintiffs of the benefit of the bargain and discharged Plaintiffs' obligation to not compete for leases. Under these circumstances, the Colorado Supreme Court is likely to rule that the jury could award the proven amount of Plaintiffs' Working Interest Damages even if greater than the amount of Plaintiffs' expectation damages.

---

[27] "The Restatement . . . is highly persuasive authority." 1-1 Corbin on Contracts § 1.21 (2017); Pioneer Real Estate, Inc. v. Larese, 762 P.2d 720, 724 (Colo. App. 1988) (citing Restatement § 344).

# IX.   <u>CONCLUSION</u>

Plaintiffs gave up the ability to acquire additional leases in the AMI and their confidential information in exchange for the promise they would receive ORRI on all leases acquired by TRZ/Hess and Brigham/Statoil in the AMI over three years. TRZ/Hess and Brigham/Statoil's actions deprived Plaintiffs of what they were promised. The District Court's orders are erroneous as a matter of law, reward Defendants for their breaches and improper conduct and improperly limit the jury's ability to award Plaintiffs appropriate compensatory damages. Plaintiffs request that the Court:

- Reverse the dismissal of Plaintiffs' failure to pursue leases, breach of good faith and fair dealing, fraudulent concealment, tortious interference and civil conspiracy claims.

- Reverse the denial of Plaintiffs' motion for reconsideration.

- Reverse the denial of Plaintiffs' motion for partial summary judgment on liability against Brigham/Statoil.

- Reverse the summary judgment for Brigham/Statoil.

- Reverse the denial of Plaintiffs' motion for partial summary judgment on liability against TRZ/Hess.

- Reverse the summary judgment for TRZ/Hess on statute of limitations.

- Reverse the summary judgment on Plaintiffs' Working Interest Damages.

Defendants were more than happy to use Plaintiffs' leases, information and noncompete to further their own interests. If the District Court's orders stand, an

AMI agreement will mean nothing for anyone in the oil and gas industry because it can be breached with impunity by simply transferring the lease to any new entity. As a wise trial judge said a half-century ago: "'This case portrays just another oil deal in which the party in whose name the leases are taken, after the well has been successfully brought in, would like to relieve himself of an encumbrance he was glad to use in putting the deal together.'" <u>Lyle Cashion Co. v. McKendrick</u>, 204 F.2d 609, 612 (5th Cir. 1953) (quoting trial court). In this case, Plaintiffs ask the Court to prevent that unfair and legally unsupported result.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is necessary because this case presents important issues of law and fact affecting AMI agreements in the oil and gas industry. Oral argument will assist the Court in understanding a complex record and deciding the multiple issues on appeal.

DATED:  June 28, 2017.

Respectfully submitted,

*s/ Tamir I. Goldstein*
Tamir I. Goldstein
John W. Mill
Joseph C. Daniels
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 297-2900
tgoldstein@shermanhoward.com
jmill@shermanhoward.com
jdaniels@shermanhoward.com

ATTORNEYS FOR
PLAINTIFFS-APPELLANTS

# <u>CERTIFICATE OF COMPLIANCE</u>

**Section 1. Word count**

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 16,477 words.

Complete one of the following:

■ I relied on my word processor to obtain the count and it is Word Version 2010:

□ I counted five characters per word, counting all characters including citations and numerals.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonably inquiry.

Dated: June 28, 2017.

*s/ Tamir I. Goldstein*
Tamir I Goldstein

## <u>CERTIFICATIONS</u>

1.      I hereby certify all required privacy redactions have been made.

2.      I hereby certify that the hard paper copies of this brief which are being submitted to the Court are exact copies of the PDF version of this brief which was filed electronically via the Court's ECF system.

3.      I hereby certify that a copy of the foregoing **APPELLANTS' OPENING BRIEF**, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the most recent version of a commercial virus scanning program (System Center Endpoint Protection, updated 06/28/17), and according to the program are free of viruses.

Dated:  June 28, 2017.

*s/ Donna L. Fouts*
Donna L. Fouts, Legal Secretary

# CERTIFICATE OF SERVICE

The undersigned certifies that on June 28, 2017, she caused the foregoing

**APPELLANTS' OPENING BRIEF** to be served via the Court's ECF system on

the following:

Elizabeth J. Hyatt, Esq.
Ogborn Mihm, LLP
1700 Broadway, Suite 1900
Denver, CO 80290
Elizabeth.hyatt@omtrial.com
*Attorneys for Defendant-Appellee Hess*
*Bakken Investment II, LLC*

Frank C. Porada, Esq.
FisherBroyles, LLP
1400 Sixteenth Street, Suite 400
Denver, CO 80202
Frank.Porada@FisherBroyles.com
*Attorneys for Defendant-Appellee*
*Statoil Oil & Gas LP*

Robert Safi, Esq.
Ashle L. McMillan, Esq.
Abigail C. Noebels, Esq.
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
rsafi@susmangodfrey.com
amcmillian@susmangodfrey.com
anoebels@susmangodfrey.com
*Attorney for Defendant-Appellee Hess*
*Bakken Investment II, LLC*

Alexis J. Gomez, Esq.
Cameron P. Pope, Esq.
Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002
agomez@andrewskurth.com
cpope@andrewskurth.com
*Attorneys for Defendant Statoil*
*Oil & Gas, LP*

Craig L. Stahl, Esq.
Andrews Kurth Kenyon LLP
10001 Woodloch Forest Drive
Suite 200
The Woodlands, TX 77380
craigstahl@andrewskurth.com
*Attorneys for Defendant Statoil*
*Oil & Gas, LP*

s/ Donna L. Fouts
Donna L. Fouts, Legal Secretary

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00134-PAB-KMT

SPRING CREEK EXPLORATION & PRODUCTION COMPANY, LLC,

     Plaintiff,

v.

HESS BAKKEN INVESTMENT II, LLC f/k/a TRZ Energy, LLC, and
STATOIL OIL & GAS, LP f/k/a Brigham Oil & Gas, LP,

     Defendants.

---

## ORDER

---

This matter is before the Court on the Motion to Dismiss [Docket No. 13] filed by defendant Hess Bakken Investments II, LLC ("Hess Bakken") and the Motion to Dismiss Pursuant to FRCP 12(b)(1), 12(b)(2) and 12(b)(6) [Docket No. 7] filed by defendant Statoil Oil & Gas LP ("Statoil").[1]  This case arises out of a 2009 contract between Spring Creek and Hess Bakken.  The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

---

[1] Statoil's motion to dismiss was filed jointly with defendant Statoil US Holdings, Inc.  However, on March 6, 2014, the parties stipulated to the dismissal of Statoil US Holdings Inc. and to the withdrawal of that defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).  Docket No. 30.  The parties also stipulated to the withdrawal of Statoil's motion to dismiss pursuant to Rule 12(b)(2).  *Id*.  The Court granted the parties' stipulated motion the following day.  Docket No. 31.  Accordingly, the only part of Docket No. 7 that is currently pending before the Court is Statoil's motion to dismiss pursuant to Rule 12(b)(6).  *Id*.

## I. BACKGROUND

The complaint sets forth the following allegations, which, for the purpose of ruling on the instant motions to dismiss, the Court takes as true. *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("We must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.").

Spring Creek is a Colorado company that engages in oil and gas exploration in the State of North Dakota. Docket No. 3 at 2, 3 ¶¶ 1, 8. Spring Creek owns or previously owned oil and gas interests in North Dakota, some of which are located in an energy-rich area known as the Tomahawk Prospect. *Id*. at 3, ¶ 9.

On October 8, 2009, Spring Creek entered into an agreement (the "Agreement") to sell its oil and gas interests in the Tomahawk Prospect to Hess Bakken. Docket No. 3 at 3, ¶ 10. As part of the Agreement, Spring Creek agreed not to acquire any additional interests in the Tomahawk Prospect and Hess Bakken agreed that it would assign Spring Creek an overriding royalty interest[2] in all current and future leases it held in the Tomahawk Prospect. *Id*. Spring Creek and Hess Bakken also entered into an Area of Mutual Interest Agreement ("AMI") in which Spring Creek agreed to refrain from securing additional oil and gas leases in the Tomahawk Prospect and Hess Bakken agreed to "immediately notify" Spring Creek of any new leases it acquired. *Id*. at 4, ¶¶ 13-14. The AMI included a confidentiality clause, barring the parties from disclosing

---

[2]An overriding royalty is a "share of either production or revenue from production (free of the costs of production) carved out of a lessee's interest under an oil-and-gas lease." Black's Law Dictionary 1839 (9th ed. 2009).

the AMI to any third party. *Id*. at 4-5, ¶ 16. Through November 5, 2010, Hess Bakken continued to acquire new leases in the Tomahawk Prospect and to assign an overriding royalty interest in those leases to Spring Creek. *Id*. at 5, ¶ 17.

In April 2010, Hess Bakken sold certain of its leases in the Tomahawk Prospect to Statoil as part of an agreement not to obtain additional leases and to refrain from competing with Statoil in the Tomahawk Prospect. Docket No. 3 at 5, ¶ 18 (the "Hess/Statoil Agreement"). As part of this agreement, Statoil purchased the leases subject to Spring Creek's overriding royalty interest. *Id*. at 6, ¶24. A Bill of Sale for this transaction was recorded with the Clerk and Recorder for the County of Williams, North Dakota. *Id*. at 6, ¶ 23 ("Bill of Sale").

During the course of its negotiations with Statoil, Hess Bakken disclosed the terms of the AMI to Statoil. Docket No. 3 at 5, ¶ 19. Neither Statoil nor Hess Bakken informed Spring Creek that it was entering into an agreement. *Id*. at 5, ¶ 20. Statoil and Hess Bakken agreed to keep their agreement hidden from Spring Creek and intentionally concealed the fact that Hess Bakken would not be entering into new leases in the Tomahawk Prospect, so that Statoil would be free to obtain new leases in the area without competition from Spring Creek. *Id*. at 5-6, ¶¶ 21-22.

Statoil has honored the Agreement, at least in part, by paying Spring Creek royalties on the leases in the Tomahawk Prospect that Hess Bakken already owned when Statoil and Hess Bakken entered into their agreement. Docket No. 3 at 6, ¶ 27. However, Statoil has since acquired new oil and gas leases in the Tomahawk Prospect without assigning overriding royalty interests to Spring Creek. *Id*. at 6, ¶ 28.

3

In the fall of 2012, Spring Creek realized that it had not been receiving new royalty interests and that Statoil had acquired a number of new leases in the Tomahawk Prospect.  Docket No. 3 at 6, ¶ 28.  On September 18, 2012, Spring Creek sent a letter to Hess Bakken and Statoil, raising its concerns that the parties were not complying with the terms of the Agreement or the AMI.  *Id.* at 7, ¶ 29.  On October 30, 2012, Spring Creek received a response from Statoil in which it admitted that it was aware of the terms of the AMI and that it would continue to pay royalties on those leases that Hess Bakken sold to Statoil.  *Id.* at 7, ¶ 30.  However, Statoil stated that it was not a party to the AMI and not obligated to assign an interest in new leases to Spring Creek. *Id*.

On December 13, 2013, Spring Creek filed a complaint in the District Court for the City and County of Denver, Colorado, asserting claims against Hess Bakken and Statoil for breach of contract, fraudulent concealment, and civil conspiracy.  Docket No. 3.  The complaint attaches the Agreement, including the AMI, as well as the Bill of Sale, *id*. at 12, 27, 35, but not the entire Hess/Statoil Agreement.

## II.  STANDARD OF REVIEW

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to plausibly state a claim.  Fed. R. Civ. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  A district court may take into account "documents referred to in the complaint if the documents are central to the plaintiff's

4

claim and the parties do not dispute the documents' authenticity." *Alvarado*, 493 F.3d at 1215 (citation and quotation marks omitted).

The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves are plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).

## III.  ANALYSIS

### A.  Claims Against Hess Bakken

#### *1.  Breach of Contract*

Spring Creek alleges that Hess Bakken breached the Agreement and the AMI by:

> 1) failing to disclose to Spring Creek all leases it acquired within the Tomahawk Prospect, 2) failing to acquire new leases within the Tomahawk Prospect during the entire period of the AMI, 3) disclosing the AMI and/or the terms of the AMI to third parties, and 4) failing to honor the Override Interests on the Existing Leases.

Docket No. 3 at 7, ¶ 36. Hess Bakken contends that these allegations fail to state a claim for breach of contract because (1) there are no allegations of fact to support the general allegation that Hess Bakken acquired, but did not disclose, a lease interest during the term of the AMI, Docket No. 7 at 4; (2) the AMI does not require Hess Bakken to acquire new leases, only to assign Spring Creek an interest in those leases it does acquire, Docket No. 7 at 4-5; (3) Hess Bakken did not breach the contract by

5

disclosing the AMI to Statoil if, as Spring Creek alleges, Hess Bakken assigned its rights and obligations under the AMI to Statoil, Docket No. 7 at 5; (4) Spring Creek waived its right to argue that Hess Bakken breached the confidentiality clause because Spring Creek subsequently disclosed the terms of the AMI to Statoil, Docket No. 7 at 5; and (5) there are no factual allegations to support the general allegation that Hess Bakken failed to honor Spring Creek's overriding royalty interest in the leases.  Docket No. 7 at 6.

In Colorado, a claim for breach of contract has four elements: (1) the existence of a contract; (2) plaintiff's performance or some justification for nonperformance; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff.[3]  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Contract construction is generally a matter of law for the Court to decide.  *Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo. 1994).  The primary goal in construing a contract is to "give effect to the intention of the parties."  *Town of Minturn v. Tucker*, 293 P.3d 581, 590 (Colo. 2013).  "Whenever possible, this intent should be ascertained from the plain language of the [contract] alone."  *Mid-Century Ins. Co. v. Robles*, 271 P.3d 592, 594 (Colo. App. 2011).  Courts construe undefined terms according to their "plain meaning, avoiding strained and technical interpretations."  *Fire Ins. Exchange v. Sullivan*, 224 P.3d 348, 351 (Colo. App. 2009).  "The court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all

---

[3]Hess Bakken moves to dismiss under Colorado law and does not dispute that the choice of law provision in the AMI, Docket No. 3 at 29, ¶ 7, governs Spring Creek's claims against it.  *See* Docket No. 13 at 3.

provisions so that none will be rendered meaningless." *Copper Mountain, Inc. v. Industrial Systems, Inc.*, 208 P.3d 692, 697 (Colo. 2009) (quotation marks omitted).

Discerning the meaning of an ambiguous contract provision is the responsibility of the finder of fact. *Miller v. City and County of Denver*, 315 P.3d 1274, 1277 n.5 (Colo. App. 2013). A contract provision is ambiguous if "it is susceptible of more than one reasonable interpretation." *Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010).

Hess Bakken does not dispute that it entered into valid contracts with Spring Creek, namely, the Agreement and the AMI. The parties' dispute primarily concerns whether Hess Bakken performed its contractual obligations.

### a. Failing to Disclose New Leases

Spring Creek asserts that the complaint "specifically alleg[es] that after November 2011, Statoil acquired new leases in the Tomahawk Prospect and that neither Hess [Bakken] nor Statoil ever disclosed those leases to Spring Creek." Docket No. 33 at 3-4. In support of this assertion, Spring Creek cites paragraph 28 of the complaint, which alleges:

> Since entering into the Hess/Statoil Agreement, Statoil has acquired numerous new oil and gas leasehold interests within the Tomahawk Prospect (the "New Leases"). Neither Statoil US, Statoil, or Hess, however, have assigned any Override Interests to Spring Creek, as required by the AMI, for the New Leases. Statoil has conceded that they are obligated to honor Spring Creek's Override Interests in the Existing Leases.

Docket No. 3 at 6, ¶ 28. The cited paragraph does not allege that Hess Bakken failed to disclose newly acquired leases, only that it failed to assign Spring Creek an overriding royalty interest in newly acquired leases. *See id*. Moreover, Spring Creek's

reliance on paragraph 34 of the complaint is unpersuasive, since that paragraph similarly alleges no failure to disclose. *Id.* at 7, ¶ 34. Accordingly, Spring Creek fails to state a claim for breach of contract based on Hess Bakken's failure to disclose leases acquired by either Statoil or Hess Bakken after April 2010.

### b.  Failing to Acquire New Leases

Hess Bakken contends that it was not obligated under the Agreement or the AMI to acquire new leases, but only to assign Spring Creek a royalty interest in any leases that it happened to acquire in the Tomahawk Prospect during the relevant time period. Docket No. 13 at 4. Hess Bakken further argues that, even if had some general obligation to pursue new leases, it was not required to obtain a minimum number of leases nor was it required to pursue new leases during a particular time frame. *Id.* Hess Bakken cites the use of the word "if" in the second sentence of the following section of the AMI as an indication that it was not obligated to pursue new leases:

> During the term of the AMI, only [Hess Bakken] may proceed to lease or otherwise acquire interests within the AMI.  If, during the term of the AMI, [Hess Bakken] should acquire any oil and gas lease, leasehold interest or mineral interest, [Hess Bakken] shall offer such interest to Coachman in the following proportions, [Hess Bakken] (90%), Coachman (10%), pursuant to that certain Participation Agreement dated October 8, 2009, by and between [Hess Bakken] and Coachman.  Furthermore, for any oil and gas lease acquired by [Hess Bakken] in the AMI, [Hess Bakken] shall immediately notify Spring Creek and Gold Coast in writing of such acquisition and Spring Creek and Gold Coast shall be entitled to an overriding royalty interest . . . . for the Spring Creek [overriding royalty interest], Spring Creek and Gold Coast, or their affiliates shall not be entitled to acquire any interest or otherwise compete with [Hess Bakken] within the AMI.

Docket No. 3 at 27, ¶ 1.

Spring Creek does not identify a specific provision of the Agreement or the AMI that requires Hess Bakken to pursue leases and to do so throughout the three-year

term of the AMI.  Docket No. 33.  Instead, Spring Creek argues that, reading the

Agreement and the AMI as a whole, it is clear that such an obligation was contemplated

by the parties–otherwise, many provisions of these contracts would be rendered

meaningless.  Docket No. 33 at 5.  For example, the AMI provides that Hess Bakken

"shall endeavor to retain Diamond Resources as a lease broker to acquire interests

within the AMI," but that if Hess Bakken is "unable to retain Diamond Resources, or if

for any reason [Hess Bakken] is unsatisfied with their performance, [Hess Bakken] may

select and retain a different lease broker in [Hess Bakken's] sole discretion."  Docket

No. 3 at 28, ¶ 3.[4]  Spring Creek further argues that the "use of the term 'if,' in the

context of the Agreement, is clearly an acknowledgment that neither party can

guarantee a land/mineral owner will sign a lease."  Docket No. 33 at 5.  Finally, Spring

Creek argues that, under the AMI, it gave up the right to pursue its own leases in the

Tomahawk Prospect in exchange for Hess Bakken's agreement to pursue such leases

and assign Spring Creek an interest in any leases it obtained.  *Id*.

Neither the Agreement nor the AMI, or both considered together, explicitly

obligates Hess Bakken to acquire new leases.  *See generally* Docket No. 3 at 12, 27.

Spring Creek is unable to point to any language in either agreement that creates such

an obligation.  The language in the AMI that refers to leasing is inconsistent with any

obligation for Hess to acquire new leases: "If, during the term of the AMI, [Hess] should

acquire any oil and gas lease. . . ."  Docket No. 3 at 27.  Rather than evidencing an

---

[4]This language is not rendered meaningless by interpreting the AMI in the way
Hess Bakken suggests.  Regardless of whether Hess Bakken had an obligation to
acquire new leases or not, this provision is simply a non-binding broker preference.

intent of the parties to require Hess to acquire additional leases, the AMI reflects an agreement to define Hess Bakken's obligations in the event that it *did* acquire a new lease.[5]  This interpretation, which is the only reasonable interpretation, does not render any of the language of the AMI meaningless.  Spring Creek fails to state a breach of contract claim based on Hess Bakken's failure to acquire new leases in the Tomahawk Prospect.

### c.  Confidentiality Provision

Spring Creek alleges that Hess Bakken breached the confidentiality provision in the AMI by "disclos[ing] the terms of the AMI to Statoil prior to entering into the Hess/Statoil Agreement.  Accordingly, at the time Hess and Statoil entered into the Hess/Statoil Agreement, Statoil was fully aware that Spring Creek was [] not actively pursuing new leasehold interests within the Tomahawk Prospect."  Docket No. 3 at 5, ¶ 19.

The AMI provides that "[t]he terms of this Agreement are confidential and no Party, nor any of its respective affiliates or representatives shall furnish this Agreement, or disclose any of its contents, to any third party."  Docket No. 3 at 29, ¶ 5.

Hess Bakken's counter-arguments miss the point.  Spring Creek alleges that Hess Bakken disclosed the terms of the AMI before Hess Bakken entered into an agreement and thus before Statoil allegedly became Hess Bakken's assignee for the

---

[5]Spring Creek does not ask the Court to interpret the AMI to contain an implied "best efforts" clause.  While such clauses are commonly read into exclusive dealing contracts, see *Kolbe & Kolbe Health and Welfare Ben. Plan v. Med. Coll. of Wis., Inc.*, 742 F.3d 751, 754 (7th Cir. 2014) (noting that best efforts clauses are commonly implied in exclusive dealing contracts), the Court is unaware of any authority that supports implying such a clause in an Area of Mutual Interest agreement.

purpose of the AMI.  Docket No. 3 at 5, ¶19.  The fact that Spring Creek alleges that

Statoil subsequently became Hess Bakken's assignee does not contradict or undermine

this breach of contract claim.

Hess Bakken argues that Spring Creek waived any claim to confidentiality of the

AMI by disclosing the AMI and its terms to Statoil in September 2012.  Docket No. 13 at

5.  But Spring Creek alleges that Hess Bakken disclosed the confidential terms of the

AMI before entering into the Hess/Statoil Agreement in April 2010.  Docket No. 3 at 5,

¶¶ 18-19.  Spring Creek did not disclose the terms of the AMI until September 2012,

more than two years after Hess Bakken's alleged breach.  *Id.* at 7, ¶ 29.  "[I]t is a

condition of each party's remaining duties to render performances to be exchanged

under an exchange of promises that there be no uncured material failure by the other

party to render any such performance due at an earlier time."  Restatement (Second) of

Contracts § 237 (1981); *see also Colo. Interstate Gas Co. v. Chemco, Inc.*, 854 P.2d

1232, 1239 (Colo. 1993) (citing § 237); *Converse v. Zinke*, 635 P.2d 882, 887 (Colo.

1981) ("If one party has failed to perform the bargained for exchange, the other party

may be relieved of a duty to continue its own performance, where the failure is material

and unexcused.").  A party's material breach of a contract discharges a counter-party's

duty to perform, even if the counter-party is unaware of the breach, and gives rise to a

claim for damages.  Restatement (Second) of Contracts § 237 cmt. c.  "Whether a

breach of a contract is material, and therefore excuses further performance by the other

party, is a question of fact."  *Kaiser v. Market Square Discount Liquors, Inc.*, 992 P.2d

636, 640 (Colo. App. 1999).

Spring Creek alleges that it breached the confidentiality provision only after Hess Bakken did so more than two years earlier.  Docket No. 3 at 7, ¶ 29.  The Court cannot determine on a motion to dismiss that Hess Bakken's alleged breach was immaterial.  *See Kaiser*, 992 P.2d at 640.  Accordingly, the Court finds that Spring Creek has stated a claim for breach of contract based on the allegation that Hess Bakken breached the promise to keep the terms of the AMI confidential.

### d.  Failing to Honor Royalty Interests in Existing Leases

Hess Bakken argues that there are no "factual allegation[s] to support the theory that [Hess Bakken] breached the AMI Agreement by 'failing to honor Spring Creek's Override Interests in the Existing Leases.'"  Docket No. 13 at 6.

Spring Creek responds by citing paragraph 27 of the complaint, which alleges that, "[t]o date, Statoil, as successor in interest to Hess, has at least in part been honoring the terms of the Agreement, including the AMI, by paying Spring Creek its Override Interests on a portion of the Existing Leases."  Docket No. 3 at 6, ¶ 27.  Spring Creek also alleges that, "[n]otwithstanding the Hess/Statoil Agreement, and Hess' agreement with Statoil to breach the Agreement, Hess remains subject to and responsible for its obligations under the Agreement."  *Id*. at 7, ¶ 34.

"Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."  Restatement (Second) of Contracts § 318; *see also Club Telluride Owners Ass'n, Inc. v. Mitchell*, 70 P.3d 502, 504 (Colo. App. 2002) (citing the Restatement (Second) of Contracts for the principle that "[a]n

obligor may effectively delegate performance to another who is willing to perform the delegated duty, but the obligor remains liable as surety unless the obligee consents to the delegation.").

Spring Creek alleges that Statoil, as assignee of Hess Bakken's rights under the AMI, has been paying interest on only a "portion of the Existing Leases."  Docket No. 3 at 6, ¶ 27.  Hess Bakken does not argue that Spring Creek consented to any delegation of its obligations under the AMI.  The complaint alleges that Statoil has not fully performed on the contractual obligation to pay royalties on existing leases and that Hess Bakken is liable for this non-performance.  This is sufficient to state a claim for breach of contract.

### 2. *Breach of Implied Covenant of Good Faith and Fair Dealing*

In Colorado, "every contract contains an implied duty of good faith and fair dealing." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  The duty to act in good faith applies when the parties, at the time of contract formation, defer a decision regarding certain terms of performance (such as quantity, price, or time) leaving one party with discretion to set such terms during the course of its performance.  *Id*.  Good faith performance under such circumstances entails "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."  *Id*. (citation omitted).  "A party's justified expectations are violated if evidence indicates it would not have signed the contract had it known of the manner in which the party given discretion would exercise its discretion to determine open terms under a contract."  *ADT Security Servs., Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007).

The implied covenant cannot, however, be used to impose obligations that conflict with the express terms of the agreement or to "inject substantive terms into the contract."  *Id*.

Spring Creek alleges that Hess Bakken breached the implied covenant of good faith and fair dealing by "entering into an agreement that prohibited [Hess Bakken] from acquiring any new leases within the Tomahawk Prospect, failing to disclose those terms, and failing to make efforts to obtain new leases."  Docket No. 3 at 8-9, ¶ 47. Hess Bakken argues that Spring Creek is attempting to insert a "best efforts" clause into the AMI for which the parties did not bargain.  Docket No. 13 at 7.

As discussed above, the AMI only defines Hess Bakken's obligations in the event that it acquires new leases.  Docket No. 3 at 27.  It does not obligate Hess Bakken to acquire any additional leases, or to continue pursuing leases in perpetuity.

Spring Creek also alleges that Hess Bakken breached the implied covenant of good faith and fair dealing by failing to disclose the terms of the Hess/Statoil Agreement to Spring Creek.  Docket No. 3 at 8-9, ¶ 47.  But Spring Creek alleges no facts that suggest a justified expectation that Hess Bakken would disclose the terms of all future agreements that affected its interests in the Tomahawk Prospect.  Accordingly, Spring Creek has failed to state a claim for breach of the implied covenant of good faith and fair dealing.

### 3.  *Fraudulent Concealment*

Spring Creek alleges that Hess Bakken breached its "duty to disclose to Spring Creek the fact that Hess was no longer acquiring new leases within the Tomahawk Prospect and that [it] had no intention of assigning Spring Creek its Override Interests in the New Leases" acquired by Statoil.  Docket No. 3 at 9, ¶ 57.  Spring Creek further

14

alleges that Hess Bakken fraudulently concealed this information in order to prevent

Spring Creek from acquiring its own leases in the Tomahawk Prospect and that Spring

Creek did in fact refrain from acquiring its own leases in reliance on its justified

expectation that Hess Bakken was continuing to acquire leases.  *Id.* at 10, ¶¶ 59-60.

Hess Bakken argues that Spring Creek's fraudulent concealment claim is barred by the

economic loss doctrine.  Docket No. 13 at 8-9.

> The tort of fraudulent concealment has five elements:
>
> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*BP America Production Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011) (citation

omitted).

The economic loss doctrine is a judicially-created rule under which "a party

suffering only economic loss from the breach of an express or implied contractual duty

may not assert a tort claim for such a breach absent an independent duty of care under

tort law."  *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962

(10th Cir. 2009) (citing *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259-62

(Colo. 2000)).  A duty is considered independent of a contract when two conditions are

satisfied: "[f]irst, the duty must arise from a source other than the relevant contract"; and

"[s]econd, the duty must not be a duty also imposed by the contract."  *Id.* at 962.

The Colorado Supreme Court has identified three policy reasons to support the

application of the economic loss rule between commercial parties: (1) maintaining the

distinction between contract and tort law; (2) enforcing expectancy interests of the parties so that they can reliably allocate risks and costs during bargaining; and (3) encouraging parties to build cost considerations into contracts since they will not recover economic damages in tort.  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).

A claim for fraudulent concealment sounds in tort.  *Barfield v. Hall Realty, Inc.*, 232 P.3d 286, 292 (Colo. App. 2010).  In order to recover on this claim, Spring Creek must show that Hess Bakken had a duty to Spring Creek to disclose certain information about its agreement with Statoil that is independent of the Agreement and the AMI.  *See Haynes Trane*, 573 F.3d at 962.  Spring Creek argues that Hess Bakken had an independent duty because it was "in a position of superior knowledge [vis-à-vis Spring Creek] and used that knowledge to [its] advantage."  Docket No. 33 at 11.

Spring Creek's reasoning is circular.  If a duty to disclose arose whenever a contractual party has superior information that it does not disclose, then there would be no need for courts to determine whether a party had an independent duty to disclose.  Such a holding would be equivalent to a blanket finding that the economic loss doctrine does not bar fraudulent concealment claims.  Colorado courts have resisted articulating such a broad rule.  Instead, they have held that an alleged misrepresentation that relates to the *ongoing* performance of a contract and occurs after the parties have "bargained for the allocation of risks, duties, and remedies" is barred by the economic loss rule.  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 75 (Colo. 2004); *A Good Time Rental, LLC v. First Am. Title Agency, Inc.*, 259 P.3d 534, 541 (Colo. App. 2011)

(negligent misrepresentation claim barred by economic loss doctrine where defendant falsely represented that it was performing a contractual obligation); *Rees v. Unleaded Software, Inc.*, --- P.3d ----, 2013 WL 6354532, at *3-4 (Colo. App. Dec. 5, 2013) (fraudulent misrepresentation claim based on party's failure to perform contractual duties was barred by the economic loss doctrine because parties were "sophisticated business entities" that "had the ability to account for the risk of nonperformance").

Furthermore, although a relationship of trust and confidence can arise when one party occupies a position superior to the other, *see First Nat'l Bank of Meeker v. Theos*, 794 P.2d 1055, 1060-61 (Colo. App. 1990), "superiority" in this context inheres in the structure of the parties' relationship. *See United Fire & Cas. Co. v. Nissan Motor Corp. in U.S.A.*, 433 P.2d 769, 770-71 (Colo. 1967) ("A confidential relationship has been defined as one 'between two persons when it is established that one occupies a superior position over the other–intellectually, physically, governmentally or morally–with the opportunity to use that superiority to the other's disadvantage."). Spring Creek does not allege that Hess Bakken occupied a superior *position* "intellectually, physically, governmentally or morally," *see id.*, only that it had superior *information* that it did not disclose to Spring Creek.

Spring Creek does not allege misrepresentations or omissions on Hess Bakken's part that fraudulently induced Spring Creek to enter into a contract, but rather alleges that Hess Bakken fraudulently concealed the fact that it was not performing its duties under an existing contract. Docket No. 3 at 9, ¶ 56. This claim is barred by the economic loss doctrine because the alleged misrepresentation took place while the

parties were performing the contract and pertained to Hess Bakken's alleged breach of the contract, not to the circumstances that initially induced Spring Creek to enter into the contract.  *See BRW*, 99 P.3d at 75; *A Good Time Rental*, 259 P.3d at 541.

## B.  Claims Against Statoil

As a threshold matter, in addressing plaintiff's claims against Statoil, the Court must decide which state's laws govern.  In a diversity case, a federal court must apply the choice of law rules of the forum state.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *Tucker v. R.A. Hanson Co., Inc.*, 956 F.2d 215, 217 (10th Cir. 1992). Statoil argues for the first time in its reply that North Dakota law applies to Spring Creek's allegations against it because North Dakota is the *situs* of the real property at issue.  Docket No. 34 at 1-2.  In a surreply filed to address choice of law issues, Spring Creek argues that its claims do not relate directly to leases in property, but rather to the performance of obligations under the Agreement as well as the circumstances surrounding the agreement between Hess Bakken and Statoil.  Docket No. 47 at 3.

Spring Creek is correct that North Dakota law does not apply to all of its claims simply because the real property at issue is located in that state.  The cases cited by Statoil stand only for the proposition that claims involving "the rights and titles" to real property are governed by the law of the *situs*.  *Wolf v. Burke*, 32 P. 427, 429 (Colo. 1893); *see also Clarke v. Clarke*, 178 U.S. 186, 191 (1900) ("It is a principle firmly established that to the law of the state in which the land is situated we must look for the rules which govern its *descent, alienation, and transfer*") (emphasis added).  Spring Creek's breach of contract and tort claims do not involve rights and title to real property.

18

Accordingly, the Court looks to Colorado's choice of law rules to determine which law governs Spring Creek's respective claims.

As Spring Creek points out in its surreply, the AMI contains a choice of law provision that provides that Colorado law governs the agreement.  Docket No. 3 at 29, ¶ 7.  For contract claims, Colorado courts apply the law chosen by the parties "unless there is no reasonable basis for their choice or unless applying the law of the state so chosen would be contrary to the fundamental policy of a state whose law would otherwise govern."  *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994) (citing Restatement (Second) of Conflict of Laws § 187 (1971)).  Here, there was a reasonable basis for selecting Colorado law because Spring Creek is a Colorado limited liability company, notices under the AMI are directed to each of the signatories in Colorado, and the Agreement appears to have been negotiated in Colorado.  Accordingly, the Court will apply Colorado law to Spring Creek's breach of contract claim.

With respect to its tort claims, Spring Creek argues first that the Court lacks sufficient facts to determine choice of law on a motion to dismiss, Docket No. 47 at 4-5 (citing *Susquehanna Inv. Group v. Amgen Boulder, Inc.*, 918 F. Supp. 326, 329 (D. Colo. 1996)), and, in the alternative, that Colorado law should apply based on application of the "most significant relationship" test.  *Id.* at 6.  Because neither party has demonstrated a substantial difference between the laws of Colorado and North

Dakota with respect to Spring Creek's tort claims, it is unnecessary to decide which state's law should apply to those claims at this time.[6]

### 1. Breach of Contract

Spring Creek alleges that Statoil, as assignee of the AMI, breached the AMI by

1) failing to disclose to Spring Creek all leases it acquired within the Tomahawk Prospect, 2) failing to assign to Spring Creek its Override Interests in the New Leases acquired by Statoil, and 3) failing to honor Spring Creek's Override Interests on all of the Existing Leases.

Docket No. 3 at 8, ¶ 41. Statoil contends that Spring Creek fails to state a claim upon which relief can be granted because (1) it is not an assignee of the AMI and thus is not liable for any of the obligations that arise under it, and (2) Spring Creek's claims with respect to existing leases are too conclusory to state a claim for breach of contract. Docket No. 34 at 3-5.

### a. Assignment of the AMI

Because the obligations to acquire new leases in the Tomahawk Prospect and to notify Spring Creek of any newly-acquired leases arise from the AMI, Docket No. 3 at 4, ¶ 14, and because Statoil is not a signatory to the AMI, Spring Creek's first two breach of contract theories against Statoil–failure to disclose all leases acquired within the Tomahawk Prospect and failure to assign override interests in newly-acquired

---

[6] *See Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 320-21 (10th Cir. 1997) (finding it unnecessary to determine choice of law issue where state law and federal common law were substantially similar); *see also Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1337 (D. Kan. 2000) (finding it unnecessary to determine choice of law matter on a motion to dismiss where "the [c]ourt discerns no material difference between the applicable substantive law").

leases–depend on Statoil being an assignee of that agreement.  Section 328 of the

Restatement (Second) of Contracts provides:

> (1) Unless the language or the circumstances indicate the contrary, as in an assignment for security, an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

> (2) Unless the language or the circumstances indicate the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties, and the obligor of the assigned rights is an intended beneficiary of the promise.

Statoil argues that the Bill of Sale contains no language purporting to assign the AMI.

Docket No. 34 at 3-4.  In response, Spring Creek argues that "other well-pled

allegations in the Complaint" explain that "the Hess/Statoil *Bill of Sale* is one part of the

larger Hess/Statoil *Agreement*, portions of which had not been disclosed to Spring

Creek, wherein Hess assigned all of its rights and obligations under the Agreement to

Statoil."  Docket No. 47 at 11-12 (citing Docket No. 3 at 6, ¶¶ 23-26) (emphasis in

original).

The Court finds that Spring Creek has plausibly pled that Statoil is the Assignee

of the Agreement and AMI.  Although Spring Creek has not attached or alleged the

contents of the entire Hess/Statoil Agreement, the complaint contains "direct or

inferential allegations respecting all the material elements necessary to sustain a

recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alteration and

quotation omitted).  While the Bill of Sale contains no language that references the AMI,

Spring Creek alleged that the Bill of Sale was only "part of th[e] transaction" between

Hess Bakken and Statoil.  Docket No. 3 at 6, ¶ 23.  Spring Creek further alleged that

"[t]hrough the Hess/Statoil Agreement, Statoil became the successor and/or assignee of Hess for the Agreement.  *Id.* at 5, ¶ 18.

### b.  Failing to Disclose New Leases

Spring Creek alleges no facts that support a breach of contract theory based on failure to disclose new leases.  As discussed above in regard to Spring Creek's breach of contract claims against Hess Bakken, the complaint alleges only that Statoil has not assigned override interests for the new leases to Spring Creek, not that it has failed to disclose the leases it has acquired.  *See* Docket No. 3 at 6, ¶ 28.  Accordingly, Spring Creek fails to state a claim for breach of contract against Statoil with respect to alleged failure to disclose new leases.

### c.  Failing to Assign Override Interests In New Leases

Statoil does not contest that if it were an assignee of the AMI, it would be obligated to satisfy Hess Bakken's contractual obligation to assign override interests in newly-acquired leases to Spring Creek.  *See generally* Docket No. 34 at 3-4.  Because Spring Creek has sufficiently alleged that Statoil is an assignee of the Agreement (including the AMI), Spring Creek has also adequately pled that Statoil breached the Agreement by failing to assign override interests in its newly-acquired leases. Specifically, Spring Creek alleged that, after entering into the Hess/Statoil agreement, Statoil "has acquired numerous new oil and gas leasehold interests within the Tomahawk Prospect" and that "[n]either . . . Statoil, or Hess . . . have assigned any Override Interests to Spring Creek, as required by the AMI, for the New Leases."

Docket No. 3 at 6, ¶ 28.  These allegations are sufficient to state a claim for breach of contract.

### d.  Failing to Honor Royalty Interests in Existing Leases

Spring Creek alleges that Statoil failed to honor Spring Creek's override interests in all of the existing leases.  Docket No. 3 at 8, ¶ 41.  Statoil argues that Spring Creek did not plead "what agreement Statoil breached" in relation to those leases, and provided only "conclusory allegations concerning an alleged breach or resulting damages."  Docket No. 34 at 5-6.[7]  While Spring Creek's allegations with respect to existing leases are cursory, the Court finds that they are plausible and sufficient to put Statoil on notice of its claim.  Spring Creek has alleged that Statoil took Hess's leasehold interests subject to Spring Creek's overriding royalty interests.  Docket no. 3 at 6, ¶ 24.  Spring Creek further alleged that Statoil failed to honor all of those interests. *Id.* at 8, ¶ 41.  Thus, Spring Creek has stated a claim for failure to honor royalty interests in existing leases.

### 2.    *Tortious Interference with Contract*

Spring Creek alleges that Statoil interfered with the Agreement and AMI by (1) "induc[ing] Hess to enter into an agreement that prohibited Hess from acquiring any new oil and gas leases in the Tomahawk Prospect," Docket No. 3 at 9, ¶ 50; (2) insisting that Hess not disclose the terms of the Hess/Statoil Agreement to Spring Creek, *id.* ¶ 52; and (3) intentionally structuring its agreements with Hess so that it could

---

[7]Statoil raises this argument for the first time in its reply brief.  Although parties should generally refrain from raising new arguments in support of dismissal in their reply papers, the Court finds that Spring Creek had sufficient opportunity to respond in its surreply and will consider Statoil's argument.

claim it was not obligated to honor the terms of the AMI.  *Id.* ¶ 53.  Spring Creek further alleges that Statoil was aware of the terms of the Agreement and knew that Hess Bakken would be in breach of the Agreement if it entered into the Hess/Statoil Agreement.  *Id.* ¶ 51.

> In Colorado:
>
> "[o]ne who *intentionally* and *improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

*Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984) (quoting Restatement (Second) of Torts § 766 (1977)) (emphasis in original).

Statoil notes that protection of contractual relations is not absolute and must be "balanced against other interests including the ability to engage in business and compete with others."  Docket No. 7 at 12.  While there is a degree of protection for business competition, where a contract is not terminable at will "the parties have a legal right to the future performance of the contract, and the interests of the parties to the contract outweigh the interests in competition."  *Memorial Gardens*, 690 P.2d at 211. Thus, interference with a contract not terminable at will is considered "improper."  *Id.* Statoil does not argue that the Agreement was terminable at will, and in fact argues the opposite.  In opposing Spring Creek's claim for breach of contract, Statoil acknowledges that the AMI was for a term of three years.  Docket No. 7 at 10; *see also* Docket No. 3 at 27 (providing that "[t]he term of the AMI shall be three (3) years").

Because the AMI was for a defined term and thus does not appear to be terminable at will, interfering with the AMI could be improper under the balancing test applied by Colorado courts.

Here, Spring Creek has failed to state a claim for tortious interference with contractual relations.  As discussed above, the AMI cannot reasonably be interpreted to require Hess Bakken to acquire new leases.  As such, Statoil correctly argues that it cannot have interfered with a contractual obligation that did not exist.  Docket No. 7 at 12.  With respect to the claim that Statoil caused Hess Bakken to keep the terms of the Hess/Statoil Agreement secret, Spring Creek identifies no provision in the Agreement that Hess Bakken breached as a result of Statoil's alleged actions.  Likewise, the claim that Statoil is liable for tortious interference with contractual relations for structuring the Hess/Statoil Agreement so that it would have a plausible claim that it was not obligated to assign its override interests to Spring Creek fails to identify how this conduct caused a breach on Hess Bakken's part.  Under well-established law, parties to an assignment agreement are free to apportion rights and obligations under the assigned contract however they please.  *See* Restatement (Second) of Contracts, § 328 (1981) (providing that an assignment of the whole contract operates as a delegation of unperformed duties under that contract "*[u]nless the language or the circumstances indicate the contrary*") (emphasis added).[8]

---

[8]Statoil argues in its reply that North Dakota law requires a showing that interference with contractual relations was not "justified."  Docket No. 34 at 6.  The Court finds that the laws of the two states are substantially similar, and the slight differences in the articulation of the elements of tortious interference with contractual relations between North Dakota and Colorado do not alter its analysis.  In North Dakota, actions are justified if they are done for "legitimate business concerns and did not

### 3. Fraudulent Concealment

Spring Creek alleges that Statoil breached a "duty to disclose to Spring Creek the fact that Hess [Bakken] was no longer acquiring new leases within the Tomahawk Prospect and that [it] had no intention of assigning Spring Creek its Override Interests in the New Leases" acquired by Statoil.  Docket No. 3 at 9, ¶ 57.  Statoil argues that it had no duty to disclose this information to Spring Creek.  Docket No. 7 at 13.

Colorado courts look to the Restatement to determine whether "the circumstances of a particular case give rise to a duty to disclose in 'equity or good conscience.'" *Mallon Oil Co. v. Bowen/Edwards Associates, Inc.*, 965 P.2d 105, 111 (Colo. 1998) (citing Restatement (Second) of Torts § 551 (1977)).  For a claim of fraudulent concealment, the Restatement contemplates a duty to disclose between parties to a transaction, and then only before the transaction is completed.  *See* Restatement (Second) of Torts §§ 551(1) ("[o]ne who fails to disclose to another a fact that he knows may justifiably induce the other *to act or refrain from acting in a business transaction*" may be liable) (emphasis added); 551(2) ("[o]ne party *to a business transaction* is under a duty to exercise reasonable care to disclose *to the other before the transaction is consummated*...") (emphasis added).  Spring Creek alleges that Statoil had a duty to disclose the facts of the Hess/Statoil agreement to Spring Creek, a non-party to the alleged agreement.  Docket No. 3 at 9, ¶ 57.  Spring Creek cites no

---

maliciously seek to damage the plaintiff."  *Thimjon Farms P'ship v. First Int'l. Bank & Trust*, 837 N.W.2d 327, 334 (N.D. 2013).  In Colorado, courts are directed to "examine various factors," including the "nature of the actor's conduct" and the "actor's motive."  *Memorial Gardens*, 690 P.2d at 210, n.7 (citing Restatement (Second) of Torts §§ 766-767 (1977)).

26

case, and the Court is aware of none, that has found a duty to disclose the terms of a contract to non-parties who may be affected by the agreement. *See Plateau Supply Co. v. Bison Meadows Corp.*, 500 P.2d 162, 165 (Colo. App. 1972) (no liability for failure to disclose in the absence of a "confidential relationship" between the parties). Because it alleges no facts that support a duty to disclose the terms of the Hess/Statoil Agreement, Spring Creek has failed to state a claim for fraudulent concealment against Statoil.

### C. Civil Conspiracy Against Hess Bakken And Statoil

Spring Creek alleges that Hess Bakken and Statoil engaged in an unlawful scheme to "commit the tortious acts identified in th[e] Complaint." Docket No. 3 at 10, ¶ 63. Defendants argue that Spring Creek cannot prove any underlying tort claim, and therefore the derivative claim of civil conspiracy must also fail. Docket No. 7 at 14; Docket No. 13 at 9.

The elements of a civil conspiracy are: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.'" *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989) (quoting *More v. Johnson*, 568 P.2d 437, 439-40 (Colo. 1977)); *see Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

Because Spring Creek failed to state a claim against either defendant for fraudulent concealment and has failed to state a claim against Statoil for tortious interference with contractual relations, it cannot maintain a derivative cause of action for

civil conspiracy with respect to its underlying tort claims.  *See Vickery v. Evelyn V. Trumble Living Trust*, 277 P.3d 864, 871 (Colo. App. 2011) (if "the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself") (citation and quotation omitted).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants Statoil and Hess Bakken's Motions to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket Nos. 7 and 13] are each **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that Plaintiff's third, fourth, fifth and sixth claims for relief are dismissed with prejudice.  It is further

**ORDERED** that Plaintiff's first claim for relief is dismissed with prejudice with regard to the theories that Hess Bakken failed to disclose leases acquired after April 2010 and failed to acquire new leases.  Plaintiff may proceed with his first claim for relief based on Hess Bakken's alleged breach of the confidentiality provision and failure to honor royalty interests in existing leases.  It is further

**ORDERED** that Plaintiff's second claim for relief is dismissed with prejudice with regard to failure to disclose all leases acquired by Statoil.  Plaintiff may proceed with its second claim for relief based on Statoil's alleged failure to assign override interests in new leases to Spring Creek and failure to honor royalty interests in existing leases.

DATED September 5, 2014.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00134-PAB-KMT

SPRING CREEK EXPLORATION & PRODUCTION COMPANY, LLC,

     Plaintiff,

v.

HESS BAKKEN INVESTMENT II, LLC f/k/a TRZ Energy, LLC, and
STATOIL OIL & GAS, LP f/k/a Brigham Oil & Gas, LP,

     Defendants.

---

**ORDER**

---

This matter is before the Court on the Motion for Reconsideration Regarding

Portions of the Court's Order Granting in Part and Dismissing in Part the Defendants'

Motions to Dismiss [Docket No. 52] filed by plaintiff Spring Creek Exploration &

Production Company, LLC ("Spring Creek").  The Court has jurisdiction pursuant to 28

U.S.C. § 1332(a)(1).

## I.  BACKGROUND

This case arises out of a dispute concerning an agreement (the "Agreement")

and an Area of Mutual Interest ("AMI") entered into between Spring Creek and

defendant Hess Bakken Investment II, LLC ("Hess Bakken") whereby Hess Bakken

agreed to assign to Spring Creek an overriding royalty interest in all current and future

leases it held in an area known as the Tomahawk Prospect.  Docket No. 3 at 3, ¶ 10.

In exchange for the overriding royalty interest in the leases, Spring Creek sold its oil and

gas interests in the Tomahawk Prospect to Hess Bakken and agreed not to acquire any

additional interests in the Tomahawk Prospect. *Id.* In April 2010, Hess Bakken sold certain of its leases in the Tomahawk Prospect to defendant Statoil Oil & Gas, LP ("Statoil") (with respect to the agreement between defendants, the "Hess/Statoil Agreement"). After Hess Bakken's sale of its interests in the Tomahawk Prospect to Statoil, Statoil honored the Agreement in part, by paying Spring Creek royalties on leases in the Tomahawk Prospect that Hess Bakken owned at the time of the Hess/Statoil Agreement, but Statoil did not assign overriding royalty interests to Spring Creek in any leases that it acquired in the Tomahawk Prospect after it acquired Hess Bakken's leases in that area. *Id.* at 6, ¶¶ 27-28.

Spring Creek initiated this action on December 13, 2013, asserting claims for relief for breach of contract, fraudulent concealment, and civil conspiracy against Hess Bakken and Statoil, as well as a claim for breach of the implied covenant of good faith and fair dealing against Hess Bakken and a claim for tortious interference with contract against Statoil. *See generally* Docket No. 3.

In its September 5, 2014 Order, the Court dismissed plaintiff's claims for breach of the implied covenant of good faith and fair dealing, tortious interference with contract, fraudulent concealment, and civil conspiracy. Docket No. 48 at 28. The Court also partially dismissed Spring Creek's breach of contract claims against each defendant. With respect to Spring Creek's breach of contract claim against Hess Bakken, the Court dismissed the claim with regard to the theories that Hess Bakken failed to disclose leases acquired after the Hess/Statoil Agreement and failed to acquire new leases. *Id.* The Court also partially dismissed Spring Creek's claim against Statoil for breach of contract with regard to the theory that Statoil breached the Agreement by failing to

2

disclose all of the leases it acquired in the Tomahawk Prospect.  *Id.*

Spring Creek seeks reconsideration of a portion of the Court's September 5, 2014 Order.  Specifically, Spring Creek asks the Court to reconsider the Court's holding that neither the Agreement nor the AMI obligated Hess Bakken to acquire new leases. Docket No. 52 at 2.  The result of this holding was partial dismissal of Spring Creek's first claim for relief (breach of contract against Hess Bakken).  *See* Docket No. 48 at 9-10, 28.

## II.  ANALYSIS

Spring Creek brings its motion pursuant to Fed R. Civ. P. 60(b), which concerns relief from a "final judgment, order, or proceeding."  However, no final judgment or order has entered against Spring Creek.  Where a party files a motion for reconsideration prior to the entry of judgment or of a final order, Rules 59(e) and 60(b) do not apply. *Houston Fearless Corp. v. Teter*, 313 F.2d 91, 92 (10th Cir. 1962).  Thus, Spring Creek's motion is procedurally improper and is denied on this ground.  In the alternative, even if the Court construes Spring Creek's motion as a motion for reconsideration, the Court nevertheless determines that Spring Creek has failed to demonstrate entitlement to relief.

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration.  *See Hatfield v. Bd. of County Comm'rs for Converse County*, 52 F.3d 858, 861 (10th Cir. 1995).  Instead, motions for reconsideration fall within a court's plenary power to revisit and amend interlocutory orders as justice requires.  *See Paramount Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1090 (10th Cir.

1980) (citing Fed. R. Civ. P. 54(b)); *see also Houston Fearless Corp.*, 313 F.2d at 92. However, in order to avoid the inefficiency which would attend the repeated re-adjudication of interlocutory orders, judges in this district have imposed limits on their broad discretion to revisit interlocutory orders. *See, e.g., Montano v. Chao*, No. 07-cv-00735-EWN-KMT, 2008 WL 4427087, at *5-6 (D. Colo. Sept. 28, 2008) (applying Rule 60(b) analysis to the reconsideration of interlocutory order); *United Fire & Cas. Co. v. McCrerey & Roberts Constr. Co.*, No. 06-cv-00037-WYD-CBS, 2007 WL 1306484, at *1-2 (D. Colo. May 3, 2007) (applying Rule 59(e) standard to the reconsideration of the duty-to-defend order). Regardless of the analysis applied, the basic assessment tends to be the same: courts consider whether new evidence or legal authority has emerged or whether the prior ruling was clearly in error. Motions to reconsider are generally an inappropriate vehicle to advance "new arguments, or supporting facts which were available at the time of the original motion." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

As grounds for reconsideration, Spring Creek argues that the Court was not, at the pleadings stage, provided with a complete version of the Agreement, as the Agreement consisted of a number of different contracts, not all of which were attached to Spring Creek's complaint. *See* Docket No. 52 at 2-3. According to Spring Creek, the entire agreement is ambiguous as to whether Hess Bakken had an obligation to acquire new leases, and Spring Creek should be allowed to present evidence regarding the parties' intent. *Id.* at 6-7. Hess Bakken argues that Spring Creek's failure to attach the complete Agreement to its complaint is not grounds for reconsideration of the Court's

4

order of dismissal.  Docket No. 60 at 3.  The Court agrees.  Spring Creek's motion is not based on evidence discovered after the Court issued its September 5, 2014 Order. Rather, as Spring Creek acknowledges, the additional contracts that it attaches to its motion for reconsideration were all "executed on or around October 8, 2009."  Docket No. 52 at 3.  Moreover, as Hess Bakken notes, *see* Docket No. 60 at 3, Spring Creek's argument in response to Hess Bakken's motion to dismiss was that the AMI "unambiguously" obligated Hess Bakken to pursue additional leases.  *See* Docket No. 33 at 4-5.  Spring Creek did not rely on any of the documents that it contends comprise the Agreement.  The Court rejected Spring Creek's argument and finds that Spring Creek's attempt to resurrect its breach of contract claim against Hess Bakken by raising an argument based on different agreements fails.

A motion for reconsideration is not the proper forum to entertain new interpretations of "supporting facts which were available at the time of the original motion."  *Servants of the Paraclete*, 204 F.3d at 1012.  Thus, even if the Court were to construe the instant motion as a motion for reconsideration, Spring Creek would not be entitled to relief.

## III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff Spring Creek Exploration & Production Company, LLC's Motion for Reconsideration Regarding Portions of the Court's Order Granting in Part and Dismissing in Part the Defendants' Motions to Dismiss [Docket No. 52] is **DENIED**.

DATED June 5, 2015.

BY THE COURT:

s/Philip A. Brimmer
_____
PHILIP A. BRIMMER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00134-PAB-KMT

SPRING CREEK EXPLORATION & PRODUCTION COMPANY, LLC, and
GOLD COAST ENERGY, LLC,

      Plaintiffs,

v.

HESS BAKKEN INVESTMENT II, LLC, f/k/a TRZ ENERGY LLC, and
STATOIL OIL & GAS LP, f/k/a BRIGHAM OIL & GAS LP,

      Defendants.

---

**ORDER**

---

This matter is before the Court on the Motion for Partial Summary Judgment as to Working Interest Damages [Docket No. 81] filed by defendant Hess Bakken Investment II, LLC ("Hess Bakken").  The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

**I. BACKGROUND[1]**

On October 8, 2009, Hess Bakken acquired approximately 5,409.63 net acres of oil and gas leasehold in Williams County, North Dakota known as the "Tomahawk Prospect" from plaintiffs Spring Creek Exploration & Production Company, LLC ("Spring Creek") and Gold Coast Energy, LLC ("Gold Coast").  Docket No. 81 at 2, Statement of Undisputed Material Fact ("SUMF") 1.[2]  Hess Bakken paid $1,200 per acre for the

---

[1]The following facts are undisputed unless otherwise indicated.

[2]At the time of the transaction, Hess Bakken was under different ownership and was known as TRZ Energy LLC.  Docket No. 81 at 2, SUMF 1.  For simplicity's sake, the

interests it acquired in the Tomahawk Prospect.  *Id.*  As part of the transaction, plaintiffs

and Hess Bakken entered into an Area of Mutual Interest Agreement (the "Agreement")

that established an area of mutual interest ("AMI") around the Tomahawk Prospect for a

three-year term.  *Id.* SUMF 2.  The Agreement states that "for any oil and gas lease

acquired by [Hess Bakken] in the AMI, . . . Spring Creek and Gold Coast shall be

entitled to an overriding royalty interest in such lease . . . provided that in no event shall

such overriding royalty be greater than 3% (the 'Spring Creek ORRI'). . . .   Except for

the Spring Creek ORRI, Spring Creek and Gold Coast, or their affiliates shall not be

entitled to acquire any interest or otherwise compete with [Hess Bakken] within the

AMI."  *Id.* SUMF 3.[3]  According to William Coleman, Spring Creek's president at the time

the Agreement was signed, the intent of the agreement was that Spring Creek would

not be entitled to acquire any working interest or otherwise to compete with Hess

Bakken within the AMI.  Docket No. 81-2 at 10, pp. 211:7-212:21.  Additionally, the

Agreement contains a confidentiality agreement that states: "[t]he terms of this

Agreement are confidential and neither [Hess Bakken] nor [plaintiffs], nor any of their

respective affiliates or representatives shall furnish this Agreement, or disclose any of

its contents, to any third party."  Docket No. 81-1 at 6, ¶ 6.

---

Court will treat any reference to TRZ Energy LLC in the record as referring to Hess
Bakken.

[3]An overriding royalty is a "share of either production or revenue from production (free of
the costs of production) carved out of a lessee's interest under an oil-and-gas lease."
Black's Law Dictionary 1839 (9th ed. 2009).

At some point after entering into the Agreement, Hess Bakken sold the Tomahawk Prospect to defendant Statoil Oil & Gas, LP ("Statoil"), then known as Brigham Oil & Gas, LP, as part of a settlement of Statoil's claims against Hess Bakken concerning an unrelated transaction.  Docket No. 81 at 2-3, SUMF 5; Docket No. 95 at 11, ¶ 23.[4]  As part of finalizing the sale of its leases acquired in the Tomahawk Prospect, Hess Bakken disclosed the terms of the Agreement to Statoil, which plaintiffs state breached the Agreement's confidentiality provision.  Docket No. 95 at 11-12, ¶ 26.  After Statoil became aware of the terms of the Agreement, Statoil revised its agreement with Hess Bakken to attempt to exclude Hess Bakken's obligations under the Agreement.  Docket No. 95 at 13, ¶ 33.  Plaintiffs state that the resulting settlement agreement between Hess Bakken and Statoil provided that Statoil would no longer honor plaintiffs' overriding royalty interests.  *Id.* ¶ 36(a).

In the operative complaint, plaintiffs state a claim for relief for breach of contract against Hess Bakken based on breach of the confidentiality provision in the Agreement and failing to honor the Spring Creek ORRI.  Docket No. 80 at 8-9, ¶¶ 32-37.[5]

---

[4]Plaintiffs state that they deny Hess Bakken's SUMF 5, Docket No. 95 at 5, ¶ 5, but do not provide a "**specific reference** to the material in the record supporting the denial" as required by the Court's practice standards.  *See* Practice Standards (Civil Cases), Judge Philip A. Brimmer § III.F.3.b.iv (emphasis in original).

[5]The amended complaint also purports to state claims for relief against Hess Bakken for breach of the implied covenant of good faith and fair dealing, fraudulent concealment, civil conspiracy, and breach of contract on the theories that Hess Bakken failed to disclose all leases it acquired within the Tomahawk Prospect and failed to acquire new leases within the Tomahawk Prospect during the entire period of the AMI.  *See* Docket No. 80 at 9-13, ¶¶ 36, 43-68.  The Court dismissed each of these claims with prejudice in an order dated September 5, 2014.  *See* Docket No. 48.  Plaintiffs were permitted to file their amended complaint in order to allow Gold Coast to intervene.  *See* Docket No.

Plaintiffs have two alternative theories for their damages: first, to be put in as good a position as plaintiffs would have been in had the contract been performed, largely through the recovery of lost overriding royalty interests; second, reliance damages for the value of the lost opportunity to acquire leases in the AMI area from the date of Hess Bakken's breach until the expiration of the Agreement.  Docket No. 95 at 3-4.[6]  Consistent with these two theories of damages, plaintiffs' damages experts, Rick Chamberlain and Adrian Reed, proffered two sets of damages calculations.  The first set of damages calculations, based on the lost value of the overriding royalty interests to which plaintiffs claim they were entitled, estimates plaintiffs' damages between $24.2 million and $59.3 million.  Docket No. 82-1 at 4.[7]  The second set of damages calculations, which is at issue here, is based on the value of plaintiffs' "potential working interest in leases within the AMI area had [plaintiffs] been free to compete."[8]  *Id.*  Mr.

_____

79 (granting Gold Coast's unopposed motion to intervene).  In seeking intervention, Gold Coast agreed to be bound by "all that has transpired with respect to Spring Creek in this action to date," including the Court's September 5, 2014 order.  Docket No. 77 at 3, ¶ 2.  Because plaintiffs did not seek, and were not granted, leave to re-allege claims that have been dismissed with prejudice, plaintiffs' third, fourth, fifth, and sixth claims for relief, as well as the portion of plaintiffs' first claim for relief that alleges previously-dismissed breach of contract theories, will be stricken.

[6]In an interrogatory response, plaintiffs state that they were damaged by Hess Bakken's alleged breach of the confidentiality provision in the Agreement by "the lost opportunity to either require [Statoil] to expressly acknowledge that by acquiring the Tomahawk leases it became an assignee of the AMI [Agreement] and/or the lost opportunity to seek and receive a waiver of the non-compete provision in the AMI [Agreement]."  Docket No. 81 at 3-4; Docket No. 81-5 at 5-6.

[7]These experts refer to plaintiffs as "Zavanna."  *See* Docket No. 82-1 at 4.  Spring Creek merged into Zavanna sometime in 2013 or 2014.  Docket No. 81-2 at 4, p. 71:3-10.

[8]As described by Hess Bakken's expert, John Lowe, the term "working interest" refers to the right to "work" leased property to find, develop, and produce minerals.  Docket No.

Chamberlain and Mr. Reed estimate these "working interest" damages between $182 million and $403 million.  *Id.*  Hess Bakken moves for partial summary judgment on the ground that plaintiffs' "lost opportunity" theory of damages is improper because plaintiffs, in the Agreement, disclaimed any expectation of receiving working interests within the AMI.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks

---

81-6 at 6, ¶ 8.

omitted)).  "Once the moving party meets this burden, the burden shifts to the

nonmoving party to demonstrate a genuine issue for trial on a material matter."

*Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir.

1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The nonmoving party

may not rest solely on the allegations in the pleadings, but instead must designate

"specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324;

*see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish,

at a minimum, an inference of the presence of each element essential to the case."

*Bausman*, 252 F.3d at 1115 (citation omitted).  When reviewing a motion for summary

judgment, a court must view the evidence in the light most favorable to the non-moving

party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

The only question before the Court is whether, under Colorado law, plaintiffs are

entitled to present their lost opportunity theory of damages to the jury.[9]  Hess Bakken

argues that plaintiffs' lost opportunity theory is legally improper because (1) the

Agreement entitled plaintiff only to payment of overriding royalty interests, and (2)

plaintiffs expressly disclaimed the right to acquire any working interests in the AMI

during the Agreement's three-year term.  Docket No. 81 at 6.

---

[9]The Agreement provides "any arbitration or dispute resolution conducted pursuant" to
the agreement "shall be construed in accordance with, and governed by, the laws of the
State of Colorado."  Docket No. 81-1 at 31, § 7.  Hess Bakken states that the
Agreement's choice of law provision governs.  Docket No. 81 at 5, n.6.  Plaintiffs do not
suggest otherwise.  As a result, the Court will apply Colorado law.

Plaintiffs' lost opportunity theory relies, in significant part, on Section 344 of the Restatement (Second) of Contracts, entitled "Purposes of Remedies," which states that contract remedies strive to protect

one or more of the following interests of a promisee:

(a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,

(b) his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

Restatement (Second) of Contracts, § 344 (1981).  Regarding the reliance interest, comment a to § 344 states: "[t]he promisee may have changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts." *Id.*, cmt. a.  In that case, "the court may recognize a claim based on [the party's] reliance rather than on his expectation" by "attempting to put [the party] back in the position in which he would have been had the contract not been made." *Id.*  Plaintiffs focus on the last form of reliance mentioned in comment a, "foregoing opportunities to make other contracts."

Plaintiffs argue that they are entitled to recover lost opportunity damages because, had the Agreement not been made, plaintiffs would have been "free to continue acquiring valuable leases in the AMI area."  Docket No. 95 at 3.  Accordingly, plaintiffs state that they should be allowed to present evidence concerning the value of the lost opportunity to acquire such leases from the time of Hess Bakken's breach.  *Id.*

7

at 4.  Plaintiffs' lost opportunity theory is predicated on the idea that, had they not entered into the Agreement (or had they rescinded the Agreement at the time of Hess Bakken's purported breach), plaintiffs would have entered into significantly more lucrative arrangements.  Plaintiffs estimate that they suffered "working interest" damages between $182 and $403 million, with an expected value of $271 million. Docket No. 82-1 at 4.  By contrast, plaintiffs' experts value their overriding royalty interests – the alternative "benefit of the bargain" theory – between $24.2 million and $59.3 million, with an expected value of $38.9 million.  *Id.*  Comparing the "expected value" of the two theories of damages calculation, plaintiffs state that their working interest damages are nearly seven times the value of their overriding royalty interests. *Id.*[10]

The parties have not identified any Colorado case addressing the circumstances that justify recovery of reliance damages.  Without a guiding opinion from Colorado, the Court must predict what the Colorado Supreme Court would do if faced with the issue. *Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1142 (10th Cir. 2008); *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002) (noting that, when the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court and, if no such rulings exist, must endeavor to predict how that high

---

[10]Hess Bakken characterizes plaintiffs' working interest damages as exceeding their overriding royalty interests "by a factor of twenty."  Docket No. 109 at 1 (emphasis in original).  It is unclear how Hess Bakken arrived at this twenty-fold difference.  Even the high range of plaintiffs' estimated working interest damages ($403 million) is not twenty times more than plaintiffs' low estimate of their overriding royalty interests ($24.2 million).  *See* Docket No. 82-1 at 4.

court would rule).  Other jurisdictions that follow the Restatement generally limit recovery of reliance damages to circumstances where expectation damages are difficult or impossible to prove with certainty.  *See, e.g.*, *Brennan v. Carvel Corp.*, 929 F. 2d 801, 811 (1st Cir. 1991) (under Massachusetts law, "[d]amages based on the injured party's reliance interest are often granted when the party's damages based on lost expectations are uncertain or cannot be measured") (citing Restatement (Second) of Contracts § 349, cmt. a (1981)); *Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 367 F. Supp. 2d 122, 138 n.28 (D. Mass. 2005) (noting that reliance damages may be appropriate where "expectancy damages are too uncertain to measure"); *Reimer v. Badger Wholesale Co., Inc.*, 433 N.W.2d 592, 594 (Wisc. App. 1988) ("reliance damages are particularly appropriate where proof of the expectation interest, i.e., profit, is uncertain").  Additionally, the Restatement's comments on reliance damages limit their application to circumstances where either (a) "profit [is] uncertain," or (b) where, as in an option contract, a modification of an ongoing contract, or a case of promissory estoppel, "a promise is enforceable because it has induced action or forbearance." Restatement (Second) of Contracts § 349, cmts. a, b (1981) (citing Restatement (Second) of Contracts §§ 87, 89, 90, 139 (1981)).

Given its acknowledgment in *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 251 (Colo. 2003), that expectation damages are the "traditional" contract remedy under Colorado law, the Colorado Supreme Court would likely limit the availability of reliance damages to circumstances where expectation damages are uncertain or impossible to calculate.  Plaintiffs offer neither evidence nor argument that their

9

expectation damages would be difficult to calculate or would otherwise provide inadequate compensation for the alleged breach.  This is unsurprising, given that plaintiffs' experts estimate those very damages in the same document that contains their working interest damages estimate.

If reliance damages were proper in this case, plaintiffs would nonetheless be limited in offering proof of damages based on the value of working interests plaintiffs might have acquired but for the Agreement.  Plaintiffs' lost opportunity theory, if proven at trial, would result in a potential recovery far beyond the benefit of the bargain that plaintiffs expected in entering into the Agreement.  Allowing reliance damages in excess of the parties' expectation interest "might be justified if the reliance claim is properly regarded as a tort claim . . . .  But if the reliance claim is to be justified as a contract claim, then a recovery that makes the plaintiff better off by reason of breach seems wrong[.]"  Dan B. Dobbs, Law of Remedies § 12.3(2) (2d ed. 1993); *see also Doering Equip. Co. v. John Deere Co. – a Div. of Deere & Co.*, 815 N.E. 2d 234, 240 (Mass. App. 2004) (noting that permitting losses greater than the benefit of the bargain "would violate the fundamental principle first articulated by Professor Fuller and thereafter adopted by Judge Learned Hand . . ., the Restatement (Second) of Contracts, and this court" that "we will not . . . knowingly put the plaintiff in a better position than . . . had the contract been fully performed") (citation and quotation omitted).

Colorado law is consistent with the above-cited authorities, namely that, absent exceptional circumstances, compensation under damages theories other than expectancy interest is limited by the value of the contract.  *See Johnson v. Bovee*, 574

P. 2d 513, 514 (Colo. App. 1978) ("We believe using the contract price as a ceiling on restitution is the better-reasoned resolution of this question"); *H.M.O. Sys., Inc. v. Choicecare Health Servs., Inc.*, 665 P.2d 635, 639 (Colo. App. 1983) ("if recovery [for breach of contract] also includes reasonable expenditures in preparation for performance or in performance, this amount is limited by the contract price") (citing Restatement (Second) of Contracts § 349, cmt. a (1981).[11]  Plaintiffs seek to convince a jury that, unfettered by the Agreement, they would have realized far greater profits than they contracted for.  Neither the Restatement nor Colorado law contemplates a scenario where, as here, the value of a lost opportunity would exceed the expectation interest multiple times over.

The cases that plaintiffs cite that recognize the lost opportunity damages theory do not compel a contrary result.  In *The Superlative Group, Inc. v. WIHO, L.L.C.*, 2014 WL 1385533 (D. Kan. Apr. 9, 2014), the court held that, under Kansas law, a plaintiff could recover lost opportunity reliance damages under a promissory estoppel theory. *Id.* at *4.  The plaintiff, which received commissions for leasing suites in a county-owned sports arena, alleged that the defendant, an arena tenant, promised plaintiff a commission on season ticket sales, which induced plaintiff to require the purchase of

---

[11]The Restatement adopts a similar approach to reliance damages, including damages for lost opportunity.  Section 349 of the Restatement provides that an injured party may prefer to pursue reliance rather than expectation damages "if he cannot prove his profit with reasonable certainty" and that "recovery for expenditures" under a reliance interest theory "may not exceed the full contract price."  Restatement (Second) of Contracts § 349, cmt. a (1981).  Likewise, the Restatement states that damages based on loss of "opportunities to make other contracts," like other reliance damages, "may be equal to the expectation interest" but are "ordinarily smaller because [they do] not include the injured party's lost profit."  *Id.* § 344, cmt. a.

season tickets as a condition of leasing suites. *Id.* at *2. Defendant then apparently refused to pay a commission on season ticket sales. Plaintiff's breach of contract claim sought the value of the season ticket commissions defendant did not pay. *Id.* at *1. Plaintiff's alternative promissory estoppel claim was based on the theory that, had it not been induced by defendant to require that suite lessees purchase a certain number of season tickets, it would have leased more suites. Thus, plaintiff sought damages in the amount of the commissions plaintiff alleged it would have earned had it leased all of the suites without the season ticket requirement. *Id.*[12] The court held that the plaintiff was entitled to pursue these "lost-opportunity reliance damages." *Id.* at *4.

To the extent that *The Superlative Group* interprets Kansas law to allow a theory of reliance damages in the promissory estoppel context that exceed a plaintiff's expectancy interest, the Court finds that Kansas and Colorado law are inconsistent. Colorado has adopted "the principles articulated by section 90(1) of the Restatement (Second) of Contracts." *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo. 1983). Under the Restatement, promissory estoppel permits "full-scale enforcement by normal [contract] remedies" that, like reliance damages in breach of contract claims, "should not put the promisee in a better position than performance of the promise would have put him." Restatement (Second) of Contracts § 90 cmt. d (1981). *The Superlative Group* provides no basis for the Court to conclude that the Colorado Supreme Court would depart from this principle. The other case that plaintiff cites, *Designer Direct, Inc. v.*

---

[12]Plaintiff sought breach of contract damages in the amount of $96,278.91 while its promissory estoppel claim sought damages totaling $210,000.00. *The Superlative Group*, 2014 WL 1385533, at *1.

*DeForest Redevelopment Auth.*, 368 F. 3d 751 (7th Cir. 2004), is also unavailing.  In *Designer Direct*, the Seventh Circuit acknowledged the availability of "reliance damages under a theory of lost opportunity" under Wisconsin law, but did not discuss the limits of such a remedy because the plaintiff "did not prove the existence of a lost opportunity." *Id.* at 752.

Plaintiffs may believe, armed with the benefit of hindsight, that they could have earned far greater profit by acquiring and developing working interests in the Tomahawk Prospect than they were entitled to under the Agreement.  However, because their lost opportunity damages theory is not supported by Colorado law, partial summary judgment is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Hess Bakken Investments II, LLC's Motion for Partial Summary Judgment as to Working Interest Damages [Docket No. 81] is **GRANTED**.  It is further

**ORDERED** that, at trial, plaintiffs Spring Creek Exploration and Production Company, LLC and Gold Coast Energy LLC will not be permitted to present evidence of the value of any working interests that they may have acquired had they not entered into, or treated as rescinded, the contract at issue in this case.  It is further

**ORDERED** that, pursuant to the Court's Order dated September 5, 2014 (Docket No. 48), plaintiffs' third, fourth, fifth, and sixth claims for relief, as well as the portion of

plaintiffs' first claim for relief that alleges previously-dismissed breach of contract theories, are stricken.

DATED March 24, 2016.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00134-PAB-KMT

SPRING CREEK EXPLORATION & PRODUCTION COMPANY, LLC, and
GOLD COAST ENERGY, LLC,

      Plaintiffs,

v.

HESS BAKKEN INVESTMENT II, LLC, f/k/a TRZ ENERGY LLC, and
STATOIL OIL & GAS LP, f/k/a BRIGHAM OIL & GAS LP,

      Defendants.

---

**ORDER**

---

      This matter is before the Court on: (1) the Motion for Summary Judgment [Docket No. 156] filed by defendant Statoil Oil & Gas LP ("Statoil"); (2) the Motion for Partial Summary Judgment Against Statoil [Docket No. 176] filed by plaintiffs Spring Creek Exploration & Production Company, LLC ("Spring Creek") and Gold Coast Energy, LLC ("Gold Coast"); (3) the Motion for Summary Judgment [Docket No. 279] filed by defendant Hess Bakken Investment II, LLC ("Hess"); and (4) Plaintiffs' Motion for Partial Summary Judgment Against Hess [Docket No. 208].  The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

## I. BACKGROUND[1]

### A.  The Tomahawk Transaction

The parties to this case are involved in the oil and gas business in North Dakota, including an area in Williams County, North Dakota, referred to as the "Tomahawk Prospect."  Docket No. 156 at 3, ¶ 1.  On October 8, 2009, plaintiffs sold Hess 5,409.63 acres of leases in the Tomahawk Prospect for $1,100 per acre.  Docket No. 279 at 7, ¶ 24 (the "Tomahawk transaction").[2]  In connection with the Tomahawk transaction, plaintiffs and Hess entered into, among other contracts, an Area of Mutual Interest agreement (the "AMI agreement").  *Id.* ¶ 27.[3]  Pursuant to the AMI agreement, Hess

---

[1]The following facts are undisputed unless otherwise indicated.  In a number of instances, the parties label certain facts as disputed where they dispute only the inferences drawn from the facts, not the underlying facts themselves.  *See, e.g.*, Docket No. 330 at 5, ¶ 28 ("Plaintiffs do not dispute the facts stated but dispute the suggestion" drawn therefrom); *id.* at 7, ¶ 43 (same).  Such purported disputes are attorney argument and are contrary to the Court's practice standards, which require that a party's response to a movant's statement of undisputed material facts contain only a "**brief** factual explanation of the reason(s) for the denial and a **specific reference** to material in the record supporting the denial."  Practice Standards (Civil cases), Judge Philip A. Brimmer § III.F.3.b.iv (emphasis in original).  The Court treats all such facts as undisputed.

[2]Both Hess and Statoil are successor entities to the parties to the agreements relevant in this case.  At the time the parties' Area of Mutual Interest agreement was negotiated, Hess was under different management and was known as TRZ Energy LLC ("TRZ").  *See* Docket No. 279 at 1.  Likewise, during the time relevant to the claims in this lawsuit, Statoil was known as Brigham Oil & Gas, LP ("Brigham").  *See id.* at 2.  Additionally, since the time period relevant to this lawsuit, Spring Creek has merged into an affiliate called Zavanna, LLC and no longer exists.  *Id.* at 5 n.2.  For simplicity's sake, the Court will refer to the parties named in this lawsuit rather than any predecessor or successor entity identified in the record.

[3]The AMI agreement was part of a "series of ten interrelated agreements" that made up the entirety of the transaction between Spring Creek and Hess.  Docket No. 176 at 6, ¶ 18; *see also* Docket No. 176-1 at 23-45; Docket No. 176-2.

agreed to pay an overriding royalty interest ("ORRI") to plaintiffs – 75% to Spring Creek

and 25% to Gold Coast – in leases that Hess acquired in the Tomahawk Prospect

during the AMI agreement's three-year term.  Docket No. 279-1 at 2-3, ¶ 1.[4]  In return,

Spring Creek and Gold Coast agreed that, except for their ORRIs, "Spring Creek and

Gold Coast . . . shall not be entitled to acquire any interest or otherwise compete with

[Hess] within the AMI" (the "non-compete clause").  Id.  The AMI agreement provided

that the "AMI, and all rights, covenants and conditions hereof shall be considered

covenants running with the land and shall inure to and be binding upon the Parties

hereto, and their respective successors and assigns."  Id. at 4, ¶ 4.

The AMI agreement also states: "[t]he terms of this Agreement are confidential

and no Party, nor any of its respective affiliates or representatives shall furnish this

Agreement, or disclose any of its contents, to any third party" (the "confidentiality

provision").  Id. ¶ 5.  According to William Coleman, Spring Creek's president, a "key

benefit[]" of the confidentiality provision was that it would require Hess to notify Spring

Creek if Hess was contemplating a transaction that "required [Hess] to disclose to a

third party the terms of the Tomahawk Transaction and/or the confidential information

that Spring Creek had provided to [Hess] in reliance on the confidentiality provision."

Docket No. 208-1 at 13-14, ¶ 44.  Gold Coast relied on Spring Creek to ensure that

---

[4]An overriding royalty is a "royalty carved out of the working interest created by an oil
and gas lease." 2-4 Williams & Meyers, Oil and Gas Law § 418 (2015).  An overriding
royalty "is . . . an interest in land and hence is governed by statutes and common law
rules relating to such interests."  Id.

Gold Coast's rights under the AMI agreement were being honored.  Docket No. 279 at 14, ¶ 80; *see also* Docket No. 279-38 at 24-25, pp. 96:12-97:24.

Hess's plan in acquiring leases in the Tomahawk Prospect was to drill exploratory wells in the area to prove the value of its leases and then to sell those leases to larger operators.  Docket No. 279 at 9, ¶ 36.  Mr. Coleman testified that, at the time of the Tomahawk transaction, he understood that Hess's intention was to "drill [the area] up and then sell it."  Docket No. 279-24 at 46, p. 234:14-21.

The Tomahawk transaction also included the execution of a "participation agreement" and a joint operating agreement ("JOA") between Hess and a third party, Coachman Energy II, LLC ("Coachman").  Pursuant to the participation agreement, Coachman retained working interests in the relevant leases after the Tomahawk Transaction.  Docket No. 279 at 8, ¶ 34.  The participation agreement creates a separate area of mutual interest agreement between Hess and Coachman, *see* Docket No. 176-1 at 23, ¶ 1, and provides that all interests within that area of mutual interest acquired by Hess and offered to Coachman shall be burdened by the ORRIs owned by plaintiffs.  *Id.* at 24, ¶ 1(c).  The JOA states that it is attached to and made part of the participation agreement.  Docket No. 178-2 at 2.

### B.  The Hess-Statoil Agreement

In December 2008 and January 2009, Statoil entered into two confidentiality agreements with a Hess affiliate, one of which prohibited Hess from acquiring leases in an area described as "Rough Rider" for one year.  Docket No. 279 at 5, ¶ 5.  Rough Rider completely overlaps the Tomahawk Prospect.  *Id.* at 4, ¶ 2.

4

On January 15, 2010, Statoil notified Hess that Hess's acquisition of oil and gas leases in the Tomahawk Prospect breached the companies' confidentiality agreement. *Id.* at 10, ¶ 46; *see also* Docket No. 279-78 at 2.  In response, Hess directed its lease brokers to stop acquiring leases in Rough Rider.  Docket No. 279 at 10, ¶ 47.  On February 24, 2010, Hess and Statoil entered into a settlement agreement (the "Hess-Statoil agreement") whereby Hess sold Statoil 10,234 net acres, including most of its leases in the Tomahawk Prospect, for $1,100 per acre.  *Id.* ¶ 48.  Pursuant to the Hess-Statoil agreement, Hess agreed that any leases it acquired in the Tomahawk Prospect during the following three months would be offered to Statoil at cost (the "three-month tail").  *Id.* ¶ 48.  In March 2010, Statoil publicly announced that it had acquired 10,000 net acres in the northeastern portion of Rough Rider.  *Id.* at 11, ¶ 58.  Hess's conveyance to Statoil was recorded on April 16, 2010.  *Id.* at 13, ¶ 72.

In connection with Statoil's due diligence in executing the Hess-Statoil agreement, Hess disclosed the terms of the AMI agreement to Statoil on February 18, 2010.  *Id.* at 10, ¶ 49.  The Hess-Statoil agreement states that the agreement does "not include . . . the Participation Agreement dated October 8, 2009, among TRZ and Coachman . . . and the Area of Mutual Interest Agreement dated October 8, 2009, among . . . [Hess] . . ., Spring Creek . . . and Gold Coast."  Docket No. 157-1 at 3, ¶ 2.

### C.  The Parties' Dealings After the Hess-Statoil Agreement

Pursuant to the AMI agreement, Hess made three assignments to plaintiffs of ORRIs in leases that Hess acquired in the Tomahawk Prospect.  Docket No. 279 at 12, ¶ 62.  The first assignment was completed in April 2010 and included leases acquired

through March 24, 2010.  *Id.* ¶ 65; *see also* Docket No. 279-13.  The second

assignment was sent to plaintiffs in June 2010 and included leases acquired through

March 11, 2010.  Docket No. 279 at 12, ¶ 66; *see also* Docket No. 279-14.  The third

assignment was sent to plaintiffs in November 2010 and included leases acquired in

2009.  Docket No. 279 at 12, ¶ 67; *see also* Docket No. 279-15.  The third assignment

was signed by Gold Coast on November 17, 2010 and by Spring Creek on December 3,

2010.  Docket No. 279 at 12, ¶ 67.

   After the three-month tail expired, Hess notified its lease brokers that they could

look for leasing opportunities in the Tomahawk Prospect.  Docket No. 279 at 11, ¶ 55.

Hess was presented at least one opportunity to acquire a lease in the Tomahawk

Prospect, but declined the opportunity because the lease was relatively small and

Hess's strategy was to acquire acreage in larger quantities.  *Id.* ¶ 56.  Statoil acquired

additional leases in the Tomahawk Prospect after the Hess-Statoil agreement, dozens

of which were publicly recorded before December 13, 2010.  *Id.* at 13, ¶ 73.

   On September 13, 2010, Mark McPherson, Gold Coast's president, sent an email

that indicated Mr. McPherson was aware that Statoil had purchased Hess's interests in

the Tomahawk Prospect.  Docket No. 279-91 at 2 ("[Statoil] came to [a Hess affiliate]

and claimed [Hess] violated an agreement and [Statoil] got to buy Tom from [Hess]").[5]

At his deposition, Mr. McPherson, when asked how he learned of Statoil's purchase of

---

[5]Hess implies, and plaintiffs do not dispute, that "Tom" refers to the Tomahawk
Prospect.  *See* Docket No. 279 at 14, ¶ 81.  Gold Coast's Rule 30(b)(6) deponent
testified that she understood "Tom" to be short for Tomahawk.  Docket No. 279-81 at 4-
5, pp. 123:22-124:1.

Hess's Tomahawk Prospect leases, stated, "I think Bill [Coleman] told me."  Docket No. 330-12 at 4, pp. 125:13-126:2.  Amy Pfannenstein, a Gold Coast Rule 30(b)(6) deponent, testified that Gold Coast knew about the Hess-Statoil agreement in September 2010 and that Gold Coast learned about the agreement from Spring Creek. Docket No. 279-81 at 6-8, pp. 125:19-23; 126:3-6; 127:20-25.

On January 26, 2011, Spring Creek proposed an acreage trade to Statoil by which Spring Creek would acquire certain leases in the Tomahawk Prospect.  Docket No. 279-58 at 2.[6]  In an email to Statoil, a Spring Creek representative stated that, to complete the proposed trade, Statoil "would need to waive the non-compete contract [Spring Creek] had with [Hess]."  *Id.*  Statoil responded that it would be willing to waive any non-compete agreement but that, when it acquired Hess's leases in the Tomahawk Prospect, Statoil "specifically [was] not taking subject to some prior existing agreements [Hess] had.  Would think [Hess] would still be subject to those prior agreements."  *Id.*  In March 2011, Hess signed a waiver of its rights under the AMI agreement with respect to the land covered by Spring Creek's contemplated acreage trade with Statoil.  Docket No. 279-44 at 5-6.

On February 3, 2011, Spring Creek asked Hess for a copy of the Hess-Statoil agreement, asked if Hess assigned Statoil its contract rights in the AMI agreement, and asked for any other information that was not confidential related to the Hess-Statoil

---

[6]In the email containing the proposal, Spring Creek's representative identified the land subject to the acreage trade as "155N-100W, Sec. 2 and 3."  Docket No. 279-58 at 2.  In later correspondence with Hess, Spring Creek identified that land as covered by the AMI agreement.  Docket No. 279-44 at 3.

agreement "that is relevant to Spring Creek performing its obligations in the Tomahawk

Prospect."  Docket No. 279-55 at 2-3.  Hess responded that it did not assign its rights in

the AMI agreement to Statoil and that the Hess-Statoil agreement included conditions

that prohibited Hess from giving Spring Creek a copy.  *Id.* at 2.

On May 11, 2012, Mr. McPherson wrote in an email to Spring Creek that Statoil

was not recognizing plaintiffs' ORRIs in the Tomahawk Prospect and suggested hiring

an attorney to address the issue.  Docket No. 279-96 at 2.  On July 12, 2012, Spring

Creek asked its lease broker, Diamond Resources, to determine whether Hess or

Statoil had taken any leases in the Tomahawk Prospect since October 8, 2009.  Docket

No. 330-9 at 9.

On September 18, 2012, Spring Creek's counsel sent a letter to Hess and Statoil,

in which Spring Creek's counsel opined that Statoil may have breached the AMI

agreement by failing to notify Spring Creek of all oil and gas leases, leasehold interests,

or mineral interests it acquired in the Tomahawk Prospect during the term of the AMI

agreement and by failing to assign the ORRIs provided for in that agreement.  Docket

No. 330 at 25, ¶ 67; Docket No. 279-59 at 2-3.  Spring Creek's counsel stated that he

understood that "[Hess] has assigned all of the leasehold interests subject to the AMI

Agreement to [Statoil] in an assignment dated April 12, 2010."  Docket No. 279-59 at 2-

3.  Spring Creek's counsel opined that the AMI agreement and the ORRIs to which the

AMI agreement entitled plaintiffs were covenants running with the land and were binding

on Statoil.  *Id.* at 4.  The letter also opined that, at the time Statoil acquired the leases

from Hess, Statoil "was, at a minimum, on constructive and inquiry notice" of the AMI

8

agreement because "the law requires a reasonable and prudent person to investigate" the publicly-recorded documents related to the Tomahawk transaction and, "[h]ad [Statoil] investigated . . . it would have discovered both the Spring Creek Override and the AMI Agreement[.]"  *Id.* at 4-5.

On October 30, 2012, Statoil's counsel responded that Statoil did not believe that the AMI agreement was a covenant running with the land.  *See* Docket No. 330-18 at 8-9.  Plaintiffs state that Statoil's October 30, 2012 letter "is the factual basis" for Spring Creek's allegation in its complaint that Hess "disclosed the terms of the AMI to Statoil prior to entering into the Hess/Statoil Agreement."  Docket No. 330 at 27, ¶ 72.  At his deposition, Mr. Coleman testified that he began suspecting that Hess breached the confidentiality agreement when "the lawyer said that they had sold the agreement and – 'But we didn't take this, that, or the other.'"  Docket No. 330-10 at 4, pp. 291:20-292:1. Plaintiffs represent that Mr. Coleman's testimony refers to the October 30, 2012 letter from Statoil's counsel and Statoil's claim that it did not take assignment of the AMI agreement.  Docket No. 330 at 26, ¶ 71.  Mr. Coleman also testified that he suspected that Hess breached the confidentiality provision when he realized that Hess had stopped acquiring leases in the Tomahawk Prospect and that Statoil was acquiring leases in the Tomahawk Prospect and not assigning plaintiffs ORRIs in those leases. Docket No. 279-24 at 56, p. 296:7-20.[7]

---

[7]Plaintiffs argue that Mr. Coleman's deposition testimony, which was objected to as vague and ambiguous and asked and answered, is inadmissible.  Docket No. 330 at 10, ¶ 68.  The question reads, in its entirety: "Q. (by Mr. Safi) Okay.  But can you answer my question about what made you think specifically that there had been a breach of the confidentiality provision?"  Docket No. 330-10 at 5, p. 296:7-10.  The Court sees no

### D.  Custom and Practice in the Oil and Gas Industry

Representatives from Spring Creek, Hess, and Brigham have testified that a prudent party seeking to acquire leases would want to see contracts that affected the relevant properties.  At his deposition, Mr. Coleman testified that he would expect any sophisticated buyer of oil and gas assets to review contracts that burdened the relevant properties and that, while he has seen "a lack of skill sets in the last five to seven years," he would never make an acquisition of third party leases without "reviewing the contracts that burden those properties."  Docket No. 279-24 at 14-15, pp. 33:13-34:3. Mr. Coleman further testified that, had he been the purchaser of Hess's leases in the Tomahawk Prospect, he would have asked to see all contracts that affected the land as part of his due diligence, and he would have expected Hess to provide them.  *Id.* at 46-47, pp. 234:24-235:11.  Likewise, Kathrine Weissner, Spring Creek's Rule 30(b)(6) deponent, testified that, after taking assignment of Hess's leases, Statoil "should be familiar" with the AMI agreement.  Docket No. 279-27 at 17, p. 194:6-17.  Former Hess employees Carter Overton and James Wason testified to the same effect.[8]  Mr. Overton said that a "prudent buyer" would review all contracts associated with the properties that were the subject of a proposed transaction.  Docket No. 279-60 at 11, p. 189:3-15.  Mr.

---

ambiguity in this question.  Plaintiffs' objection that the question had been asked and answered is also without merit.  The Court has reviewed the deposition pages before and after Mr. Coleman's answer that plaintiffs attached to their response and sees no other instance where Mr. Coleman provided the same testimony.  *See generally id.* at 3-5, pp. 289:20-296:20.  Plaintiffs' objections are overruled.

[8]In an unrelated filing, Hess identified Mr. Overton and Mr. Wason as former officers and directors of Hess.  *See* Docket No. 97 at 2.

Wason testified that, "[a]s a matter of course," a party contemplating the Hess-Statoil agreement or a similar deal would have to provide a buyer with the opportunity to conduct due diligence and review all contracts that relate to the relevant properties. Docket No. 279-35 at 44, p. 228:4-9.  Statoil's representative, David Brigham, testified that he would not have entered into the transaction without first knowing the burdens he would be subjected to.  Docket No. 330-14 at 8, pp. 206:24-207:11.

### E.  Procedural History

Spring Creek filed this lawsuit on December 13, 2013 in the District Court for the City and County of Denver, Colorado, Docket No. 3, and defendants removed the case to this Court on January 17, 2014.  Docket No. 1.  In its complaint, Spring Creek asserted claims against Hess for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraudulent concealment.  *See* Docket No. 3.  Spring Creek also asserted claims against Statoil for breach of contract, tortious interference with contract, and fraudulent concealment.  *Id.*  Finally, Spring Creek asserted a claim jointly against Hess and Statoil for civil conspiracy.  *Id.*  Hess and Statoil each moved to dismiss all claims against them.  Docket Nos. 7 (Statoil); 13 (Hess).

On September 5, 2014, the Court granted Hess and Statoil's motions to dismiss in part.  *See* Docket No. 48.  The Court dismissed Spring Creek's claims for breach of the implied covenant of good faith and fair dealing, fraudulent concealment, tortious interference, and civil conspiracy.  *Id.* at 28.  Additionally, the Court partially dismissed Spring Creek's breach of contract claims against Hess and Statoil, each of which was predicated on different theories.  *See id.* at 7-13; 20-23.  Pursuant to the Court's

September 5, 2014 order, Spring Creek was permitted to proceed with its breach of

contract claims on the following theories: (1) Hess's alleged breach of the confidentiality

provision (the "confidentiality claim"); (2) Hess's alleged failure to honor royalty interests

in the existing leases; (3) Statoil's alleged failure to assign ORRIs in newly-acquired

leases to Spring Creek; and (4) Statoil's alleged failure to honor royalty interests in

existing leases.

On April 14, 2015, Gold Coast filed an unopposed motion to intervene in this

lawsuit.  Docket No. 74.  In its motion, Gold Coast agreed to "be subject to all that has

transpired with respect to Spring Creek in this action to date" and to be bound by the

Court's order on defendants' motions to dismiss.  *Id.* at 3, ¶ 2.  Although its motion was

originally denied for procedural reasons, *see* Docket No. 76, Gold Coast was permitted

to intervene in this lawsuit on April 28, 2015.  Docket No. 79.  After Gold Coast was

granted leave to intervene, plaintiffs filed an amended complaint.  Docket No. 80.[9]

On May 5, 2015, Hess moved for partial summary judgment to prevent plaintiffs

from arguing that their damages should be measured in terms of the value of their lost

opportunity to acquire leases in the AMI area and the profits they would have made

from the working interests on such leases.  *See* Docket No. 81.  The Court granted

Hess's motion for partial summary judgment on March 24, 2016.  Docket No. 286.

---

[9]The amended complaint re-alleged all of plaintiff's original claims, including those that
the Court dismissed in its September 5, 2014 order.  *Compare* Docket No. 80 *with*
Docket No. 3.  Because Gold Coast's intervention was premised on its acceptance of all
that had previously transpired in this lawsuit, the Court struck the previously-dismissed
claims.  *See* Docket No. 286 at 3-4 n.5.

Statoil moves for summary judgment on the ground that it is not a party to or otherwise bound by the terms of the AMI agreement.  *See* Docket No. 156.  Hess moves for summary judgment on the grounds that the confidentiality claim is time-barred, that Hess did not materially breach the AMI agreement, that Hess is not liable on plaintiffs' claim that Statoil underpaid royalties due on the ORRIs Hess assigned to plaintiffs, and that plaintiffs' damages models for the confidentiality claim are impermissible.  *See* Docket No. 279.[10]  Plaintiffs move for partial summary judgment against Hess on the confidentiality claim, *see* Docket No. 208, and for partial summary judgment against Statoil on the ground that Statoil is bound by the terms of the AMI agreement.  *See* Docket No. 176.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

---

[10]Hess also seeks summary judgment on plaintiffs' lost opportunity, or "working interest," damages theory.  *See* Docket No. 279 at 32-40.  As the Court has already granted Hess summary judgment on that claim, Docket No. 286, this portion of Hess's motion is moot.

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010). Where, as here, there are cross motions for summary judgment as to certain issues, the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party. *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004).

## III. ANALYSIS

### A.  Plaintiffs' and Statoil's Cross-Motions for Summary Judgment

Statoil moves for summary judgment on the ground that Statoil is not an assignee of the AMI agreement and is not subject to the AMI agreement's terms. Specifically, Statoil argues that the Hess-Statoil agreement unambiguously excludes the AMI agreement, and that Hess and Statoil's agreement is conclusive. Docket No. 156 at 11-16. In their cross motion for summary judgment, plaintiffs argue that (1) the non-compete clause and (2) the provision entitling plaintiffs to ORRIs (collectively, the "covenants") are covenants running with the land that are binding on Statoil, Docket No. 176 at 17-29, that Statoil expressly assumed the obligations of the AMI agreement, *id.*

at 29-31, and that, under North Dakota law,[11] Statoil's voluntary acceptance of the

benefit of the AMI agreement constitutes consent to its obligations.  *Id.* at 31-33.[12]

### 1.  Covenant Running with the Land

### a.  Judicial Estoppel

Statoil argues that plaintiffs cannot argue that the covenants run with the land

because plaintiffs did not allege this theory in their complaint and because, in opposing

Statoil's motion to dismiss, Spring Creek represented that it "does not allege that the

AMI is a covenant that runs with the land."  Docket No. 32 at 5; *see also* Docket No. 190

at 7.

Plaintiffs argue that, although Statoil correctly quoted their earlier filing, that

statement was inaccurate and that their amended complaint alleges that the covenants

---

[11]Statoil argues that North Dakota law applies to whether Statoil took assignment of the AMI agreement because Hess and Statoil's agreement chose North Dakota law to govern their transaction and because the transaction concerns interests in real estate. Docket No. 156 at 10 & n.5.  Plaintiffs also appear to assume that North Dakota law applies to their claims against Statoil.  *See generally* Docket No. 172.  The Court concurs.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption").

[12]Plaintiffs filed a document titled Motion to Clarify in connection with their response to Statoil's motion for summary judgment.  [Docket No. 183]  This motion concerns plaintiffs' attempt, in their response to Statoil's motion for summary judgment, to incorporate by reference the statement of undisputed material facts in plaintiffs' motion for summary judgment and to use those facts as additional disputed facts opposing Statoil's motion for summary judgment.  *See* Docket No. 172 at 8.  Plaintiffs' response cites to their original motion for summary judgment, which the Court struck for failure to conform to applicable page limits.  *See* Docket No. 175.  Plaintiffs seek to clarify that their incorporation by reference refers to plaintiffs' re-filed motion.  *See* Docket No. 183 at 2-4.  The Court will grant this motion.

run with the land.  Docket No. 210 at 4-5 n.2.  Plaintiffs also argue that their earlier

inaccurate statement does not warrant a finding of judicial estoppel.  The Court agrees.

In considering the issue of judicial estoppel, the Court considers whether "1) a

party's later position is clearly inconsistent with its earlier position; 2) a party has

persuaded a court to accept that party's earlier position, so that judicial acceptance of

an inconsistent position in a later proceeding would create the perception that either the

first or second court was misled; and 3) the party seeking to assert the inconsistent

position would derive an unfair advantage if not estopped." *Mathews v. Denver

Newspaper Agency LLP*, 649 F. 3d 1199, 1209 (10th Cir. 2011) (citation and quotation

omitted).   In two paragraphs in the amended complaint, plaintiffs characterize the

covenants as running with the land.  *See* Docket No. 80 at 5-6, ¶¶ 18 ("Statoil

purchased all of the leasehold interest subject to Plaintiffs' . . . interests attached to the

property that ran with the land"), 23 (same).  Although plaintiffs mischaracterized their

complaint in response to Statoil's motion to dismiss, a clearly inconsistent position, the

Court did not adopt plaintiffs' earlier position and Statoil does not argue that plaintiffs

would gain an unfair advantage from the Court considering their argument on the

merits.

### b.  Whether the Covenants Run with the Land

Pursuant to N. D. Cent. Code § 47-04-24, "[c]ertain covenants contained in

grants of estates in real property are appurtenant to such estates and pass with them so

as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in

the same manner as if they personally had entered into them.  Such covenants are said

to run with the land."  North Dakota law further provides:

> [a]ll covenants contained in a grant of an estate in real property, which are made for the direct benefit of the property or some part of it then in existence, run with the land.  Such covenants include covenants:
>
> 1. Of warranty;
>
> 2. For quiet enjoyment;
>
> 3. For further assurance on the part of a grantor; or
>
> 4. For the payment of rent, taxes, or assessments upon the land on the part of a grantee.

N.D. Cent. Code § 47-04-26.

Statoil argues that the North Dakota Supreme Court has resolved this issue

conclusively.  Docket No. 190 at 9-10.  Statoil cites *Golden v. SM Energy Co.*, 826 N.W.

2d 610 (N.D. 2013), for the proposition that area of mutual interest agreements are not

considered covenants running with the land under North Dakota law.  Docket No. 190 at

9-11.  Plaintiffs argue that *Golden* is not dispositive because, in *Golden*, the parties

stipulated that the area of mutual interest agreement at issue was not a covenant

running with the land.  Docket No. 210 at 5.

In *Golden*, the plaintiff entered into an area of mutual interest agreement via a

letter agreement with a predecessor entity of the defendant.  826 N.W. 2d at 613-14.

The letter agreement provided that "any assignment of this agreement" made by the

defendant's predecessor "shall recite that same is made pursuant and subject to the

terms and conditions of this Agreement."  *Id.* at 614.  As plaintiffs note, the parties in

*Golden* agreed "that the AMI clause is not a covenant that runs with the land, but is a

personal covenant that is enforceable only between the original parties to the agreement." *Id.* at 615.

Although the *Golden* court did not expressly decide that area of mutual interest agreements are personal rather than real covenants, the court assumed that the covenants were personal based on the parties' agreement. *See id.* at 615.[13]  In so doing, the *Golden* court cited *Beeter v. Sawyer Disposal LLC*, 771 N.W. 2d 282 (N.D. 2009).  In *Beeter*, the parties entered into an option contract for the sale of an area of land containing a landfill. *Id.* at 283.  In addition to the purchase price, the option contract provided that the seller would receive six percent of the revenue derived from the buyer's operation of the premises from all waste disposal activity, including any expansion of the waste disposal facility. *Id.* at 284.  The contract provided that the six percent payment would be "perpetual and a covenant running with the real estate." *Id.* The *Beeter* court stated that a critical factor distinguishing real covenants from personal covenants is that the latter do "not touch or concern the occupation or enjoyment of the land." *Id.* at 285 (citation and quotation omitted).  The court held that, because the covenant to pay a six percent royalty was "a purely personal benefit to the [plaintiff] and appears, in fact, to be part of the consideration and payment for the land," the covenant did not run with the land, notwithstanding the parties' stated intent that it do so. *Id.* at 286.

---

[13]Plaintiffs argue that the parties in *Golden* stipulated that the area of mutual interest agreement was not a covenant running with the land "[b]ased on their facts." Docket No. 210 at 5.  The Court finds that the better reading of *Golden* is that the parties made an assumption about North Dakota law and the North Dakota Supreme Court adopted that assumption.

Plaintiffs argue that the AMI agreement runs with the land because, unlike the royalty in *Beeter*, the primary purpose of area of mutual interest agreements is to increase the likelihood of leasehold or mineral development.  Docket No. 176 at 21. Plaintiffs argue that the AMI agreement was part of a broader development plan and that, because the AMI agreement removed a major competitor for leases in the affected area, the AMI agreement "reduced the prices . . . Hess and its successors and assigns had to pay for leases in the AMI area."  Docket No. 176 at 21, 23-24.  The Court disagrees.  In *Golden*, the court explained that an assignee of contractual rights "is responsible only for the obligations of the assignor which the assignee contracts to undertake," and found that this "general rule[] of contract law governing assignments also appl[ies] to AMI clauses."  826 N.W. 2d at 616.  Although *Golden* did not expressly hold that all area of mutual interest agreements are personal covenants, such finding is a necessary implication of the North Dakota Supreme Court's holding.  If AMI agreements were covenants running with the land, a subsequent assignee's consent or refusal to take assignment of AMI clauses would be irrelevant.[14]  Thus, a finding that AMI agreements are covenants running with the land and bind assignees of land regardless of their consent cannot be reconciled with *Golden*.  *Accord*, Scott Lansdown, *Golden v. SM Energy Company and the Question of Whether an Area of Mutual Interest*

---

[14]The Court also notes that, in rejecting the argument that the assignee of leases subject to an area of mutual interest is bound by an AMI agreement because the assignee voluntarily accepts the benefit of that agreement, the *Golden* court reasoned that such a rule "turns the AMI clause, as well as *any other personal covenant*, into a covenant that runs with the land."  *Golden*, 826 N.W. 2d at 618 (emphasis added). Thus, while *Golden* did not expressly hold that all AMI agreements are personal covenants, the court characterized AMI clauses as "personal covenants."

*Covering Oil and Gas Rights is Binding on Successors and Assigns*, 89 N.D. L. Rev. 267, 294 (2013) ("It is safe to say that Golden confirms that in North Dakota an AMI will generally not be deemed a covenant running with the land, and that this result will be obtained regardless of the parties' intent").  Thus, while other states may have reached a contrary conclusion, *see Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W. 2d 903, 911 (Tex. 1982), the Court finds that, were it faced with this issue, the North Dakota Supreme Court would find that AMI agreements are personal covenants that do not run with the land.  *See Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1142 (10th Cir. 2008) (where the state's highest court has not directly addressed the issue, "we must predict how that court would rule").

### 2. Express Assignment of the AMI Agreement

Statoil argues that it did not take assignment of the AMI agreement from Hess because the Hess-Statoil agreement unambiguously excludes the AMI agreement. Docket No. 156 at 11-13.  Plaintiffs argue that Statoil assumed the obligations of the AMI agreement because the bills of sale incorporate the AMI agreement.  *See* Docket No. 176 at 29-31.

Plaintiffs' argument requires the Court to review a series of related documents. Plaintiffs argue that Statoil agreed to take assignment of the AMI agreement because a document titled "Assignment, Bill of Sale and Conveyance" executed between Hess and Statoil subsequent to the Hess-Statoil agreement states that Statoil, as assignee, "expressly assumes its proportionate share of the obligations owed to the other parties

under the terms of the [JOA]" between Hess and Coachman.  Docket No. 177-1 at 2.[15]

Plaintiffs argue that Statoil's assumption of the JOA in the 2nd assignment subjects

Statoil to the obligations in the AMI agreement because (1) the JOA states that it was

"[a]ttached to and made a part of" the participation agreement signed between Hess

and Coachman, Docket No. 178-2 at 2, and (2) the participation agreement states that

all properties acquired thereunder by Hess and offered to Coachman are to be

proportionately burdened by plaintiffs' ORRIs.  *See* Docket No. 176-1 at 24, ¶ 1(c).

The Court finds that the language in the 2nd assignment does not have the

cascading effect that plaintiffs attribute to it.  Under North Dakota law, "[w]hether or not

. . . obligations were assumed by a party acquiring oil and gas leases subject to an area

of mutual interest clause is a question of intent, and all the surrounding circumstances

must be evaluated to determine that intent."  *Golden*, 826 N.W. 2d at 616.  Here, Statoil

evidenced a plain intent to take the leases free of the participation agreement by

excluding the participation agreement from its contract with Hess.  *See* Docket No. 157-

1 at 3, ¶ 2.  The 2nd assignment is not inconsistent with Statoil's stated intent to exclude

the AMI agreement.  The 2nd assignment provides that Statoil assumed the obligations

of the JOA, not the participation agreement.  Docket No. 178-2 at 2.  Even if Hess and

Coachman intended the JOA to be a part of the participation agreement, nothing

prohibits Statoil from assuming the obligations of one but not the other.  "An assignee is

responsible only for the obligations of the assignor which the assignee contracts to

---

[15]Plaintiffs refer to this document as the "2nd assignment."  For the sake of consistency,
the Court will do the same.

undertake." *Golden*, 826 N.W. 2d at 616.  Plaintiffs point to no evidence that, by

assuming the JOA, Statoil intended to undertake the obligations of the participation

agreement.

Plaintiffs argue that Statoil assumed the obligations of the AMI agreement

because the 2nd assignment assigns Statoil all of Hess's "right, title and interest" in the

leases on which plaintiffs held ORRIs, including "all overriding royalty interests."  Docket

No. 176 at 30; *see also* Docket No. 177-1 at 2.  Plaintiffs argue that, because Statoil

was obligated to honor the terms of the ORRIs that Hess had previously assigned to

plaintiffs and, because the document by which Hess assigned those ORRIs (the "ORRI

assignment") stated that it was "made subject to" the AMI agreement, Statoil expressly

assumed the AMI agreement.  Docket No. 176 at 30-31; *see also* Docket No. 177-2 at

3.  Plaintiffs' argument is without merit.  The relevant language from Hess's assignment

of ORRIs to plaintiffs states as follows:

> This Assignment is made subject to . . . that certain Area of Mutual
> Interest Agreement dated October 8, 2009 by and between [Hess] . . .,
> Spring Creek and Gold Coast (the "AMI").  The . . . AMI contain[s] certain
> representations, warranties and agreements between the Parties, some of
> which survive the delivery of this Assignment, as provided for therein, and
> shall not be merged in to this Assignment or be otherwise negated by the
> execution or delivery of this Assignment.  This Assignment shall not be
> construed to amend the . . . AMI or vary the rights and obligations of the
> Parties from those set forth in the . . . AMI.  In the event of any conflict
> between this Assignment and the . . . AMI, the terms of the . . . AMI, as
> applicable, shall control.

Docket No. 177-2 at 3.  This language does not, as plaintiffs argue, "incorporate . . . the

AMI [a]greement."  Docket No. 176 at 31.  In fact, the ORRI assignment acknowledges

that the AMI agreement contains separate "representations, warranties and

agreements" that survived the ORRI assignment and that the AMI agreement did not merge into the latter document.  Docket No. 177-2 at 3.  As plaintiffs acknowledge, the key covenants in the AMI agreement are (1) the non-compete clause and (2) Hess's agreement to assign ORRIs to plaintiffs.  *See* Docket No. 176 at 17.  Those covenants "survive[d]" – and therefore continued to exist independently of – the ORRI assignment.  Docket No. 177-2 at 3.  In taking assignment of the leases, which all parties agree were burdened by plaintiffs' then-existing ORRIs, Statoil did not agree to assume the obligation to assign ORRIs to plaintiffs in all of its later-acquired leases in the Tomahawk Prospect.  As previously discussed, "an assignee is responsible only for the obligations of the assignor which the assignee contracts to undertake."  *Golden*, 826 N.W. 2d at 616.

### 3. N.D. Cent. Code § 9-03-25

Plaintiffs argue that Statoil is deemed to have taken assignment of the AMI agreement by operation of North Dakota law because Statoil voluntarily accepted the benefit of the AMI agreement.  Docket No. 176 at 31-33.  Plaintiffs rely on N.D. Cent. Code § 9-03-25, which states: "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting."  The *Golden* court rejected this argument, reasoning that interpreting Section 9-03-25 in this manner "turns the law of assignments on its head" by converting all personal covenants related to land into covenants running with the land.  *Golden*, 826 N.W. 2d 610, 618.  The court held that Section 9-03-25 requires "extrinsic evidence of conduct after completion of the

transaction that suggests a voluntary acceptance of the benefit of the transaction." *Id.* at 618.

Plaintiffs attempt to distinguish *Golden* by arguing that they have presented evidence of Statoil's actual notice – rather than constructive notice – of the AMI agreement. Docket No. 210 at 9. Statoil's actual knowledge, as compared with the *Golden* defendant's constructive notice of the agreement in that case, is a distinction without a difference. Section 9-03-25 applies where the facts are "known or ought to be known to the person accepting." The statute does not distinguish between actual and constructive notice and, therefore, assigns no special weight to facts actually known.

Plaintiffs also argue that they have presented evidence that Statoil voluntarily accepted the benefit of the AMI agreement by acquiring leases for two and a half years "more easily and less expensively because Plaintiffs were not competing for leases in reliance on receiving an ORRI on the leases . . . Statoil acquired." Docket No. 210 at 9. Plaintiffs provide no evidence that Statoil itself assumed the benefits of the AMI agreement by, for instance, attempting to enforce the AMI agreement's non-compete provision. Moreover, Mr. Wason testified that, after the Hess-Statoil agreement, his understanding was that Hess remained able to acquire acquisitions in the Tomahawk Prospect and remained bound by the terms of the AMI agreement. *See* Docket No. 156-9 at 8, pp. 205:11-207:3. Plaintiffs offer no contrary evidence. Because the undisputed evidence shows that the benefits and burdens of the AMI agreement remained with Hess, plaintiffs cannot establish that Statoil took assignment of the AMI agreement as a matter of law pursuant to Section 9-03-25.

24

In sum, the Court agrees with Statoil that the Hess-Statoil agreement unambiguously excludes the AMI agreement. Because plaintiffs have identified no grounds by which this agreement is made unenforceable, the agreement between Hess and Statoil is conclusive. Plaintiffs' motion for partial summary judgment will be denied, and Statoil's motion for summary judgment will be granted to the extent that Statoil seeks a judgment that it is not an assignee of the AMI agreement.

### 4. *Underpayment of Overriding Royalty Interests*

The Court's finding that Statoil is not bound by the terms of the AMI agreement does not conclude its inquiry. Plaintiffs also bring a claim for breach of contract against Statoil for failing to properly pay plaintiffs' ORRIs on the leases that Hess assigned to plaintiffs. *See* Docket No. 354 at 4. Statoil only mentions this claim in a footnote and states that any cause of action arising from such claim would not be for breach of the AMI agreement but, rather, would only be recoverable under the theories of "detrimental reliance and unjust enrichment." Docket No. 156 at 13 n.9. Essentially, Statoil seeks summary judgment as to this claim because plaintiffs miscast an equitable claim for unpaid royalties as a claim for breach of contract.

Statoil relies on *Golden* for its argument that plaintiffs cannot state a cause of action for breach of contract for underpaid royalties. *Id.* Specifically, Statoil quotes *Golden* for the proposition that any recovery for unpaid royalty interests "depends upon the equitable principles of detrimental reliance and unjust enrichment." *Golden*, 826 N.W. 2d at 620. Statoil's reliance is mistaken. The quoted language from *Golden* was discussing the North Dakota Supreme Court's earlier decision in *Acoma Oil Corp. v.*

25

*Wilson*, 471 N.W. 2d 476 (N.D. 1991), and related to a scenario where a well operator

who owed royalty interests to multiple parties "overpaid some and underpaid other"

obligations to royalty owners, "but had paid out 100 percent of the well proceeds under

a title opinion and division orders executed by the working interest owners." *Golden*,

826 N.W. 2d at 619.  As noted in *Golden*, the *Acoma* court held that, under those facts,

"the underpaid royalty owners . . . can recover from the overpaid royalty owners" based

on detrimental reliance and unjust enrichment theories.  *Id.* at 620; *see also Acoma*, 471

N.W. 2d at 484-85.

    *Golden* does not hold that an ORRI holder cannot pursue a claim for underpaid

royalties on a breach of contract theory.  Indeed, the North Dakota Supreme Court has

reached the opposite conclusion.  In *Finstrom v. First State Bank*, 525 N.W. 2d 675

(N.D. 1994), the court held that a plaintiff who had a right to royalties under the lease for

gravel mined on his land had a "contractually controlled" right of payment that accrued

on "the date of the sale of any portion of the severed gravel."  *Id.* at 677; *see also Ritter,*

*Laber & Assocs. v. Koch Oil, Inc.*, 680 N.W. 2d 634, 639 (N.D. 2004) ("*Finstrom*

supports the principle that the . . . refusal to pay [] royalty proceeds to a plaintiff may be

. . . a breach of contract").[16]  Plaintiffs may assert this breach of contract claim against a

subsequent assignee of the leases on which plaintiffs own ORRIs.  *See Van Sickle v.*

*Hallmark & Assocs., Inc.*, 744 N.W. 2d 532, 540 (N.D. 2008) (characterizing royalty

holders' claim against subsequent assignees for breach of lease obligations as "a claim

---

[16]The *Finstrom* court further noted that "gravel royalties are . . . analogous to petroleum
royalties."  *Finstrom*, 525 N.W. 2d at 677.

for breach of contract"); *see also* 3 Summers Oil & Gas § 29:12 (3d ed. 2015) ("[i]n a majority of the cases, where a lease or an assignment of a lease makes provision for oil payments or overriding royalties out of the lessee's interest, the agreement is treated as a covenant running with the land and is enforceable by the assignee of the lessor or of the assignor against the successive assignees of the lease").   Accordingly, Statoil is not entitled to summary judgment on plaintiffs' breach of contract claim for underpayment of royalties.

### B.  Hess's Motion for Summary Judgment

#### 1.  Statute of Limitations

Hess argues that plaintiffs' claim that Hess breached the AMI agreement by disclosing its terms to Statoil is barred by the statute of limitations.   Breach of contract actions must be "commenced within three years after the cause of action accrues."   Colo. Rev. Stat. § 13-80-101.[17]  "A cause of action for breach of any express or implied contract . . . shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence."   Colo. Rev. Stat § 13-80-108(6).   Spring Creek filed this lawsuit on December 13, 2013, Docket No. 3, and Gold Coast filed its successful motion to intervene in this case on April 21, 2015.

---

[17]The AMI agreement includes a provision titled "Governing Law" that states that "any arbitration or dispute resolution conducted pursuant hereto shall be construed in accordance with, and governed by, the laws of the State of Colorado."   Docket No. 279-1 at 4, ¶ 7.

Docket No. 77.[18]  Thus, the relevant dates for statute of limitations purposes are December 13, 2010 and April 21, 2012.

### a.  Waiver

Plaintiffs argue that Hess waived its statute of limitations defense by failing to raise the defense in response to plaintiffs' motion for summary judgment.  Docket No. 330 at 28-29.  Plaintiffs cite *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164 (S.D. Ind. 1992), for the proposition that, "[w]hen a party moves for summary judgment on the issue of liability, the non-movant is thereby placed on notice that *all* arguments and evidence opposing a finding of liability must be presented to properly resolve that issue."  *Id.* at 1167 (emphasis in original).  In *Stop-N-Go*, summary judgment had entered on the plaintiff's claim that the defendants breached certain environmental warranties in the relevant agreement between the parties.  *Id.* at 1166. The Court found that defendants' failure to argue their affirmative defenses at the summary judgment stage waived those defenses.  *Id.* at 1167-68.  The Court reasoned that allowing unargued affirmative defenses after judgment on liability issues would create a sort of "legal 'limbo.'"  *Id.*

---

[18]Hess states that Gold Coast is deemed to have filed suit on April 28, 2015, the date the Court granted its motion to intervene.  Docket No. 279 at 17.  Although the difference is not determinative in this case, Hess is mistaken.  An intervening party is deemed to have filed suit as of the date it files a successful motion for intervention, even where such motion is not granted until after the limitations period has expired.  *See United States ex rel. Canion v. Randall & Blake*, 817 F.2d 1188, 1192 (5th Cir. 1987) ("the filing of the motion for intervention, and not the later approval of the motion and actual filing of the complaint, determines the commencement of the action for purposes of the statute of limitations"); *McIntosh v. Boatman's First Nat'l Bank of Okla.*, 1996 WL 685655, at *1 (10th Cir. Nov. 29, 1996) (unpublished) (a successful motion to intervene filed within the limitations period "renders the subsequent complaint timely").

*Stop-N-Go* is distinguishable from this case.  Unlike in *Stop-N-Go*, the Court has not entered summary judgment in plaintiffs' favor on any claim.  Rather than raise the statute of limitations in response to plaintiffs' partial motion for summary judgment, Hess filed its own motion seeking summary judgment on the statute of limitations issue.  In a more closely analogous case, *Cytec Industries, Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d. 821 (S.D. Ohio 2002), the court held that a defendant that asserted the affirmative defense of statute of limitations in its answer and then filed a timely motion for summary judgment on that defense did not waive the issue by failing to raise it in response to the plaintiff's earlier-filed motion for partial summary judgment.  *Id.* at 828-29.  The court reasoned that, because the plaintiff did not seek summary judgment on the defendant's statute of limitations defense, the defendant was "not required to demonstrate a genuine issue of fact with respect to its statute of limitations defense."  *Id.* at 830.  The Court agrees with the *Cytec* court's reasoning.  Hess raised statute of limitations as an affirmative defense in its answer, Docket No. 83 at 7, and plaintiffs' motion for summary judgment was silent as that defense.  *See* Docket No. 208.  Hess did not waive the defense by filing its own motion for summary judgment rather than raising the defense in response to plaintiffs' motion.

### b.  Date of Accrual

Hess argues that plaintiffs had actual knowledge of the Hess-Statoil agreement as of September 13, 2010 and that plaintiffs had constructive knowledge of the transaction earlier than that date because the conveyance was recorded on April 16, 2010 and was accessible via NDRIN, a publicly available database to which plaintiffs

had access, shortly afterwards.  Docket No. 279 at 18.  Hess argues that plaintiffs'

notice of the Hess-Statoil agreement put plaintiffs on notice that Hess disclosed the AMI

agreement to Statoil, rendering plaintiffs' claim for breach of the confidentiality provision

untimely.  *Id.* at 19.  Plaintiffs argue that constructive notice of public records has no

bearing on the accrual of their claims and that the evidence shows that their claims did

not accrue until October 2012, upon receipt of a letter from Statoil's attorney.  Docket

No. 330 at 32-33.

The Court agrees with Hess that the confidentiality claim accrued no later than

September 13, 2010.  The evidence shows that, by that date, plaintiffs had actual notice

of the Hess-Statoil agreement and that, because plaintiffs knew that no prudent buyer

would have entered into that agreement without first reviewing all documents that

burdened the subject properties, plaintiffs either discovered Hess's disclosure of the

AMI agreement to Statoil or should have discovered it "by the exercise of reasonable

diligence."  Colo. Rev. Stat. § 13-80-108(6).

Mr. McPherson's email demonstrates his actual knowledge as of September 13,

2010 that Hess sold its leases in the Tomahawk Prospect to Statoil.  Docket No. 279-91

at 2.  Mr. McPherson's email further demonstrates that he was aware that the Hess-

Statoil agreement arose out of Statoil's claim that Hess had violated a separate

agreement between those parties, *see id.*, a fact that Hess represents was not public

knowledge.  Docket No. 279 at 21.  Plaintiffs do not dispute that Mr. McPherson was

aware of the Hess-Statoil agreement as of September 13, 2010.  *See* Docket No. 330 at

11, ¶ 81 ("Gold Coast does not dispute that no later than September 13, 2010 Gold Coast knew [Hess] had sold leases in Tomahawk to . . . Statoil").

Mr. McPherson testified that he believed he learned of the Hess-Statoil agreement from Mr. Coleman.  Docket No. 330-12 at 4, p. 125:13-18 ("Q.  Okay.  So you did have an understanding at this point . . . that part of the Tomahawk properties that [Hess] bought were then sold to [Statoil]?  A.  Yes.  Q.  How did you become aware of that?  A.  I think Bill [Coleman] told me.").  Additionally, in his declaration, Mr. McPherson states that Gold Coast was "essentially an investor" and that Gold Coast and Mr. McPherson "relied on Mr. Coleman and Spring Creek to handle the Tomahawk Transaction . . . and to protect the mutual interests of Gold Coast and Spring Creek.  Specifically, Gold Coast relied on Mr. Coleman and Spring Creek with respect to the terms of the Area of Mutual Interest Agreement."  Docket No. 330-2 at 4, ¶¶ 12-13.  Moreover, Ms. Pfannenstein, Gold Coast's Rule 30(b)(6) deponent, testified that, to prepare to answer questions about the timing and manner by which Gold Coast became aware of the Hess-Statoil agreement, she spoke with Mr. McPherson and Ms. Weissner (a Spring Creek Rule 30(b)(6) deponent) and, based on those discussions, she "gathered that Gold Coast became aware of that transaction from Spring Creek."  Docket No. 279-81 at 6, p. 125:12-18.

Given the testimony of Mr. McPherson and Ms. Pfannenstein, the only reasonable inference that a jury could draw is that Mr. McPherson learned of the Hess-Statoil agreement from Mr. Coleman.  Importantly, plaintiffs do not dispute that Mr. Coleman was the source of Mr. McPherson's knowledge.  Instead, plaintiffs attempt to

shift Mr. Coleman's knowledge to a time within the limitations period.  Plaintiffs suggest

that Mr. Coleman revealed this information to Mr. McPherson in October 2011, rather

than on or before September 13, 2010.  Docket No. 330 at 11, ¶ 81.  Plaintiffs cite to a

portion of Mr. McPherson's deposition in which he testified about an email dated

October 2011.  Docket No. 330-12 at 3, pp. 122:3-124:19.  Nothing in the cited

testimony, however, refutes Hess's evidence that both Spring Creek's and Gold Coast's

presidents knew of the Hess-Statoil agreement as of September 13, 2010.[19]  The fact

that Mr. McPherson discussed the Hess-Statoil agreement in an email dated October

2011 has no bearing on when he first learned about the transaction.  Because the

undisputed evidence demonstrates that Mr. McPherson knew of the transaction

between Hess and Statoil as of September 13, 2010 and that he learned of it from Mr.

Coleman, Spring Creek necessarily knew of the transaction on or before that date.[20]

---

[19]Under Colorado law, the knowledge of Mr. McPherson and Mr. Coleman, each of
whom is identified as the president of his company, is imputed to plaintiffs.  *See* Colo.
Rev. Stat. § 7-80-405 (a manager of an LLC is the LLC's agent); Restatement (Second)
of Agency § 272 cmt. b (1958) (where an agent's "knowledge of a particular fact is
relevant to the legal liability of participants in an event," then "the principal is affected as
if the circumstances were such that the principal would have reason to know or should
know the fact.").

[20]Ms. Weissner states in her declaration that, "[i]n January/February 2011 and all times
prior," Spring Creek did not know that Hess had sold and assigned its leases in the
Tomahawk Prospect to Statoil.  Docket No. 330-3 at 6, ¶ 17.  Ms. Weissner's denial in
her declaration is not sufficient, by itself, to defeat summary judgment.  *See United
States v. Premises Known as 717 S. Woodward Street, Allentown, Pa.*, 2 F.3d 529, 533
(3d Cir. 1993) ("a bare but sworn assertion of a [party's] lack of knowledge will not
suffice to create a material dispute of fact where that assertion is impeached by a well
supported showing to the contrary").  As previously discussed, the undisputed
testimonial evidence from Mr. McPherson and Ms. Pfannenstein establishes that Mr.
McPherson learned of the Hess-Statoil agreement from Mr. Coleman no later than
September 13, 2010.  Mr. Coleman's knowledge is imputed to Spring Creek.  Moreover,

The Court further finds that, based on plaintiffs' actual knowledge of the Hess-Statoil agreement as of September 13, 2010, the confidentiality claim accrued as of that date.  Plaintiffs knew that any entity, such as Statoil, would need to review all agreements that burdened oil and gas leases before agreeing to acquire those leases.  Mr. Coleman testified that he would "[a]bsolutely" want to see all contracts that affected any property interest he acquired from a third party and that he would expect any sophisticated buyer of oil and gas assets to do so.  Docket No. 279-24 at 13-14, pp. 32:25-33:24.  Although Mr. Coleman testified that he had witnessed transactions where such due diligence had not occurred, he attributed these transactions to a "lack of skill" among those who completed them.  *Id.* at 14, p. 33:16-24.  Likewise, Ms. Weissner testified that Statoil would be familiar with the AMI agreement as soon as it acquired leases from Hess.  Docket No. 279-27 at 17, p. 194:6-13.  Finally, in the September 18, 2012 letter, Spring Creek's counsel opined that Statoil was required by law to conduct an inquiry into public records that would have led to the discovery of the AMI agreement.  Docket No. 279-59 at 5.  The September 18, 2012 letter does not suggest any means by which Statoil could have become aware of the AMI agreement without Hess disclosing it.  Consistent with this testimony and evidence of industry standards, Mr. Overton and Mr. Wason testified that any prudent buyer of oil and gas

---

when Spring Creek contacted Statoil regarding a proposed acreage trade on January 26, 2011, Spring Creek asked Statoil to waive the non-compete clause.  Docket No. 279-58 at 2.  Ms. Weissner does not explain how Spring Creek could have known to ask Statoil, and not Hess, to waive a portion of the AMI agreement if, at the same time, Spring Creek was unaware of the Hess-Statoil transaction.  In light of the undisputed evidence, Ms. Weissner's statements asserting Spring Creek's ignorance of the agreement are not entitled to any weight.

interests would review all contracts associated with the relevant properties as a matter of course.  Docket No. 279-60 at 11, p. 189:3-15; Docket No. 279-35 at 44, p. 228:4-9. [21] Plaintiffs offer no competing evidence or argument regarding industry standards.  As such, the Court finds that there is no genuine issue of material fact that, as soon as plaintiffs were aware of the Hess-Statoil agreement, plaintiffs either knew or should have known that Hess disclosed the AMI agreement to Statoil.

Plaintiffs argue that the statute of limitations should be tolled because, between February 2010 and December 13, 2013, defendants "engaged in a conscious and continuous effort to conceal from Plaintiffs the material fact of . . . Hess's breach of confidentiality."  Docket No. 330 at 34.  The Court disagrees.  Under Colorado law, the doctrine of equitable tolling may apply "where the defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely manner."  *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996).  "The principle underlying equitable tolling in these circumstances is that a person should not be permitted to benefit from his or her own wrongdoing."  *Id.* at 1096-97.  Here, the Court has found that plaintiffs had actual knowledge of all facts necessary to discover the alleged breach no later than September 13, 2010, more than three years before they filed this lawsuit. Thus, even if the Court agreed with plaintiffs that Hess actively concealed its breach of

---

[21]Although the parties submit no testimony from Gold Coast on this topic, Mr. McPherson testified that he relied on Mr. Coleman to "manage" and "police" his interests because Mr. Coleman was the partner with relevant experience in investing in oil and gas interests.  He further testified that his reliance on Mr. Coleman's experience was "clearly the reason I'm investing with him" and speculated that this arrangement may have been in Gold Coast's written agreement with Spring Creek.  Docket No. 279-38 at 24-25, pp. 96:12-97:14.

the confidentiality provision from plaintiffs, plaintiffs cannot demonstrate that such concealment "prevented [them] from asserting [their] claims in a timely manner." *Id.* at 1096.

In sum, the Court finds that plaintiffs' confidentiality claim accrued no later than September 13, 2010 and is thus barred by Colorado's three-year statute of limitations for breach of contract claims.[22] Summary judgment is appropriate as to this claim.

### 2. *Hess's Liability for Underpayment of ORRIs*

Hess argues that it cannot be liable on plaintiffs' breach of contract claim for Statoil's alleged underpayment to plaintiffs (the "underpaid royalties") claim. Specifically, Hess argues that the AMI agreement creates no obligations with respect to the ORRIs that plaintiffs retained when they sold their Tomahawk Prospect leases to Hess (the "retained ORRIs"), and that the AMI agreement only obligated Hess to assign ORRIs in the leases it acquired within the area of mutual interest (the "assigned ORRIs" and, collectively with the retained ORRIs, the "existing ORRIs"). Docket No. 279 at 42-44. Hess argues that, "[o]nce the [a]ssigned ORRIs were assigned to Plaintiffs, the AMI Agreement was fully performed." *Id.* at 43. Because ORRIs are real property interests carved out of a mineral estate and run with the leases, Hess argues, plaintiffs' right to receive royalties pursuant to their overriding royalty interests is not contractual. *Id.* Plaintiffs respond that "[a] fair reading of paragraph one of the AMI Agreement is that it

---

[22]Because the Court grants Hess's motion for summary judgment on statute of limitations grounds, the Court does not consider Hess's argument that it did not breach the confidentiality provision. Additionally, plaintiffs' motion for partial summary judgment on the confidentiality claim will be denied as moot.

imposes two obligations on . . . Hess: to <u>assign</u> ORRI and to <u>pay</u> ORRI." Docket No. 330 at 43 (emphasis in original).

The Court agrees with Hess that plaintiffs' claims do not arise from the AMI agreement. As Hess points out, the AMI agreement imposes no obligations with respect to the retained ORRIs. *See* Docket No. 279-1. Accordingly, plaintiffs cannot maintain a claim for breach of the AMI agreement based on underpayment of those ORRIs. With respect to the assigned ORRIs, the AMI agreement states:

> If, during the term of the AMI, [Hess] should acquire any oil and gas lease, leasehold interest or mineral interest, . . . [Hess] shall immediately notify Spring Creek and Gold Coast in writing of such acquisition and Spring Creek and Gold Coast shall be entitled to an overriding royalty interest in such lease. . . . [Hess] shall assign such overriding royalty interest to Spring Creek and Gold Coast, in the following proportions. Spring Creek (75%) and Gold Coast (25%).

*Id.* at 2-3, ¶ 1. As the Court has previously held, this language imposes a conditional obligation on Hess. *See* Docket No. 48 at 8-10. Namely, in the event that Hess acquired new leases in the Tomahawk Prospect, it had the duty to (1) immediately notify plaintiffs of the acquisition and (2) assign an ORRI to plaintiffs in the acquired leases in accordance with the terms set forth in the AMI agreement. The AMI agreement itself does not grant plaintiffs any ORRI for which they had a right to demand payment. Plaintiffs' right to payment comes from the subsequent documents by which Hess assigned ORRI in the leases it acquired that were subject to the AMI agreement. *See* Docket Nos. 279-13, 279-14, 279-15.

Although plaintiffs' claims for underpayment of royalties on the existing ORRIs do not arise from the AMI agreement, it does not follow that Hess is immune from liability

for Statoil's alleged underpayment of royalties.  Hess was contractually obligated to pay

royalties on both the retained ORRIs and the assigned ORRIs.  "An oil and gas lessee

does not escape his duties to perform the covenants of the lease by assignment, even

though the assignee may also incur the duty of their performance, for the lessee is

bound by virtue of his contract with the lessor."  3 Summers Oil & Gas § 29:7 (3d ed.

2015); *see also Wold v. Diamond Resources, Inc.*, 2011 WL 4709885, at *2 (D. N.D.

Oct. 4, 2011) (the "well-established principle in the law of contracts that a contracting

party cannot escape its liability on the contract by merely assigning its duties and rights

under the contract to a third party" applies to oil and gas leases); *Whale v. Rice*, 49 P.2d

737, 741 (Okla. 1935) (where original party to an oil and gas lease "obligated himself to

pay the rent, the assignment of the lease by him and the subsequent payments of rents

and royalties by the assignee did not relieve him of the obligation to pay unpaid rentals

and royalties falling due under the lease") (citation omitted).[23]  Thus, Hess remains

---

[23]Although the parties do not raise the issue, it appears that Colorado law may apply to plaintiffs' breach of contract claim with respect to the assigned ORRIs.  The AMI agreement contains a choice of law provision that provides that both the AMI agreement "and the transactions contemplated [t]hereby . . . shall be construed in accordance with, and governed by, the laws of the State of Colorado."  Docket No. 279-1 at 4, ¶ 7.  The retained ORRIs are not subject to this provision, as they are not mentioned in the AMI Agreement, but the assigned ORRIs are certainly transactions "contemplated by" the AMI agreement.  The Colorado Supreme Court does not appear to have addressed whether an assignor of interests under an oil and gas lease remains liable for performance.  Without a guiding opinion from Colorado, the Court must predict what the Colorado Supreme Court would do if faced with the issue.  *Pompa*, 520 F.3d at 1142.  To the extent that Colorado law applies to a portion of plaintiffs' surviving breach of contract claim, the Court concludes that the Colorado Supreme Court, consistent with the above-cited authorities, would hold that the law of contract assignment applies equally to oil and gas leases, as Colorado courts apply principles of contract law to such leases.  See *Clough v. Williams Production RMT Co.*, 179 P.3d 32, 42 (Colo. App. 2007) ("The measure of damages for breach of contract is the same for oil and gas

liable to plaintiffs on their claim for underpayment of royalties on the existing ORRIs and

is not entitled to summary judgment on this claim.

## IV.  EFFECT OF THE COURT'S ORDER ON OTHER PENDING MATTERS

The Court's partial grant of summary judgment in favor of Hess and Statoil

affects several other motions currently pending in this case.  The Court finds that, in

light of the holdings in this order, the following motions are now moot:

- Plaintiffs' Unopposed Motion to Substitute Official Deposition Transcript for Rough Draft Deposition Transcript [Docket No. 227].  The Court has resolved plaintiffs' motion for summary judgment without reference to the transcript at issue.

- Plaintiffs' Motion to Exclude Testimony and Opinions of John S. Lowe [Docket No. 247].  All of the challenged opinions in Mr. Lowe's report relate to the legal effect of the confidentiality provision.  *See id.*  This motion is mooted by the Court's grant of summary judgment on the confidentiality claim on limitations grounds.

- Plaintiffs' Motion to Strike Inadmissible Evidence Submitted by [Hess] in Response to Plaintiffs' Motion for Summary Judgment [Docket No. 248].  This motion seeks to strike Mr. Lowe's opinion from Hess's response to plaintiffs' motion for summary judgment.  The Court has ruled on plaintiffs' motion without reference to Mr. Lowe's report.

- Hess's Motion for Leave to File Surreply [Docket No. 254].  Hess filed a conditional motion for leave to file a surreply to address certain "newly proffered evidence" in plaintiffs' reply in support of their motion for summary judgment against Hess [Docket No. 249].  Hess's request only applies "if the Court is inclined to grant" plaintiffs' motion on the basis of this newly proffered evidence, Docket No. 254 at 2-3, ¶ 5, which the Court has not done.

---

leases as it is for other contracts"); *Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 843 (Colo. App. 2011) (citing the Restatement (Second) of Contracts (1981) for guidance on interpreting oil and gas leases); *Connell v. Sun Oil Co.*, 596 P.2d 1215, 1217 (Colo. App. 1979) (applying the canon that a contract's words should be construed according to their "plain and accepted meaning" to an oil and gas lease assignment).

- Statoil's Motion to Exclude Expert Testimony of Robin A. Forté [Docket No. 272].  The challenged opinions relate to whether the AMI agreement was a covenant running with the land and whether Statoil was subject to the AMI agreement by contractual assignment.  *Id.* at 2.  The Court has resolved these issues.

- Plaintiffs' Motion to Strike Inadmissible Evidence Submitted by Hess Bakken in Support of Hess Bakken's Motion for Summary Judgment [Docket No. 329].  This motion seeks to exclude three declarations attached to Hess's motion for summary judgment: the declarations of William Abington, Terry Payne, and John Lowe.  Hess cites the Abington and Payne declarations in connection with Hess's challenge to plaintiffs' claimed damages on the confidentiality claim.  *See* Docket No. 279 at 39, 41.  The Court resolved that claim on limitations grounds and did not discuss any of the challenged declarations.

- Hess Bakken's Motion to Strike Select Declarations and Deposition Testimony Submitted in Support of Plaintiffs' Response (Doc. 330) to Hess Bakken's Motion for Summary Judgment [Docket No. 349].  The Court resolved Hess's motion without reference to any of the challenged material.

In addition, it appears that certain other pending motions and objections may be moot, at least in part.  For instance, plaintiffs move to exclude the report of defendants' experts William Abington and Terry Payne.  *See* Docket Nos. 245, 273.  Both expert reports relate to plaintiffs' damages theories, which are "based, in part, on future oil and gas production from wells in the subject area."  Docket No. 273 at 2; *see also* Docket No. 245 at 13 (noting that plaintiffs' "ORRI damages theory" seeks recovery of the value of the ORRI plaintiffs "should have received for leases taken through October 2012, and the wells that would pay out over the next 30-60 years or as long as the wells on those leases operate").  Pursuant to this order, the only damages to which plaintiffs are entitled are damages for Statoil's alleged underpayment of royalties on the existing ORRIs.  Such damages are limited to past underpaid royalties, as Statoil cannot be said

to have underpaid with respect to any payments that have not yet been made.  In light of the Court's holdings, it is not clear to the Court whether any of the challenged expert opinions remain at issue.  As further examples, plaintiffs' motion to exclude the opinion of Statoil's expert Bruce Kramer [Docket No. 270] only appears relevant to whether Statoil is an assignee of the AMI agreement, and Hess's motion to exclude the opinion of Mr. Forté [Docket No. 278] appears to relate to Hess's obligation to continue acquiring leases and Mr. Forté's opinions on the importance of the confidentiality provision.  All these issues have been resolved.  The Court has similar concerns regarding certain objections to the orders of the magistrate judge.

Although these and other matters appear to the Court to be moot, the Court is hesitant to deny them on this basis without first giving the parties the opportunity to address the matter.  Additionally, certain motions and/or objections to rulings of the magistrate judge may be partially moot, and the parties may find that this case would benefit from the parties withdrawing those motions and filing revised motions that focus the Court's attention on matters still at issue in this case.  Accordingly, within five days of the entry of this order, the parties shall file a joint statement, not to exceed ten pages, expressing their respective opinions on which motions and objections, if any, are moot in light of this order.

## V. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Statoil Oil & Gas LP's Motion for Summary Judgment [Docket No. 156] is **GRANTED** in part and **DENIED** in part as reflected in this order.  It is further

**ORDERED** that plaintiffs' Motion for Partial Summary Judgment Against Statoil [Docket No. 176] is **DENIED**.  It is further

**ORDERED** that plaintiffs' Motion Regarding Incorporation by Reference in Plaintiffs' Response to Statoil's Motion for Summary Judgment [Docket No. 183] is **GRANTED**.  It is further

**ORDERED** that defendant Hess Bakken Investment II, LLC's Motion for Summary Judgment [Docket No. 279] is **GRANTED** in part and **DENIED** in part as reflected in this order.  It is further

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment Against Hess [Docket No. 208] is **DENIED**.  It is further

**ORDERED** that the following motions are **DENIED** as moot for the reasons specified in this order:

- Plaintiffs' Unopposed Motion to Substitute Official Deposition Transcript for Rough Draft Deposition Transcript [Docket No. 227];

- Plaintiffs' Motion to Exclude Testimony and Opinions of John S. Lowe [Docket No. 247];

- Plaintiffs' Motion to Strike Inadmissible Evidence Submitted by [Hess] in Response to Plaintiffs' Motion for Summary Judgment [Docket No. 248];

- Hess's Motion for Leave to File Surreply [Docket No. 254];

- Statoil's Motion to Exclude Expert Testimony of Robin A. Forté [Docket No. 272];

41

- Plaintiffs' Motion to Strike Inadmissible Evidence Submitted by Hess Bakken in Support of Hess Bakken's Motion for Summary Judgment [Docket No. 329]; and

- Hess's Motion to Strike Select Declarations and Deposition Testimony Submitted in Support of Plaintiffs' Response (Doc. 330) to Hess's Motion for Summary Judgment [Docket No. 349].

It is further

**ORDERED** that, within five days of the entry of this order, the parties' shall submit a joint filing, not to exceed ten pages, indicating their respective positions on which currently pending motions and objections to the rulings of the magistrate judge, if any, are moot in light of this order.

DATED September 8, 2016.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge