**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

SPRING CREEK EXPLORATION &
PRODUCTION COMPANY, LLC; GOLD
COAST ENERGY, LLC,

     Plaintiffs - Appellants,

v.

HESS BAKKEN INVESTMENT, II, LLC,
f/k/a TRZ Energy, LLC; STATOIL OIL &
GAS, LP, f/k/a Brigham Oil & Gas, LP,

    Defendants - Appellees.

No. 17-1010
(D.C. No. 1:14-CV-00134-PAB-KMT)
(D. Colo.)

_____

**ORDER**

_____

Before **LUCERO**, **McKAY**, and **McHUGH**, Circuit Judges.

_____

    This matter is before us on *Plaintiffs-Appellants' Petition for Panel Rehearing*

("Petition") and Defendants-Appellees' responses thereto. Upon careful consideration of

the Petition and the responses, we grant the Petition in part to the extent of the

modifications in the attached revised opinion. Our February 21, 2018 opinion is

withdrawn and replaced by the attached revised opinion.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

by: Chris Wolpert
    Chief Deputy Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

SPRING CREEK EXPLORATION &
PRODUCTION COMPANY, LLC; GOLD
COAST ENERGY, LLC,

      Plaintiffs - Appellants,

v.

HESS BAKKEN INVESTMENTS II,
LLC, f/k/a TRZ Energy, LLC; STATOIL
OIL & GAS, LP, f/k/a Brigham Oil & Gas,
LP,

      Defendants - Appellees.

No. 17-1010

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-00134-PAB-KMT)**
_____

Tamir I. Goldstein (John W. Mill and Joseph C. Daniels with him on the briefs), Sherman
& Howard L.L.C., Denver, Colorado, for Plaintiffs - Appellants.

Cameron P. Pope, Andrews Kurth Kenyon LLP, Houston, Texas (Alexis J. Gómez,
Andrews Kurth Kenyon LLP, Houston, Texas; Craig L. Stahl, Andrews Kurth Kenyon
LLP, The Woodlands, Texas; and Frank C. Porada, Berenbaum Weinshienk PC, Denver,
Colorado, with him on the briefs), for Defendant - Appellee Statoil Oil & Gas LP.

Robert S. Safi, Susman Godfrey L.L.P., Houston, Texas (Ashley L. McMillian and
Abigail C. Noebels, Susman Godfrey L.L.P., Houston , Texas, and Elizabeth J. Hyatt,
Ogborn Mihm, L.L.P., Denver, Colorado, with him on the briefs), for Defendant -
Appellee Hess Bakken Investments II, LLC.

_____

Before **LUCERO**, **McKAY**, and **McHUGH**, Circuit Judges.

———————————————————

**McHUGH**, Circuit Judge.

———————————————————

Plaintiffs Spring Creek Exploration & Production Company, LLC ("Spring Creek") and Gold Coast Energy, LLC ("Gold Coast") appeal from four separate district court orders dismissing contract and tort claims against Defendants Hess Bakken Investments II, LLC ("Hess") and Statoil Oil & Gas, LP ("Statoil").[1] For reasons to follow, we affirm.

## I.    BACKGROUND

### A.   Factual History

This case arises out of the oil fields of western North Dakota. Our story begins around January 2009, when Statoil entered into two agreements with a Hess affiliate. One of those agreements the parties call the "Rough Rider Agreement." The Rough Rider Agreement prohibited Hess for one year from acquiring any oil or gas interests in the Rough Rider Prospect (a sizable swath of land in North Dakota's McKenzie and Williams Counties) in exchange for Hess's affiliate receiving certain proprietary information from Statoil.

———————————————

[1] Each party to this case has been known by varying names over the years. For the sake of clarity, we refer to the parties as Spring Creek, Gold Coast, Hess, and Statoil, rather than the names of their predecessors or successors in interest.

1.     **The Tomahawk Agreement**

On October 8, 2009, still within the one-year non-compete period, Hess entered

into a series of agreements (collectively, the "Tomahawk Agreement") with Spring

Creek, Gold Coast, and non-party Coachman Energy relating to the Tomahawk Prospect,

a collection of land lying entirely within the much larger Rough Rider Prospect. As one

part of the Tomahawk Agreement, Spring Creek and Gold Coast sold all of their oil and

gas leasehold interests (covering about 5,400 net acres) in the Tomahawk Prospect to

Hess in exchange for an overriding royalty interest ("ORRI") in the hydrocarbons

produced under the terms of the leases. The parties refer to this portion of the Tomahawk

Agreement as the "First Assignment." Hess's plan for these leases was to drill enough

exploratory wells to prove their value and then sell them to larger operators. Spring

Creek's president, William Coleman, testified that, at the time of the Tomahawk

transaction, he understood that Hess's intention was to "drill [the area] up and then sell

it." Aplt. App'x, Vol. XXIII, at 3759, 234:14–21.

In another part of the Tomahawk Agreement, Spring Creek, Gold Coast and Hess

executed the "Area of Mutual Interest Agreement." That agreement (the "AMI

Agreement") established the entire Tomahawk Prospect as an Area of Mutual Interest

("AMI") for a term of three years. In relevant part, the AMI Agreement states:

> During the term of the AMI, only [Hess] may proceed to lease or otherwise
> acquire interests within the AMI. If, during the term of the AMI, [Hess]
> should acquire any oil and gas lease, leasehold interest or mineral interest,
> [Hess] shall offer such interest to Coachman in the following proportions,
> [Hess] (90%), Coachman (10%), pursuant to that certain Participation
> Agreement dated October 8, 2009, by and between [Hess] and Coachman.

*Id.* at Vol. II, 304, § 1. The agreement further provides that "for any oil and gas lease acquired" by Hess in the AMI during the three-year term, Spring Creek and Gold Coast would receive ORRIs in those newly acquired leases, in addition to the ORRIs Spring Creek and Gold Coast were already slated to receive under the existing leases transferred to Hess in the First Assignment. *Id.*

Finally, the AMI Agreement contains two other clauses relevant to this dispute:

> 4.    <u>Covenant Running with the Land</u>. This AMI and all rights, covenants and conditions hereof shall be considered covenants running with the land and shall inure to and be binding upon the Parties hereto, and their respective successors and assigns.

> 5.    <u>Confidentiality</u>. The terms of this Agreement are confidential and no Party, nor any of its respective affiliates or representatives shall furnish this Agreement, or disclose any of its contents, to any third party.

*Id.* at 306.

## 2.    Hess-Statoil Settlement Agreement

Hess's foray into the Tomahawk Prospect did not go unnoticed. On January 15, 2010, Statoil sent a letter to Hess alleging that Hess had breached the Rough Rider Agreement by acquiring leases in the Rough Rider Prospect during the non-compete period. That letter led to a February 2010 settlement agreement (the "Hess-Statoil Settlement Agreement"), in which Hess sold most of its Tomahawk Prospect leases to Statoil at a discount. Hess further agreed that any leases it acquired in the Tomahawk Prospect in the next three months would be offered to Statoil at cost (the "three-month tail"). In connection with Statoil's due diligence in executing the Hess-Statoil Settlement Agreement, Hess disclosed to Statoil the terms of the AMI Agreement and provided it

with a copy. Statoil had no interest in inheriting Hess's obligations under the AMI Agreement. To that end, the Hess-Statoil Settlement Agreement states the assignment of leases from Hess to Statoil does "not include . . . the Area of Mutual Interest Agreement dated October 8, 2009, among [Hess] . . . , Spring Creek . . . and Gold Coast." *Id.* at Vol. XXXIV, 5760, ¶ 2.

Neither Spring Creek nor Gold Coast was privy to the Hess-Statoil negotiations. After the agreement was finalized, however, Statoil publicly announced that it had acquired about 10,000 net acres in the Rough Rider Prospect. And on April 12, 2010, Hess and Statoil executed an Assignment, Bill of Sale and Conveyance (the "Second Assignment"), formally transferring the Tomahawk leasehold interests from Hess to Statoil. That conveyance was recorded four days later.

### 3.    The Parties' Dealings After the Hess-Statoil Settlement Agreement

Pursuant to the AMI Agreement, Hess made three assignments to Spring Creek and Gold Coast of ORRIs in leases that Hess acquired in the Tomahawk Prospect. The first, completed in April 2010, included leases acquired through March 24, 2010. The second, sent to Plaintiffs in June 2010, included nine leases acquired through March 11, 2010. The third, sent to Plaintiffs in November 2010, only included leases acquired in 2009. All three assignments referenced "Brigham Leases," a reference to Statoil's predecessor, in the footer.

After the three-month tail in the Hess-Statoil Settlement Agreement expired, Hess notified its lease brokers to resume the hunt for leasing opportunities in the Tomahawk Prospect. Hess was presented at least one opportunity to acquire a lease in the Tomahawk

Prospect, but declined to follow through because the lease was relatively small and Hess's strategy was to acquire acreage in larger quantities. Statoil, meanwhile, acquired many additional leases in the Tomahawk Prospect during this time, dozens of which were publicly recorded throughout 2010.

Although it is not clear exactly when Plaintiffs learned of the Hess-Statoil transaction, on September 13, 2010, Mark McPherson, Gold Coast's president, sent an email stating, "We sold Tomahawk to Randy, who flipped to [Hess] until [Statoil] came to [Hess] and claimed [Hess] violated an agreement and [Statoil] got to buy [the Tomahawk Prospect leases] from [Hess]." *Id.* at Vol. XXVII, 4764. At his deposition, Mr. McPherson was asked how he knew that Statoil purchased the Tomahawk Prospect leases from Hess. His answer: "I think Bill [Coleman, Spring Creek's president] told me." *Id.* at Vol. XXIV, 3990, 125:13–125:18. That answer is consistent with the testimony of Gold Coast's Rule 30(b)(6) deponent, Amy Pfannenstein. According to Ms. Pfannenstein, Gold Coast knew about the Hess-Statoil Settlement Agreement in September 2010, and Gold Coast learned about the agreement from Spring Creek. *Id.* at Vol. XXVII, 4672–73, 125:19–126:17.

### B. Procedural History

This litigation began on December 13, 2013, when Spring Creek brought suit against Hess and Statoil in Colorado state court. The original complaint identified six claims for relief:

1. Breach of Contract (against Hess)

2. Breach of Contract (against Statoil)

3. Breach of the Implied Covenant of Good Faith and Fair Dealing (against Hess)

4. Tortious Interference with Contract (against Statoil)

5. Fraudulent Concealment (against Hess and Statoil)

6. Civil Conspiracy (against Hess and Statoil)

Spring Creek attached three exhibits to its original complaint:

1. The First Assignment (part of the October 8, 2009, Tomahawk Agreement, by which Spring Creek and Gold Coast sold Tomahawk leases to Hess)

2. The AMI Agreement (also part of the Tomahawk Agreement, by which Spring Creek, Gold Coast, and Hess identified the Tomahawk area as one of mutual interest)

3. The Second Assignment (part of the Hess-Statoil Settlement, by which Hess assigned its Tomahawk leases to Statoil)

On January 17, 2014, Statoil removed Spring Creek's suit to the United States District Court for the District of Colorado. Hess and Statoil then separately moved to dismiss the complaint.

The district court granted in part and denied in part each motion. *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-CV-00134-PAB-KMT, 2014 WL 4400764, at *14 (D. Colo. Sept. 5, 2014) ("*Spring Creek I*"). In particular, the district court dismissed with prejudice Spring Creek's third, fourth, fifth, and sixth claims for relief. *Id.* That left just the breach of contract claims, but even those did not escape unscathed. As to Hess, the district court dismissed Spring Creek's breach of contract claim to the extent it alleged Hess failed to disclose leases acquired after April 2010 and failed to acquire new leases in the AMI. *Id.* at *4–5. As to Statoil, the district court dismissed Spring Creek's breach of contract claim to the extent it alleged Statoil failed to

disclose all leases acquired by Statoil in the AMI. *Id.* at *11. The district court then explained what was left of Spring Creek's suit:

- "Plaintiff may proceed with [its] first claim for relief based on Hess Bakken's alleged breach of the confidentiality provision and failure to honor royalty interests in existing leases."

- "Plaintiff may proceed with its second claim for relief based on Statoil's alleged failure to assign override interests in new leases to Spring Creek and failure to honor royalty interests in existing leases."

*Id.* at *14. Put differently, Spring Creek had two surviving claims against Hess: (1) that Hess breached the AMI Agreement's confidentiality provision by disclosing its terms to Statoil without Spring Creek's consent, and (2) that Hess breached the AMI Agreement by not paying ORRIs on the "Existing Leases," which the original complaint defines as those leases sold to Hess in the First Assignment, plus leases acquired by Hess in the AMI through November 2010. And Spring Creek had two surviving claims against Statoil: (1) that Statoil failed to pay ORRIs on those same Existing Leases, and (2) that Statoil failed to pay ORRIs on the "New Leases," which the original complaint defines as those oil and gas leasehold interests acquired by Statoil within the Tomahawk Prospect after Statoil entered into the Hess-Statoil Settlement Agreement.

Spring Creek promptly moved for reconsideration of the district court's order. The district court denied that motion. *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-CV-00134-PAB-KMT, 2015 WL 3542699, at *3 (D. Colo. June 5, 2015) ("*Spring Creek II*"). While the reconsideration motion was pending, Gold Coast moved to intervene as an additional plaintiff. The district court granted Gold Coast's

motion. On April 28, 2015, Plaintiffs filed an amended complaint, which added Gold Coast as a plaintiff but was otherwise identical to the original complaint.

Meanwhile, the case proceeded through discovery. In May 2015, Hess moved for partial summary judgment on Plaintiffs' request for reliance damages. The district court granted that motion in full. *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-CV-00134-PAB-KMT, 2016 WL 1170105, at *6 (D. Colo. Mar. 24, 2016) ("*Spring Creek III*").

Hess and Statoil thereafter separately moved for summary judgment. In September 2016, the district court granted in part and denied in part both motions.[2] *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-CV-00134-PAB-KMT, 2016 WL 9735145, at *17 (D. Colo. Sept. 8, 2016) ("*Spring Creek IV*"). As to Hess, the district court held Plaintiffs' claims for breach of the AMI Agreement's confidentiality provision were time-barred. *Id.* at *14. As to Statoil, the district court held that Statoil was not an assignee of the AMI Agreement; it partially granted Statoil's motion for summary judgment on that basis. *Id.* at *10–11. As to both Hess and Statoil, the district court denied their motions for summary judgment on Plaintiffs' breach of contract claims for underpayment of royalties on the Existing Leases. *Id.* at *11, 15.

Rather than proceed to trial on the underpayment-of-royalties claims, the parties jointly moved to dismiss the remaining claims without prejudice, as all preferred to arbitrate them instead. Indeed, the parties executed an Agreement to Arbitrate dated

---

[2] In the same September 8 order, the district court also denied Plaintiffs' motions for partial summary judgment against Statoil and Hess.

December 7, 2016. On December 15, the district court granted in part the stipulated motion to dismiss the Existing Leases claims.[3] It entered final judgment on December 16 and an amended final judgment on December 21, 2016. This appeal timely followed.

Contemporaneous with the parties' briefing in this court, the Existing Lease claims were resolved in arbitration. In October 2017, an arbitrator dismissed with prejudice Spring Creek's Existing Lease claims against both Hess and Statoil. And in November 2017, upon stipulation of the parties, the same arbitrator awarded Gold Coast $82,924.96 from Statoil and dismissed Gold Coast's claims against Hess, with prejudice.

## II. JURISDICTION

Before addressing the merits, we first dispose of two jurisdictional questions. The first concerns the district court's subject matter jurisdiction; the second, our appellate jurisdiction. For the reasons that follow, we conclude we do have jurisdiction to decide this appeal.

### A. District Court's Subject Matter Jurisdiction

The parties all agree that the district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). But we have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). "To determine whether a party has adequately presented facts sufficient to establish federal diversity jurisdiction, appellate courts must

---

[3] The district court denied the joint motion insofar as it requested that the district court "refer the remaining breach of contract claims for past damages to arbitration pursuant to the Parties' agreement." Aplt. App'x, Vol. XXXII, at 5684, 5690.

look to the face of the complaint, ignoring mere conclusory allegations of jurisdiction." *Penteco Corp. v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991) (citations omitted). "The party seeking the exercise of jurisdiction in his favor 'must allege in his pleading the facts essential to show jurisdiction.'" *Id.* (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). "Ordinarily, 'the jurisdiction of the Court depends upon the state of things at the time of the action brought, and . . . after vesting, it cannot be ousted by subsequent events.'" *Price v. Wolford*, 608 F.3d 698, 702 (10th Cir. 2010) (quoting *Mullan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)).

Both plaintiffs in this case are limited liability companies. Although an open question in the Tenth Circuit, the "majority rule" is that, for diversity purposes, a limited liability company is a citizen of every state in which its members reside. *See Shannon's Rainbow, LLC v. Supernova Media, Inc.*, 683 F. Supp. 2d 1261, 1266–67 & n.23 (D. Utah 2010) (collecting cases); *accord Carden v. Arkoma Assocs.*, 494 U.S. 185, 189, 195 (1990) (holding that, corporations aside, "for diversity purposes, the citizenship of an artificial entity . . . depends on the citizenship of 'all the members'") (quoting *Chapman v. Barney*, 129 U.S. 677, 682 (1889)). In their Disclosure Statement to this court, Plaintiffs assert (a) at the time Spring Creek filed its state court complaint, all five of its members were citizens of Colorado, and (b) at the time Gold Coast intervened in this suit, both of its members were citizens of Colorado. These assertions are not supported by citations to the appellate record.

Plaintiffs never pleaded the citizenship of Spring Creek's members. Recall that Spring Creek's initial complaint was filed in state court. In that original complaint,

Spring Creek alleged only that it "is a Colorado limited liability company with its principal place of business located" in Colorado. Aplt. App'x, Vol. I, at 56, Compl. ¶ 1. Being a state-court complaint, it did not allege federal jurisdiction. *Id.* at 57, Compl. ¶¶ 5–7. After Gold Coast was permitted to intervene, Plaintiffs filed an Amended Complaint, which remains the operative complaint in this action. In their Amended Complaint ("AC"), Plaintiffs alleged in relevant part:

> 1.     Spring Creek is a Colorado limited liability company with its principal place of business located at 1200 17th St., Suite 1100, Denver, CO 80202.
>
> 2.     Gold Coast is a Colorado limited liability company with its principal place of business at 4531 Silver Gate Drive, Castle Rock, CO 80108. *Gold Coast's members are all Colorado residents.*
>
> . . . .
>
> 5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. Specifically, as to the amount in controversy, Plaintiffs are seeking damages against Defendants in excess of $1,000,000.

*Id.* at 460–61, AC ¶¶ 1–2, 5 (emphasis added). Plaintiffs pleaded that Gold Coast's members are all residents of Colorado, but the Amended Complaint is conspicuously silent as to Spring Creek's members.

"Where the pleadings are found wanting, an appellate court may also review the record for evidence that diversity does exist." *Penteco*, 929 F.2d at 1521 (citing *Sun Printing & Publ'g Ass'n v. Edwards*, 194 U.S. 377, 382 (1904)). Upon Statoil's removal of this case to federal court, the district court ordered Defendants to show cause why this

case should not be dismissed due to lack of subject matter jurisdiction.[4] Statoil responded, but its response was not included by any party as part of the appellate record. Evidently satisfied with Statoil's response, the district court discharged its order to show cause that same day. Neither the order to show cause nor the order discharging the order to show cause is part of the appellate record.

From the district court's docket, we can see that Statoil's response purported to demonstrate (a) Spring Creek's members are all citizens of Colorado, (b) Hess is a citizen of Delaware and Texas, (c) Statoil is a citizen of Nevada, Delaware, and Texas, and (d) Statoil US Holdings, Inc., which was also a named defendant at that time, is a citizen of Delaware and Connecticut. *See* Response to Order to Show Cause, *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-CV-00134-PAB-KMT (D. Colo. Feb. 3, 2014), ECF No. 14. On that basis, Statoil argued that complete diversity of citizenship existed and that the district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332. *Id.* The original papers and exhibits filed in the district court constitute part of the record on appeal. *See* Fed. R. App. P. 10(a)(1). Because Statoil's response to the district court's order is necessary for us to confirm the district court's subject matter jurisdiction, we sua sponte supplement the appellate record to include that document. *See* Fed. R. App. P. 10(e)(2)(C); *United States v. Polly*, 630 F.3d 991, 995 n.1 (10th Cir. 2011); *see also United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010) (taking

---

[4] This case consists entirely of state-law claims. There is no colorable argument for federal question jurisdiction. As a result, federal jurisdiction must lie, if at all, based on diversity of citizenship.

judicial notice of district court order not part of the record on appeal). Under any test, complete diversity of citizenship existed at the outset of this case. Thus, we are satisfied that the district court had subject-matter jurisdiction.

## B. This Court's Appellate Jurisdiction

In general, federal circuit courts have jurisdiction to review only "final decisions" of district courts. 28 U.S.C. § 1291; *New Mexico v. Trujillo*, 813 F.3d 1308, 1316 (10th Cir. 2016). "A 'final decision' is ordinarily one that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Jackson v. Los Lunas Cmty. Program*, --- F.3d ----, 2018 WL 504315, at *9 (10th Cir. Jan. 23, 2018) (citation omitted). "Put differently, a final decision is one by which the district court disassociates itself from a case." *Id.* (internal quotation marks omitted). As a general rule, we will not allow parties to manufacture finality "by obtaining a voluntary dismissal without prejudice of some claims so that others may be appealed." *HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1199 n.7 (10th Cir. 2017) (internal quotation marks and alteration omitted). "That rule does not apply in every circumstance, however." *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1238 (10th Cir. 2006). "Although a dismissal without prejudice is usually not a final decision, where the dismissal finally disposes of the case so that it is not subject to further proceedings in federal court, the dismissal is final and appealable." *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1275 (10th Cir. 2001). "The critical determination as to whether an order is final is whether [the] plaintiff has been effectively excluded from federal court under the present circumstances." *Id.* (citation and alteration omitted). As the Supreme Court

recently reiterated, "finality is to be given a practical rather than a technical construction." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1712 (2017) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171 (1974)).

The issue we must decide is whether the parties' voluntary dismissal of the Existing Lease claims and the subsequent arbitration proceedings rendered the district court's prior decisions final and appealable. Plaintiffs contend the parties' Arbitration Agreement and the associated dismissal without prejudice "have finally and completely disposed of the remaining issues of the case so they are not subject to further proceedings in federal court." Appellants' Response to Court's Order dated February 1, 2017 ("Aplt. Resp.") at 2. But the district court explicitly declined to decide the parties' obligations under the Arbitration Agreement, which had never before been at issue in this case, or to "refer" the remaining claims to arbitration. Without a district court order requiring the referral of the remaining claims to arbitration, there would seem to remain "the possibility that the parties could file another complaint raising those same claims." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1011 (10th Cir. 2000). Indeed, Hess and Statoil argue that "nothing in the 'without prejudice' judgment itself has 'the effect of conclusively excluding [Spring Creek and Gold Coast] from federal court' on the Existing Lease claim." Appellee's Response to Court's Order dated February 17, 2017 ("Aplee. Resp.") at 3–4 (quoting *Waltman v. Georgia-Pacific, LLC*, 590 F. App'x 799, 816 (10th Cir. 2014)).

During the pendency of this appeal, however, the Existing Lease claims have been finally resolved in arbitration. Plaintiffs submitted two supplemental statements saying

so, declaring in their latter statement that "the Existing Lease Claims of Spring Creek and Gold Coast have been fully and finally resolved, and are not subject to further proceedings in court." Appellant's Second Supplemental Statement Regarding Jurisdiction at 2. Although Hess and Statoil initially argued against appellate jurisdiction, they have not renewed those arguments in the wake of these subsequent developments. Nor did they argue against our jurisdiction at oral argument. Their apparent concession is well-taken. Whatever jurisdictional problems once extant, at this juncture we are satisfied that all claims between these parties have now been finally resolved. While it is possible that the parties may litigate anew over the arbitration, that is no matter, for

> even if a party in this case returns to the district court in a separate judicial proceeding to confirm, vacate or enforce the award resulting from arbitration, these subsequent judicial proceedings are . . . distinct matters, and the possibility of their occurrence does not deprive the district court's order in the original proceeding of its finality.

*Servants of Paraclete*, 204 F.3d at 1011 (internal quotation marks omitted). Mindful that "finality is to be given a practical rather than a technical construction," *Microsoft Corp.*, 137 S. Ct. at 1712 (citation omitted), we are convinced that the district court has fully "disassociate[d] itself" from this case. *See Los Lunas*, 2018 WL 504315, at *9 (citation omitted).

\* \* \*

In sum, the district court had jurisdiction, as do we, and we now proceed to the merits of Plaintiffs' appeal.

## III.  DISCUSSION

The remainder of this opinion will proceed in five parts. First, we will examine the district court's September 2014 order dismissing certain contract and tort claims on Hess and Statoil's Rule 12(b)(6) motions ("*Spring Creek I*"). Second, we will examine the district court's June 2015 order denying Spring Creek's motion to reconsider parts of the September 2014 order ("*Spring Creek II*"). Third, we turn to the district court's March 2016 order granting partial summary judgment for Hess on Plaintiffs' request for reliance damages ("*Spring Creek III*"). Fourth, we will examine those portions of the district court's September 2016 order granting summary judgment to Statoil ("*Spring Creek IV*"). Finally, we will examine the portion of that same September 2016 order granting summary judgment to Hess ("*Spring Creek IV*," redux).

### A.   Motions to Dismiss ("*Spring Creek I*")

In this subpart, we review the rulings in the district court's September 5, 2014 order. *See Spring Creek I*, 2014 WL 4400764. Like the district court, we divide our analysis into three parts. First, we will consider Spring Creek's claims against Hess. Second, we will consider Spring Creek's claims against Statoil. Third, we will consider Spring Creek's civil conspiracy claim against Hess and Statoil together. For all these claims, we review the district court's judgments de novo. *Albers v. Bd. of Cty. Comm'rs*, 771 F.3d 697, 700 (10th Cir. 2014). To survive dismissal, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**1.     Claims Against Hess**

The district court dismissed Spring Creek's claims against Hess for (1) breach of contract for failing to acquire new leases within the Tomahawk Prospect during the entire period of the AMI, (2) breach of the implied covenant of good faith and fair dealing, (3) fraudulent concealment, and (4) civil conspiracy. *See Spring Creek I*, 2014 WL 4400764, at *3–9, 13. We consider Plaintiffs' challenges to the first three claims in this section. We consider their challenge to the civil conspiracy dismissal at Section III.A.3, *infra*.

a.      *Breach of Contract for Failing to Acquire New Leases*

Plaintiffs argue that Hess breached the AMI Agreement by failing to acquire new leases in the Tomahawk Prospect throughout the three-year AMI period. The district court disagreed. It held that nothing in the Tomahawk Agreement, generally, or the AMI Agreement, in particular, obligated Hess to acquire new leases. *Spring Creek I*, 2014 WL 4400764, at *5. Instead, it held that the AMI Agreement merely defined Hess's obligations "in the event that it *did* acquire a new lease." *Id.* (emphasis in original). In the district court's view, its interpretation was "the only reasonable interpretation," and so, as a matter of law, Spring Creek failed to state a breach of contract claim based on Hess's failure to acquire new leases. *Id.*

We begin our review of that ruling with a word on choice of law. The AMI provides that it shall be construed and governed by the laws of Colorado. The district court accordingly applied Colorado law to all of Plaintiffs' contract claims against Hess.

Nobody objects on appeal, so we assume Colorado law applies as well. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

Under Colorado law, "[c]ontract interpretation is a question of law for the court to decide." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 696 (Colo. 2009). "The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties." *Id.* at 697. "To determine the intent of the parties, the court should give effect to the plain and generally accepted meaning of the contractual language." *Id.* We should be wary of "viewing clauses or phrases in isolation," *U.S. Fidelity & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992), instead reading them in the context of the entire contract, "seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless," *Pepcol Mfg Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984). Recitals, however, "are not strictly any part of the contract" and cannot "extend" contractual stipulations. *Las Animas Consol. Canal Co. v. Hinderlider*, 68 P.2d 564, 566 (Colo. 1937) (citation omitted); *accord Weingarten Realty Inv'rs v. Miller*, 661 F.3d 904, 911 & n.11 (5th Cir. 2011) (citing *Las Animas*, applying Colorado law). On a motion to dismiss, allegations in a complaint "do not overcome contradictory statements in the text of a contract attached to [the] complaint." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014).

On appeal, Plaintiffs argue that the AMI Agreement is, at the least, ambiguous about whether Hess was obligated to acquire new leases. Plaintiffs are wrong. The AMI

Agreement plainly does not require Hess to acquire new leases. To recap, the AMI

Agreement provides: "***If,*** during the term of the AMI, [Hess] should acquire any oil and

gas lease, leasehold interest or mineral interest . . . ." Aplt. App'x, Vol. I, at 304, § 1

(emphasis added). Looking to that same provision, the district court held that it "is

inconsistent with any obligation for Hess to acquire new leases." *Spring Creek I*, 2014

WL 4400764, at *5. We agree with the district court. Plaintiffs' attempts to manufacture

ambiguity are unavailing. They argue that the AMI Agreement "would be unambiguous

. . . if it said '[Hess] does <u>not</u> have to acquire leases.' It does not." Aplt. Br. at 30

(emphasis in original). Plaintiffs' strawman does not impress, for there are lots of

requirements one could imagine imposing on Hess that the AMI Agreement does not

explicitly disclaim. For instance, the AMI Agreement is silent as to whether Hess's

payments must be made in rubles (or any other particular currency). But that silence is

not an ambiguity. Nor would it support a plausible claim that Hess breached the contract

by sending payment in U.S. dollars. These sorts of imagined breaches, detached from any

contractual duty, are appropriately dismissed at the pleadings stage.

   In their attempt to undermine the plain meaning of the "If" provision, Plaintiffs

point to two other portions of the AMI Agreement: a recital and a broker provision. The

recital provides that "the Parties ***desire*** to establish an area of mutual interest covering the

Tomahawk Prospect and provide for the acquisition of interests by [Hess]." Aplt. App'x,

Vol. I, at 304 (emphasis added). As a recital, it is "not strictly any part of the contract,"

*Las Animas*, 68 P.2d at 566, but, even if it were, it would not create an obligation to

acquire new leases. The recital's language is aspirational; by its terms it imposes no

obligations on anyone. The broker provision is similarly permissive. It states that Hess

"shall endeavor to retain Diamond Resources as a lease broker to acquire interests within

the AMI." Aplt. App'x, Vol. I, at 305, § 3. Reading the broker provision in light of the

"If" provision, it is clearly not obliging Hess to acquire new leases. It is merely, in Hess's

words, "a non-binding broker preference provision" that "says nothing about [Hess]

being required to acquire leases, much less how many leases it had to acquire." Hess

Aplee. Br. at 25.

Plaintiffs' position is curious for another reason: In the proceedings below,

Plaintiffs acknowledged "that Hess cannot guarantee that it will be able to actually

acquire new leases." Aplt. App'x, Vol. I, at 381. They repeat that observation in their

opening brief on appeal, conceding "that neither party can guarantee that a mineral owner

will sign a lease." Aplt. Br. at 29. That reality, which Plaintiffs acknowledge, undermines

their argument that the contract can plausibly be read to bind Hess to an obligation that it

could not guarantee it would be able to meet.[5]

Finally, we conclude that Plaintiffs are not deprived of the benefit of the bargain

under our interpretation of the AMI Agreement. Under the AMI Agreement, to whatever

extent Hess acquires additional leases, Plaintiffs would benefit, in the form of additional

ORRIs, "from the resources [Hess] invested in acquiring new leases, if any, without any

effort on Plaintiffs' part, and receive those ORRIs 'free and clear of any burdens placed

thereon by [Hess].'" Hess Aplee. Br. at 22 (quoting Aplt. App'x, Vol. I, at 81–82, § 1).

_____

[5] Nor does the AMI Agreement include a "best efforts" clause, and Spring Creek
did not ask the district court to interpret the AMI Agreement to contain an implied one.

And Spring Creek concedes that "Hess *did* acquire new leasehold interests within the Tomahawk Prospect and assigned Spring Creek its Override Interests pursuant to the terms of the Agreement." Aplt. App'x, Vol. I, at 59, Compl. ¶ 17 (emphasis added). Plaintiffs' grievance, therefore, is merely that Hess did not acquire enough new leases for long enough into the three-year AMI term. But that is not a grievance we can cure. Even had Hess acquired no new leases, Plaintiffs still would have received the benefit of their bargain, both because it received valuable consideration for the leases it sold to Hess, including ORRIs in those Existing Leases, and because Hess was not obliged to acquire any new leases at all.

b.       *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Next, Plaintiffs argue that they stated a plausible claim that Hess breached the covenant of good faith and fair dealing. They contend that Hess breached the implied covenant when it agreed to the Hess-Statoil Settlement Agreement four months into the three-year AMI term and stopped all efforts to acquire leases in the AMI. The district court dismissed this claim as derivative of the breach-of-contract claim discussed *supra*. *Spring Creek I*, 2014 WL 4400764, at *7–8.

"Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995), *as modified on denial of reh'g* (Jan. 16, 1996). It "applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time." *Id.* "Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract." *Id.* That is not what

happened here. Plaintiffs may have had a claim for the breach of implied covenant of good faith and fair dealing if, for example, the AMI Agreement required Hess to acquire new leases in the AMI, without specifying the quantity of new leases. But the AMI Agreement did not "defer" a decision as to the scope of Hess's requirement to acquire new leases; there was no requirement at all. Accordingly, Hess did not breach any implied covenant when it stopped trying to acquire new leases. The district court correctly dismissed this claim.

c.    *Fraudulent Concealment*

The complaint alleged that Hess fraudulently concealed (1) the terms of the Hess-Statoil Settlement Agreement, (2) that Hess was no longer acquiring leases in the Tomahawk Prospect, and (3) that Plaintiffs would not be assigned ORRIs on the New Leases acquired by Statoil in the Tomahawk Prospect during the AMI term. A claim for fraudulent concealment sounds in tort.[6] *E.g.*, *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 606 (Colo. 2016). To prevail on such a claim, a plaintiff must prove five elements:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011) (citation omitted).

---

[6] The district court applied Colorado law to the fraudulent concealment claim. On appeal, the parties again assume that Colorado law applies, so, once more, we do the same. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

The district court held that Spring Creek's fraudulent concealment claim is barred by Colorado's economic loss doctrine. *Spring Creek I*, 2014 WL 4400764, at *8–9. Under the economic loss doctrine, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000); *see Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009) (quoting *Town of Alma*). The doctrine applies between commercial parties for three main policy reasons:

> (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort.

*BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004). "To survive a motion to dismiss based on the economic loss rule, [a plaintiff] merely has to allege sufficient facts, taken in the light most favorable to him, that would amount to the violation of a tort duty that is independent of the contract." *Van Rees*, 373 P.3d at 608.

Plaintiffs argue that the economic loss doctrine does not apply because tort law imposed a duty on Hess independent from its duties under the Tomahawk Agreement. "The existence and scope of a tort duty is a question of law to be determined by the court." *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 866 (Colo. 2005). "The determination that a duty does or does not exist is an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is or is not entitled to protection." *Id.* (internal quotation marks and alterations omitted).

According to Plaintiffs, a tort duty arises out of Plaintiffs and Hess's "special relationship of trust and confidence as, in essence, joint venturers combining their resources to explore and develop the oil and gas resources in the AMI." Aplt. Br. at 33. Hess's tort duties purportedly obliged it to disclose to Plaintiffs (a) the existence and terms of its agreement with Statoil, (b) that it would not pursue any additional leases in the AMI after February 2010, and (c) that Statoil did not consider itself bound by the AMI Agreement and would not assign Plaintiffs ORRIs on leases it took in the AMI. Plaintiffs further claimed Hess had a tort duty not to prevent or frustrate Plaintiffs' investigation, as it did when, in response to Plaintiffs' request, it refused to provide a copy of the Hess-Statoil Settlement Agreement and affirmatively misrepresented that it could not be disclosed.

The district court rejected Spring Creek's argument as to Hess's supposed tort duties as circular, because "[i]f a duty to disclose arose whenever a contractual party has superior information that it does not disclose, then there would be no need for courts to determine whether a party had an independent duty to disclose." *Spring Creek I*, 2014 WL 4400764, at *9. The district court further observed that such a holding "would be equivalent to a blanket finding that the economic loss doctrine does not bar fraudulent concealment claims." *Id.* In reviewing the district court's application of Colorado law, we are guided by the holdings of the Colorado Supreme Court. *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003). In the absence of a definitive resolution of a legal issue by that court, our task is to predict how the Colorado Supreme Court would rule. *See United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004).

On appeal, Plaintiffs principally rely on *H & H Distribs., Inc. v. BBC Int'l, Inc.*, a case in which the Colorado Court of Appeals affirmed a money damages award premised on fraudulent concealment between parties to a contract. 812 P.2d 659, 662–63 (Colo. App. 1990). That case involved a contract entered into in 1983 between plaintiff H & H, a wholesale distributor of footwear, and defendant BBC, a shoe manufacturer. *Id.* at 661. H & H presented evidence that, in 1984, BBC failed to inform H & H that (a) BBC's foreign licensor was not following through on its promises to have promotional campaigns in the United States, (b) it had decided not to run any more trade advertisements after May 1984, (c) BBC was having problems with four other distributors, (d) the brand was adversely affected by litigation with another company, and (e) BBC had agreed by July 1984, as part of a settlement, to discontinue use of the logo and to terminate further sales of shoes bearing the original logo by the end of October 1984. *Id.* at 662. The court also noted that there was evidence not disclosed to H & H that BBC had last paid its employees in the spring of 1984, "[y]et, in the summer of 1984 BBC continued to make affirmative misrepresentations that the program was still viable." *Id.* The court concluded "that in equity and good conscience BBC had a duty, apart from the contract, to disclose these items." *Id.*

Hess attempts to distinguish *H & H* on the ground that it "involved an affirmative misrepresentation—a fact the opinion mentioned twice." Hess Aplee. Br. at 29–30. According to Hess, it was the affirmative misrepresentation in *H & H* that "gave rise to a duty to disclose the truth." *Id.* at 30. Hess argues that because Spring Creek's complaint "did not allege any such affirmative misrepresentation," *H & H* is inapposite. *Id.* We are

not persuaded. Although *H & H* is not a decision of Colorado's highest court, it nevertheless supports Plaintiffs' argument that they have a plausible fraudulent concealment claim under Colorado law, notwithstanding their contractual relationship with Hess. Although Hess is correct that there were affirmative misrepresentations in *H & H*, the court's opinion does not indicate those facts were crucial to its holding. *See* 812 P.2d at 662. In any event, whether affirmative misrepresentations are required is a distraction. *H & H* stands for the proposition that, "in equity and good conscience," parties to a contract may owe "a duty, apart from the contract, to disclose" facts that are relevant to the profitability or viability of the ongoing contractual relationship. *See id.*

If *H & H* provided a complete picture of Colorado precedent, we would reverse the district court's dismissal of Plaintiffs' fraudulent concealment claim. But we are not confident that *H & H* is a reliable indicator of current Colorado law. Significantly, *H & H* predates the economic loss rule, which was first articulated by the Colorado Supreme Court in 2000. *See Town of Alma*, 10 P.3d at 1264. Plaintiffs defend *H & H* by arguing that this subsequent development in the law "in no way changes the holding that the duty is <u>independent</u> of the contract and arises in tort." Aplt. Reply Br. at 15 n.9 (emphasis in original). That holding, however, was reached without the benefit of Colorado's rationale in adopting the economic loss rule, including the importance of maintaining the distinction between contract and tort law and preserving the right of contracting parties to allocate risk. *See Town of Alma,* 10 P.3d at 1262. And even if Plaintiffs' point were well-taken, the question we must decide is whether the Colorado Supreme Court would today adopt *H & H*'s analysis, not whether *H & H* has been formally overruled. We predict that

it would not. In tendering that prediction, we note that Plaintiffs offered no answer to the district court's criticism of their argument as circular. Nor do they address whether to hold that an independent tort duty existed in this case would effectively gut Colorado's economic loss doctrine such that it never applied. And, *H & H* aside, Plaintiffs' argument that their fraudulent concealment claim survives the economic loss doctrine is without support from decisions issued in Colorado after the adoption of that doctrine, or from other economic loss jurisdictions. We accordingly affirm the district court's dismissal of the fraudulent concealment claim.

**2.     Claims Against Statoil**

The district court's September 2014 order dismissed Spring Creek's claims against Statoil for (1) breach of contract insofar as Spring Creek alleged Statoil was an assignee of the AMI Agreement, (2) tortious interference with contract, (3) fraudulent concealment, and (4) civil conspiracy. *Spring Creek I*, 2014 WL 4400764, at *9–13. On appeal, Plaintiffs challenge only the district court's dismissal of the tortious interference and civil conspiracy claims. We consider Plaintiffs' tortious interference claim in this section. We consider their challenge to the civil conspiracy dismissal at Section III.A.3, *infra*.

Plaintiffs argue that they plausibly alleged that Statoil tortiously interfered with Plaintiffs' rights under the Tomahawk Agreement by (1) intentionally and improperly inducing Hess to breach that agreement, (2) insisting that Hess not disclose to Plaintiffs the Hess-Statoil Settlement Agreement, and (3) intentionally structuring the Hess-Statoil

Settlement Agreement so that Statoil could claim it was not bound by the AMI Agreement.

"Colorado recognizes the tort of intentional interference with contractual relations." *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984).[7] We have previously held that a defendant may be liable for tortious interference with contract under Colorado law where:

> 1. the defendant causes a third party to fail in some significant aspect of performance which the third party owes to the plaintiff, such as by depriving the third party in significant part of the means of performance; and
>
> 2. the defendant's conduct was wrongful; and
>
> 3. the defendant acted either for the primary purpose of interfering with the performance of the plaintiff's contract, or knowing that the interference was certain or substantially certain to occur as a result of the defendant's action.

*Ecco Plains, LLC v. United States*, 728 F.3d 1190, 1199 (10th Cir. 2013) (citing *Slater Numismatics, LLC v. Driving Force, LLC*, 310 P.3d 185, 194 (Colo. App. 2012)). The district court held that Spring Creek failed to state a tortious interference claim because (1) the AMI Agreement did not require Hess to acquire new leases, and so Statoil cannot have interfered with a contractual obligation that did not exist, and (2) Spring Creek

---

[7] In the district court, Statoil argued that North Dakota law applies to Spring Creek's allegations against it because North Dakota is the *situs* of the real property at issue. Spring Creek argued for Colorado law. The district court found it unnecessary to decide which state's law applies to the tortious interference claim, as neither party demonstrated a substantial difference. *Spring Creek I*, 2014 WL 4400764, at *9–10, 12 n.8. On appeal, both parties relied exclusively on Colorado law in the sections of their briefs regarding Spring Creek's tortious interference claim. Because the parties have assumed on appeal that Colorado law applies, we do too. *See Grynberg*, 538 F.3d at 1346.

failed to identify any other provision in the Tomahawk Agreement that Hess breached as a result of Statoil's alleged actions. *Spring Creek I*, 2014 WL 4400764, at *12.

On appeal, Plaintiffs do not argue any error in the district court's tortious interference analysis independent of the court's conclusion that Hess had no obligation to pursue additional leases in the AMI Agreement. Because we have already held that the district court correctly ruled Hess had no obligation to acquire new leases, *see* Section III.A.1.a., *supra*, Plaintiffs' tortious interference challenge necessarily fails.

### 3. Civil Conspiracy Against Hess and Statoil

Plaintiffs' opening brief concedes that their civil conspiracy claims are derivative of their fraudulent concealment and tortious interference claims. They offer no independent argument for reversal. Because we affirm the dismissal of Plaintiffs' fraudulent concealment and tortious interference claims, Plaintiffs' civil conspiracy challenge necessarily fails.

\* \* \*

In sum, we affirm in all respects the district court's September 2014 rulings dismissing Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent concealment, tortious interference, and civil conspiracy.

Plaintiffs separately challenge the district court's refusal to reconsider its September 2014 rulings, which we have just affirmed. We now turn to the district court's order denying reconsideration, which we also affirm.

## B.    Motion for Reconsideration ("*Spring Creek II*")

The Federal Rules of Civil Procedure do not recognize a "motion for reconsideration." But that is not to say that such motions are prohibited. After all, "a district court always has the inherent power to reconsider its interlocutory rulings" before final judgment is entered. *Warren v. Am. Bankers Ins. of FL*, 507 F.3d 1239, 1243 (10th Cir. 2007); *see* Fed. R. Civ. P. 54(b) ("any order . . . that adjudicates fewer than all the claims . . . may be revised at any time" before entry of final judgment). In considering such interlocutory motions, however, "the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b)," which govern a district court's reconsideration of its final judgments. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008).

We review a district court's decision denying a motion for reconsideration for abuse of discretion. *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1235 (10th Cir. 2001). "Under an abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted). "That is to say, we will not alter a trial court's decision unless it can be shown that the court's decision was an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.* at 1236 (internal quotation marks omitted).

Spring Creek sought reconsideration of portions of the district court's September 2014 order "[p]ursuant to Fed. R. Civ. P. 60(b)." Aplt. App'x, Vol. I, at 258. Under that

rule, a district court "may relieve a party or its legal representative from a *final* judgment, order, or proceeding." Fed. R. Civ. P. 60(b) (emphasis added). Because no final judgment or order had entered against Spring Creek, the district court denied the motion as procedurally improper. *Spring Creek II*, 2015 WL 3542699, at *2. In the alternative, the district court held that, even if it construed Spring Creek's reconsideration motion outside of the Rule 60(b) context, Spring Creek failed to demonstrate entitlement to relief. *Id.*

The thrust of Spring Creek's argument for reconsideration was that the district court would have interpreted Hess's obligations under the AMI Agreement differently had it reviewed other agreements executed that same day. The reconsideration motion thus attached eight additional contracts that, together with the AMI Agreement and the First Assignment, constitute the ten-part Tomahawk Agreement. Spring Creek did not argue that the contracts were newly discovered. Instead, Spring Creek acknowledged it "regrettably may not have been clear in its Complaint" and "apologize[d] for the confusion." Aplt. App'x, Vol. I, at 259–60. Spring Creek's apology notwithstanding, the district court declined to consider the additional contracts. It noted the inefficiency that would attend repeated re-adjudication of interlocutory orders and cited with approval two district court orders in which judges imposed limits on their broad discretion in this area. *Spring Creek II*, 2015 WL 3542699, at *2. It further noted that reconsideration motions "are generally an inappropriate vehicle to advance 'new arguments, or supporting facts which were available at the time of the original motion.'" *Id.* (quoting *Servants of the Paraclete*, 204 F.3d at 1012). Because the contracts were available to Spring Creek when

it filed its complaint and when it filed its briefs in opposition to the motions to dismiss, the district court found that Spring Creek was entitled to no relief. *Id.* at *2–3.

On appeal, Plaintiffs argue the district court applied the wrong legal standard. They contend the district court erroneously relied on Rule 60(b)(2), which provides that "the court may relieve a party" from a final judgment where there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). Plaintiffs are mistaken. First, the district court did not rely on Rule 60(b)(2) in denying reconsideration. It never even cited that rule. Instead, it invoked its "plenary power to revisit and amend interlocutory orders as justice requires." *See Spring Creek II*, 2015 WL 3542699, at *2 ("Regardless of the analysis applied, the basic assessment tends to be the same: courts consider whether new evidence *or legal authority* has emerged *or whether the prior ruling was clearly in error*." (emphasis added)). Second, Rule 60(b) is, by its terms, permissive. It allows a district court to grant relief where it has been presented newly discovered evidence, Fed. R. Civ. P. 60(b)(2), but it does not prohibit a district court from granting relief in the absence of newly discovered evidence, *see* Fed. R. Civ. P. 60(b)(1), (6) (allowing the district court discretion to grant relief "[o]n motion and just terms" because of "excusable neglect" or "any other reason that justifies relief"). As a result, Plaintiffs cannot show that they were prejudiced by application of a rule that vested the court with the discretion to grant the relief that was sought. Third, even if the district court had errantly relied on Rule 60(b), Plaintiffs would be barred under our invited error doctrine from arguing

against that standard, given that they themselves proposed it to the district court. *See John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001).

The remainder of the Plaintiffs' argument on appeal regurgitates Spring Creek's arguments for reconsideration that the district court declined to consider. All of them rely on references to additional Tomahawk Agreement contracts executed contemporaneously with the First Assignment and AMI Agreement. Spring Creek had these additional documents in its possession all along, but chose not to attach them to its complaint or its briefs in opposition to the motions to dismiss. The district court was not "arbitrary, capricious, whimsical, or manifestly unreasonable" in refusing to consider them for the first time after it had already ruled. *See Wright*, 259 F.3d at 1236. We affirm the district court's order denying reconsideration.

### C. Partial Summary Judgment on Reliance Damages ("*Spring Creek III*")

Plaintiffs argue the district court erred in prohibiting them from pursuing a reliance theory of damages. Plaintiffs' preferred damages theory is that, had they rescinded the AMI Agreement at the time of Hess's purported breach, they would have entered into significantly more lucrative agreements in the Tomahawk Prospect. Thus, they believe they should be entitled to the value of the lost opportunity to acquire leases in the AMI area from the date of Hess's breach until the expiration of the AMI Agreement. The stakes are high: Plaintiffs estimated their reliance damages totaled between $182 million and $403 million, with an expected value of $271 million. By contrast, their expectation damages—their "benefit of the bargain" damages, in other words—totaled between $24.2 million and $59.3 million, with an expected value of $38.9

million. The parties and the district court all agree that Colorado law controls—but, at least in the district court, "[t]he parties have not identified any Colorado case addressing the circumstances that justify recovery of reliance damages." *Spring Creek III*, 2016 WL 1170105, at \*4. "Without a guiding opinion from Colorado," the district court predicted that "the Colorado Supreme Court would likely limit the availability of reliance damages to circumstances where expectation damages are uncertain or impossible to calculate." *Id.* For the reasons that follow, the district court's holding is sound. Any contrary conclusion would run afoul of generally accepted principles of contract law.

"We review the grant of summary judgment de novo applying the same standard as the district court." *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1275 (10th Cir. 2008).

"In general, contract law espouses three distinct, yet equally important, theories of damages to remedy a breach of contract: expectation damages, reliance damages, and restitution damages." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998) (internal quotation marks omitted). "The root purpose of a contract remedy is 'to place the plaintiff-promisee in as good a position as [it] would have occupied had the defendant-promisor not breached the contract.'" *In re Carvalho*, 335 F.3d 45, 51 (1st Cir. 2003) (alteration in original) (quoting 24 Richard A. Lord, Williston on Contracts

§ 64:1, at 7 (4th ed. 2002)). In an action for breach of contract, expectation damages are the norm. *See Smith v. Farmers Ins. Exch.*, 9 P.3d 335, 337 (Colo. 2000) ("Generally, in a breach of contract action, a plaintiff may recover the amount of damages necessary to place him in the same position he would have occupied had the breach not occurred."); *see also ALLTEL Info. Servs., Inc. v. F.D.I.C.*, 194 F.3d 1036, 1039 n.3 (9th Cir. 1999) ("Expectation damages are the ordinary basis for damages for breach of contract."); *ATACS*, 155 F.3d at 669 (expectation damages are "preferred"); *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 251 (Colo. 2003) (Bender, J., concurring) ("[T]raditional contract damages are based upon the expectations of the party at the time the contract is formed.").

Reliance damages, by contrast, aim to reimburse a party "for loss caused by reliance on the contract by being put in as good a position as he would have been in *had the contract not been made*." *ALLTEL*, 194 F.3d at 1039 n.3 (quoting Restatement (Second) of Contracts § 344 (Am. Law Inst. 1981)). When reliance damages are awarded in lieu of expectation damages, they are generally viewed as—from the plaintiff's perspective—a second-best option, selected only where expectation damages are difficult or impossible to prove. *See Admiral Fin. Corp. v. United States*, 378 F.3d 1336, 1344 (Fed. Cir. 2004) (noting reliance damages are "ordinarily a second-best alternative to a party injured by breach who cannot prove damages measured by expectation" (quoting Restatement of Restitution and Unjust Enrichment § 38 cmt. a (Tentative Draft No. 3 2004))); *ATACS*, 155 F.3d at 669 ("[W]here a court cannot measure lost profits with certainty, contract law protects an injured party's reliance interest by seeking to achieve

the position that it would have obtained had the contract never been made, *usually through the recovery of expenditures actually made in performance or in anticipation of performance*." (emphasis added)).

Plaintiffs' claimed reliance damages are peculiar in that they far outpace their claimed expectation damages. *Cf. Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 98 F. Supp. 3d 600, 605 (E.D.N.Y. 2015) ("[R]eliance damages are about restoration and strive to place injured parties in the same position as they were prior to the execution of the contract, not to bestow a windfall on injured parties." (internal quotation marks omitted)), *aff'd*, 646 F. App'x 25 (2d Cir. 2016). The district court was rightly suspicious of that fact. Plaintiffs have not argued that expectation damages are unprovable. And they have not cited a single case in which a plaintiff was allowed to pursue—let alone recover— reliance damages in excess of ascertainable expectation damages.

In light of the foregoing, we affirm the district court's grant of partial summary judgment on Plaintiffs' request for reliance damages. *See Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 799 F.3d 827, 832 (7th Cir. 2015) ("Courts will not knowingly put the plaintiff receiving a reliance recovery in a better position than he would have occupied had the contract been fully performed." (internal quotation marks omitted)); *Old Stone Corp. v. United States*, 450 F.3d 1360, 1378 (Fed. Cir. 2006) ("[R]eliance damages are inappropriate where relief would result in an unfair windfall to the non-breaching party.").

### D. Summary Judgment—Statoil ("*Spring Creek IV*")

Spring Creek and Gold Coast claim that Statoil breached the AMI Agreement by failing to assign them ORRIs on leases that Statoil acquired on its own—the so-called New Leases. The problem with this claim is obvious: Statoil is not a party to the AMI Agreement. Nonetheless, Plaintiffs claim that Statoil is bound by the terms of that agreement for three independent reasons:

(1)    The AMI Agreement's non-compete clause and its provisions requiring Hess to assign ORRIs ("the AMI Covenants") are covenants running with the land.

(2)    Statoil expressly assumed the obligations of the AMI Agreement.

(3)    Statoil voluntarily accepted the benefits of the AMI Agreement, and thus it is bound to it by virtue of N.D. Cent. Code § 9-03-25.

Aplt. Br. at 45. The district court rejected all three arguments and granted partial summary judgment in favor of Statoil on Plaintiffs' breach of contract claim. *Spring Creek IV*, 2016 WL 9735145, at *6–11. Plaintiffs renew all three arguments on appeal. We affirm the decision of the district court.

"We review the grant of summary judgment de novo applying the same standard as the district court." *Levy*, 789 F.3d at 1168. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mosier*, 546 F.3d at 1275. In reviewing the district court's decision, which applied

38

North Dakota law,[8] we are guided by the holdings of the North Dakota Supreme Court. *See Wankier*, 353 F.3d at 866. In the absence of a definitive resolution of a legal issue by that court, our task is to predict how the North Dakota Supreme Court would rule. *See DeGasso*, 369 F.3d at 1145.

**1.     Do the AMI Covenants run with the land?**

Covenants that run with North Dakota land are defined by statute. *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282, 285 (N.D. 2009). Indeed, "[t]he *only* covenants which run with the land are those specified [by statute] and those which are incidental thereto." N.D. Cent. Code § 47-04-25 (emphasis added). Another North Dakota statute provides:

> All covenants contained in a grant of an estate in real property, which are made for the direct benefit of the property or some part of it then in existence, run with the land. Such covenants include covenants:
>
>> 1. Of warranty;
>>
>> 2. For quiet enjoyment;
>>
>> 3. For further assurance on the part of a grantor; or
>>
>> 4. For the payment of rent, taxes, or assessments upon the land on the part of a grantee.

N.D. Cent. Code § 47-04-26. "Real covenants," which run with the land, are distinct from "personal covenants," which do not. *See Beeter*, 771 N.W.2d at 286 ("[I]f a covenant or

---

[8] The district court applied North Dakota law to all of the disputes between Plaintiffs and Statoil at summary judgment. On appeal, neither party argues against the applicability of North Dakota law, so we follow in their presumption that North Dakota law applies. *Cf. Grynberg*, 538 F.3d at 1346 (presuming, along with the parties, that Colorado law applies).

deed restriction benefits the grantor personally, and serves no real benefit to the land, then the covenant is personal in nature and does not 'run with the land' upon a subsequent sale of the property." (quoting *Barton v. Fred Netterville Lumber Co.*, 317 F. Supp. 2d 700, 704 (S.D. Miss. 2004))). And, "[a]n agreement between the parties, however strongly expressed, cannot cause a covenant to be attached to the land if it is not of such a nature that the law permits it to be attached." *Id.* at 287 (quoting 21 C.J.S. *Covenants* § 34 (2006)).

Plaintiffs argue that the AMI Covenants qualify as covenants that run with the land, for they "directly benefitted the Spring Creek Leases." Aplt. Br. at 47. In particular, Plaintiffs argue that the AMI Covenants (a) helped Hess and Statoil acquire leases and develop the AMI area, (b) reduced the prices Hess and Statoil had to pay for leases in the AMI by excluding Spring Creek and Gold Coast as rival bidders, and (c) allowed Hess and Statoil to acquire large blocks of leases in the AMI and increased the value of the leases. Statoil responds that the North Dakota Supreme Court has definitively held that AMI agreements are personal covenants, not covenants made for the direct benefit of property. *See Golden v. SM Energy Co.*, 826 N.W.2d 610, 615 (N.D. 2013).

In *Golden*, an oil well operator appealed from a summary judgment declaring that certain plaintiffs were entitled to ORRIs in leases and lands covered by a decades-old letter agreement. *Id.* at 613. As told by the North Dakota Supreme Court, the parties in that case "agree[d] that the AMI clause" in the letter agreement was "not a covenant that runs with the land, but is a personal covenant that is enforceable only between the original parties to the agreement." *Id.* at 615 (citing *Beeter*, 771 N.W.2d at 286).

Plaintiffs place tremendous weight on that stipulation, which, in their view, renders *Golden* useless in determining whether the AMI Covenants run with the land in this case. The district court disagreed, "find[ing] that the better reading of *Golden* is that the parties made an assumption about North Dakota law and the North Dakota Supreme Court adopted that assumption." *Spring Creek IV*, 2016 WL 9735145, at *8 n.13. We find the district court's reading of *Golden* more persuasive, as do others. *See* Scott Lansdown, *Golden v. SM Energy Company and the Question of Whether an Area of Mutual Interest Covering Oil and Gas Rights Is Binding on Successors and Assigns*, 89 N.D. L. Rev. 267, 294 (2013) ("It is safe to say that Golden confirms that in North Dakota an AMI will generally not be deemed a covenant running with the land, and that this result will be obtained regardless of the parties' intent."); Andrew Scott Graham, *Real or Personal?: The Area of Mutual Interest Covenant in the Williston Basin After Golden v. SM Energy Company*, 89 N.D. L. Rev. 241, 247–48 (2013) ("The Golden Court characterized the AMI as a personal covenant, citing Beeter v. Sawyer Disposal LLC, for the proposition that the AMI benefited the grantor personally and that the covenant served no direct benefit to the land." (footnotes omitted)). But even if, strictly speaking, *Golden*'s AMI analysis is not integral to the holding in that case or binding on North Dakota courts, it is still our best evidence of how the North Dakota Supreme Court would treat the AMI Covenants were it deciding this case. To that end, we find it instructive that the court's opinion did not indicate any reluctance to accept the parties' stipulation. And no justice wrote separately to caution that the issue remains unresolved.

Even putting *Golden* aside, we find other reasons to believe the North Dakota Supreme Court would hold the AMI Covenants do not run with the land. Consider, for instance, that the AMI Covenants at issue on appeal apply only to the New Leases—that is, oil and gas leases in the Tomahawk Prospect that were acquired by Statoil *from entities other than Spring Creek, Gold Coast, or Hess.*[9] A corollary of Plaintiffs' argument is that Plaintiffs and Hess had the power to impose real covenants running with land that none of them had any interest in. We find that view deeply implausible, an intuition shared by the North Dakota Supreme Court. *See Beeter*, 771 N.W.2d at 287 (finding "no plausible explanation how a supposed 'reservation' of a 'royalty interest' or other property right . . . could extend to property beyond the land conveyed in the deed, and in which the [conveyors] had no interest"). Plaintiffs argue that *Beeter* is "not applicable here because it did not involve an AMI." Aplt. Reply Br. at 20. But North Dakota law treats AMI covenants as it would any other covenant, as Plaintiffs themselves acknowledge. *See* Aplt. Reply Br. at 19 ("The North Dakota Supreme Court would look to the North Dakota statutes on covenants running with the land . . . to decide this issue. . . . *Nothing in these statutes suggests there are any special requirements for an AMI to run with the land.*" (emphasis added)). Moreover, *Golden*, which did involve an AMI,

---

[9] Statoil does not dispute that it owes ORRIs on the Existing Leases. *See* Statoil Aplee. Br. 53 ("Statoil was obligated to pay Appellants ORRIs on the Existing Leases because those ORRIs already burdened the Existing Leases when Statoil acquired them[.]") The parties disagreed as to whether Statoil underpaid the ORRIs on the Existing Leases, and the district court denied summary judgment on that claim. Those disputes have since been resolved in arbitration.

cited *Beeter* immediately after accepting the parties' stipulation that the AMI in that case did not run with the land. *See Golden*, 826 N.W.2d at 615.

Finally, Plaintiffs cite to out-of-state cases applying out-of-state law. It is true that AMI covenants run with the land under Texas law. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910–11 (Tex. 1982). Yet Plaintiffs' protest, that "[w]ith no analysis, the District Court rejected *Westland* and did not address . . . other cases" decided by courts in Texas and Colorado, is misplaced. Aplt. Br. at 50–51. The district court focused its attention on North Dakota law, as was proper. Finding clear guidance from cases decided by the North Dakota Supreme Court, the district court quite reasonably declined to survey the law in other jurisdictions. The district court correctly concluded that the covenants at issue in this case do not run with the land under North Dakota law.

## 2. Did Statoil accept assignment of the AMI Agreement?

Next, Plaintiffs argue that, even if the AMI Covenants do not run with the land, Statoil is nevertheless subject to them because it expressly assumed Hess's obligations under the AMI Agreement. Plaintiffs' argument is not that Statoil accepted assignment of the AMI Agreement in the Hess-Statoil Settlement Agreement. It clearly did not. *See* Aplt. App'x, Vol. XXXII, at 5760, ¶ 2 (the Hess-Statoil Settlement Agreement, stating that it does "not include . . . the Area of Mutual Interest Agreement"). Plaintiffs argue instead that Statoil expressly assumed Hess's obligations under the AMI Agreement when Hess and Statoil executed the Second Assignment, a few weeks after memorializing the Hess-Statoil Settlement Agreement. This would be a curious course of

events, requiring us to conclude that Statoil expressly disclaimed any obligations under the AMI Agreement in the Hess-Statoil Settlement Agreement, only to expressly assume those same obligations a few weeks later, in the very assignment of leases the Settlement Agreement authorized. The Second Assignment does no such thing. It does not even mention the AMI Agreement. And that omission creates a problem for Plaintiffs, for contracts generally do not assign other contracts (let alone "expressly") without mentioning the earlier contract by name. Plaintiffs purport to avoid that problem by reference to two different provisions in the Second Assignment. We will next address each provision in turn.

    a.    *Paragraph A of the Second Assignment*

Plaintiffs' first argument is directed at the following provision of the Second Assignment:

> . . . [Hess] . . . assigns . . . unto [Statoil] all of [Hess]'s right, title and interest . . . in and to . . . [the Tomahawk Prospect leases], including all leasehold estates, royalty interests, overriding royalty interests, net profits interests, and similar interests . . .

*Id.* at Vol. X, 1835, ¶ A. On its face, this provision says nothing about the AMI Agreement. So Plaintiffs attempt to pair it with something that does. Shortly before the Second Assignment was executed, Hess made the first of three royalties payments that it would make to Spring Creek and Gold Coast. These payments were memorialized in an assignment that did reference the AMI Agreement. In particular, the royalties assignment provided that the assignment of royalties "is made subject to" the AMI Agreement. *Id.* at Vol. XI, 1865, ¶ B. Plaintiffs argue that when Hess assigned to Statoil all "right, title and

44

interest" in the leases on which Plaintiffs held ORRIs, including "all . . . overriding royalty interests," Statoil became obligated to honor the terms of the ORRIs that Hess had previously assigned to Plaintiffs. And because the ORRI assignment stated that it was "made subject to" the AMI Agreement, Statoil expressly assumed the AMI Agreement. We are unconvinced.

Hess's assignment of ORRIs states that "the AMI contain[s] certain representations, warranties and agreements between" Plaintiffs and Hess, "some of which survive the delivery of this Assignment, as provided for therein, *and shall not be merged into this Assignment*." *Id.* (emphasis added). Relying on that language, the district court concluded the AMI Covenants "'survive[d]'—and therefore continued to exist independently of—the ORRI assignment." *Spring Creek IV*, 2016 WL 9735145, at *10. On appeal, Plaintiffs do not engage with the district court's reasoning. Instead, they say "[n]othing in the Second Assignment of Spring Creek Leases disclaims the AMI Agreement." Aplt. Br. at 54. But not disclaiming the AMI Agreement is nowhere near the equivalent of expressly assuming it. *See Golden*, 826 N.W.2d at 616 ("An assignee is responsible only for the obligations of the assignor which the assignee contracts to undertake.").

b.      *Paragraph 3 of the Second Assignment*

Plaintiffs' second argument is that the Second Assignment expressly assigns the AMI Agreement to Statoil because Statoil agreed to "expressly assume[] its proportionate share of the obligations owed to other parties under the terms of the Joint Operating Agreement dated October 8, 2009, between [Hess] and Coachman Energy II, LLC." Aplt.

45

App'x at Vol. X, 1835, ¶ 3. This argument is also unpersuasive. As the district court observed,

> Plaintiffs' argument requires the Court to review a series of related documents. . . . Plaintiffs argue that Statoil's assumption of the JOA in the 2nd assignment subjects Statoil to the obligations in the AMI agreement because (1) the JOA states that it was "[a]ttached to and made a part of" the participation agreement signed between Hess and Coachman, and (2) the participation agreement states that all properties acquired thereunder by Hess and offered to Coachman are to be proportionately burdened by plaintiffs' ORRIs.

*Spring Creek IV*, 2016 WL 9735145, at *9 (citations omitted). The district court concluded that the Second Assignment "does not have the cascading effect" Plaintiffs attribute to it. *Id.* Plaintiffs' argument fails because the Second Assignment commits Statoil only to the obligations in the JOA, not the "participation agreement," which is the document Plaintiffs actually rely on to invoke the AMI Agreement. As Statoil argues on appeal, "[t]he 'attachment' language in the JOA on which Appellants rely for their first premise makes the JOA 'part of' the Participation Agreement; it does not make the Participation Agreement part of the JOA. The 'attachment' is only one way." Statoil Aplee. Br. at 56. Statoil is correct. Statoil did not expressly assume the obligations of the AMI Agreement, and Plaintiffs' attempts to prove a "cascading" connection back to that document fail. Once again, an "assignee is responsible only for the obligations of the assignor which the assignee contracts to undertake." *Golden*, 826 N.W.2d at 616.

### 3.    North Dakota Cent. Code. § 9-03-25

Finally, Plaintiffs argue that North Dakota Cent. Code § 9-03-25 binds Statoil to the AMI Agreement because Statoil voluntarily accepted the benefits of the Tomahawk

Agreement. Under that provision, a "voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting." N.D. Cent. Code § 9-03-25; *accord Morris v. Ewing*, 76 N.W. 1047, 1050 (N.D. 1898) ("After accepting the benefits of a transaction, a party will not be permitted to repudiate the transaction."). "[T]he principle enunciated in N.D.C.C. § 9–03–25 is simply part of the totality of circumstances to be considered by the court in deciding the parties' intentions." *Golden*, 826 N.W.2d at 618. To give an example of § 9-03-25 in action, *Golden* referred to *Westby v. Schmidt*, 779 N.W.2d 681, 689 (N.D. 2010), a case in which a corporation knowingly and voluntarily accepted the benefits of a contract where it billed an individual for work done on his house and accepted his payments under a contract. *See id.*

By contrast, *Golden* roundly rejected a lower court's application of § 9-03-25 on facts similar to the case at bar. *See id.* (noting that plaintiff's argument "turn[ed] the AMI clause, as well as any other personal covenant, into a covenant that runs with the land and obliterates the requirement that an assignee consent to be responsible for the obligations of the assignor"). The district court found *Golden* controlling. *Spring Creek IV*, 2016 WL 9735145, at *10. On appeal, Plaintiffs argue that Statoil voluntarily accepted the benefits of the Tomahawk Agreement in three ways: (1) per the terms of the Second Assignment, Statoil accepted the benefits of the JOA, (2) Statoil purchased many leases in the AMI, and therefore accepted the benefits of Plaintiffs not competing for leases in the AMI, and (3) Statoil accepted Plaintiffs' confidential well, lease and land information from Hess.

47

The first and third arguments are unavailing because they are unmoored from any benefits that would relate to being a party to the AMI Agreement, as opposed to other portions of the multifaceted Tomahawk Agreement. The second argument fails because, as the district court held, "Plaintiffs provide no evidence that Statoil . . . attempt[ed] to enforce the AMI agreement's non-compete provision." *Id.* Plaintiffs cannot point to "any evidence of conduct on the part of [Statoil] that is inconsistent with [Statoil's] interpretation of the assignment," *Golden*, 826 N.W.2d at 618, namely, that it refused to accept assignment of the AMI Agreement in its dealings with Hess. Therefore, the district court's grant of summary judgment in favor of Statoil was proper.

* * *

In sum, we affirm in all respects the district court's grant of summary judgment in favor of Statoil. We turn next to the district court's grant of summary judgment in favor of Hess.

### E.   Summary Judgment—Hess ("*Spring Creek IV*," redux)

To recap, after the motion to dismiss, Plaintiffs' case against Hess was limited to a breach of contract claim based on (1) Hess's alleged breach of the AMI Agreement's confidentiality provision and (2) Hess's failure to honor royalty interests in Existing Leases. The district court granted summary judgment in favor of Hess on the first theory for breach of contract (the "confidentiality claims"), but denied summary judgment on the second theory. The second theory for breach of contract was later resolved through arbitration and is not before us.

Although the parties fully briefed the merits of Plaintiffs' confidentiality claims, the district court ruled for Hess solely on the ground that the confidentiality claims were time-barred by Colorado's three-year statute of limitations. *Spring Creek IV*, 2016 WL 9735145, at *14. On appeal, Plaintiffs argue that the district court's statute of limitations ruling was in error. But we decline to reach that issue. Instead, we affirm the district court's grant of summary judgment on the alternative ground that any alleged breach of the confidentiality provision did not cause Plaintiffs any damages.

"We review the grant of summary judgment de novo applying the same standard as the district court." *Levy*, 789 F.3d at 1168. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mosier*, 546 F.3d at 1275. "Further, we may affirm the district court for any reason supported by the record." *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000).

Under Colorado law, a breach of contract claim has four elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.'" *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted). On appeal, Hess argues that it is entitled to summary judgment because there is no genuine dispute of material fact with regard to the fourth element. As characterized by Hess, Plaintiffs advanced three theories in the district court for how they were harmed by Hess's disclosure:

> According to Plaintiffs, but for the disclosure: (1) [Statoil] "may" not have closed on the [Hess-Statoil] transaction and [Hess] would have continued to acquire leases in Tomahawk; alternatively, (2) [Statoil] "may" have closed on the transaction without attempting to disclaim the AMI Agreement. In the further alternative, Plaintiffs contended that (3) had [Hess] consulted with them before the disclosure, Plaintiffs "may" have consented to the disclosure on the condition that [Statoil] agreed to be bound by the AMI Agreement.

Hess Aplee. Br. at 64 (citation omitted).[10] In Hess's view, Plaintiffs' first theory fails because undisputed evidence establishes that Hess would not have acquired additional leases in the Tomahawk Prospect, and thus Plaintiffs were not deprived of additional ORRIs. The second and third theories, meanwhile, are both predicated on Statoil agreeing to be bound by the AMI Agreement without seeing it first. Those theories fail, according to Hess, because the unrebutted evidence establishes that Statoil was not willing to be bound by the AMI Agreement. *See* Aplt. App'x, Vol. XXII, at 3624–25, 206:4–207:5 (Statoil "would not" and "could not" acquire the Tomahawk Prospect leases without knowing the terms of the AMI Agreement).

In their reply brief, Plaintiffs pursued only the first theory of harm.[11] To place that argument in context, Plaintiffs admit that Statoil was entitled to review the contents of the

---

[10] We have already determined that the district court properly granted partial summary judgment in Hess's favor on Plaintiffs' request for reliance damages. *See supra*, Section III(C).

[11] Plaintiffs did not address causation of damages at all in their opening brief. Hess contends this is a waiver. Hess Aplee. Br. at 63 (citing *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1160 (10th Cir. 2013)). We disagree. In *Water Pik*, we declined to consider challenges to a district court's ruling where those challenges were made for the first time in a reply brief. 726 F.3d at 1160. Here, by contrast, Plaintiffs' arguments are not directed toward challenging a district court ruling. Plaintiffs could not know, *ex ante*,

50

AMI Agreement once it acquired the Existing Leases from Hess. Thus, any damage must have occurred, if at all, during the period between Statoil's review of the AMI Agreement during its due diligence, and the date of the Second Assignment, whereby the Existing Leases were transferred to Statoil.

According to Plaintiffs, Hess's breach of the confidentiality provision caused them damages because "Statoil would not have done the [Hess-Statoil Settlement Agreement] otherwise." Aplt. Reply Br. at 39 n.24. They further argued that "Hess's claim that there were [not] many leases left to acquire . . . is obviously contradicted by the fact [that Statoil] acquired over 2500 acres of new leases after [Hess] stopped acquiring new leases." *Id.* It is difficult for us to evaluate this further argument, because it is unaccompanied by any citation to the voluminous record. We cannot discern, for instance, whether Statoil's acquisition of new leases actually occurred within the Tomahawk Prospect, or elsewhere within the much larger Rough Rider Prospect, in which case Statoil's acquisitions are of little relevance. Nor are we convinced that Statoil's acquisition of additional leases in the Tomahawk Prospect would be probative of whether *Hess* would have acquired additional leases. Indeed, Plaintiffs have not referred us to any record evidence contradicting Hess's proffered evidence that (1) Hess did not have a leasing budget or long-term lease acquisition goals for the Tomahawk Prospect, (2) Hess did not believe there were many leases left to acquire, and (3) even after settling

---

what alternative grounds for affirming, if any, that Hess might pursue on appeal, and so we do not fault them for addressing these issues for the first time on reply.

with Statoil, Hess felt free to lease in the Tomahawk Prospect, but declined to act on the opportunities presented for strategic reasons.

On the record before us, summary judgment for Hess is proper because Plaintiffs have not presented a genuine dispute of material fact regarding any damages caused by Hess's purported breach of the AMI Agreement's confidentiality provision. And without proffering evidence in support of one of the elements of their breach of contract claims, Plaintiffs' claims fail as a matter of law, entitling Hess to summary judgment. *See Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137–38 (10th Cir. 2016).

At oral argument, Plaintiffs offered additional reasons as to why they might have been damaged by Hess's breach of the confidentiality provision. *See* Oral Argument Recording 11:21–12:11 (arguing that, but for Hess's breach, Plaintiffs "would have been part of the discussion" and so (a) Statoil might have assumed the AMI Agreement, or, if not, (b) Plaintiffs would have competed for additional leases in the Tomahawk Prospect themselves, having been freed of the AMI Agreement's non-compete provision). But arguments presented to us for the first time at oral argument are waived. *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017). While we do not fault Plaintiffs for not raising these arguments in their opening brief, we do fault them for not including them in their reply brief, which they filed after Hess had put the merits of the confidentiality claims at issue. We can see no justification for Plaintiffs' decision to wait until oral argument to advance these additional damages theories. Therefore, we decline to consider them. *See id.*

In light of our conclusion that Plaintiffs' confidentiality claims fail on the merits, we decline to consider whether the district court was correct to rule that Plaintiffs' confidentiality claims were also time-barred.

## IV.  CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED.